J. Daniel Holsenback, Esq. (SBN 145640)
**J. DANIEL HOLSENBACK, APC**
625 Broadway, Suite 906
San Diego, California 92101
Telephone:      (619) 269-4634
Facsimile:      (619) 269-4635

Attorneys for Plaintiffs Theodore & Lois Koziol

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THEODORE AND LOIS KOZIOL<br>24 Seagoin Road<br>Brick Town, NJ 08723<br><br>                    Plaintiffs,<br><br>            vs.<br><br>THE UNITED STATES OF AMERICA<br>The Executive Office<br>Office of the Legal Adviser<br>Room 5519<br>United States Department of State<br>2201 C Street, NW<br>Washington, DC 20520-6310<br><br>                    Defendants. | Case No. 08cv947-DMS(BLM)<br><br>(E.D. Pa. No. 07-3432)<br><br>**PLAINTIFFS' RESPONSE TO GENERAL ATOMICS CROSS-MOTION TO QUASH OR TO ENTER A PROTECTIVE ORDER**<br><br>Hon.               Barbara L. Major<br>Courtroom:      TBD<br>Date:              August 13, 2008<br>Time:             1:30 p.m.<br><br>              **[FRCP 45]** |

## PLAINTIFFS' RESPONSE  IN OPPOSITION TO GENERAL ATOMICS CROSS-MOTION TO QUASH OR TO ENTER A PROTECTIVE ORDER

        Plaintiffs respectfully request this Court deny General Atomics Aeronautical Systems, Inc.'s (GA-ASI) Motion to Quash or Enter a Protective Order and GA-ASI's request for sanctions against Plaintiffs' counsel.  Alternatively, Plaintiffs' request that the Court enter a reasonable protective order which is limited in scope.

1

## I.    Preliminary Statement

GA-ASI's Motion to Quash or Enter a Protective Order raises the same legal and factual argument as its Response in Opposition to Plaintiff's Motion to Compel.  The only argument not previously raised is GA-ASI's request for sanctions against Plaintiffs' counsel.  Plaintiffs, therefore, will not rehash the same arguments they made in Reply to GA-ASI's Response to the Motion Compel, but will incorporate it by reference.  However, for the convenience of the Court, Plaintiffs now submit a composite exhibit detailing all of the correspondence between Plaintiff's counsel and GA-ASI's counsel over the subpoena and protective order.  (Ex. 1).

## II.    There is No Justifiable Basis for Imposing Sanctions on Plaintiffs' Counsel

Under Federal Rule of Civil Procedure 45(c)(1), the Court has authority to impose sanctions on a party or attorney for issuing and serving an unduly burdensome subpoena.  GA-ASI's argument for sanctions is based entirely on an inaccurate construction of the facts.  Contrary to GA-ASI's position, the record proves that Plaintiffs acted in good faith while GA-ASI engaged in a series of dilatory tactics.  GA-ASI's misconduct with respect to the unconscionable terms of the protective order only occurred after GA-ASI was in direct contact with its subcontractor Rotax[1], a party materially adverse to Plaintiffs' interest, who is being sued in a RICO action.

GA-ASI's arguments for sanctions are all without merit.  The subpoena is enforceable because this Court has jurisdiction to issue a subpoena in connection with the federal FOIA action.  Fed. R. Civ. P. 45 (a)(2)(C) (a *subpoena duces tecum* must be issued by the district court located where the production is to be made).  Moreover, the documents subpoenaed are clearly relevant to the FOIA action.  Plaintiffs filed the FOIA action to obtain evidence that the State Department effectuated service on Rotax in Austria.  The documents subpoenaed have the potential to prove

---

[1]    Rotax has a vested interest in closing the courtroom because if the GA-ASI documents show that every brief, affidavit and deposition of a Rotax employee was false, other lawyers are likely to file their own RICO lawsuits.  That is not an excuse for GA-ASI's attempt to insulate Rotax from liability for perjury.  Accordingly, if the Court decides to enter a protective order, Plaintiffs respectfully request that the Court allow all documents produced to be freely given, without restriction, to State or Federal prosecutors for the purposes of any potential criminal investigations for perjury or obstruction of justice.

Rotax is subject to service in the United States, therby rendering the need to prove foreign service unnecessary. Thus, the documents are central to the FOIA action. *See, e.g., Topol v. Trustees of Univ. of Pa.*, 160 F.R.D. 476, 477 (E.D. Pa. 1995) ("[M]aterial is relevant if it bears on, or reasonably could bear on, an issue that is or may be involved the litigation."). The fact that the documents are also relevant to Plaintiffs' state court action does not provide a basis for GA-ASI to avoid production in connection with the FOIA action. *E.g.*, *Dove v. Atl. Capital Corp.*, 963 F.2d 15, 19 (2d Cir. 1992) ("[W]here the discovery sought is relevant to a good faith defense in the federal case, the mere fact that it may be used in other litigation does not mandate a protective order."); *Cipollone v. Liggett Group, Inc.*, 113 F.R.D. 86, 91 (D. N.J. 1986).

Although GA-ASI contends that the documents subpoenaed contain confidential information and trade secrets, there is nothing on the face of the subpoena that indicates that the documents are the type subject to protection. The documents requested pertain solely to Rotax's amenability to service. The contract related documents Plaintiffs seek pertain to GA-ASI's purchase of Rotax engines, which are then incorporated into the United States Air Force Predator unmanned aircraft. Through FOIA, Plaintiffs received a multitude of publically available documents concerning accident investigations for these faulty Rotax engines and the Air Force's request for a new engine to power the Predator. (Ex. 2). As the United States Government feels that sensitive information such as accident investigations of the Rotax engine system is unprotected from public access, there is no privilege or right that protects GA-ASI from disclosing the benign categories of documents Plaintiffs request. Plaintiffs agreed to negotiate a workable protective order as a courtesy to GA-ASI and to facilitate discovery without court intervention. However, once Rotax asserted its influence in the negotiation process, the demands of GA-ASI became unbearable and have resulted in a breakdown of negotiations.

GA-ASI must show good cause for this Court to issue a protective order. Fed. R. Civ. P. 26(c)(1); *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210 (9th Cir. 2002). Good cause exists when the moving party proves that "specific prejudice or harm will result if no protective order is granted." *Id.* at 1210-11. GA-ASI's unsubstantiated claim that the documents contain confidential proprietary information is insufficient to justify a protective order.

*See, e.g., Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982) (rejecting defendant's argument that certain documents were confidential and should be placed under seal because "a naked conclusory statement that publication of the Report will injure the bank in the industry and local community falls woefully short of the kind of showing which raises even an arguable issue as to whether it may be kept under seal."), *cert. denied*, 460 U.S. 1051 (1983).

Alternatively, if the Court finds that GA-ASI is entitled to a protective order, such an order must be limited in scope. GA-ASI's proposed order is unduly burdensome on Plaintiffs because it requires Plaintiffs to agree to two unconscionable provisions. (*Wolk Declaration* ¶ 4; Ex. 3). There is no justification for requiring Plaintiffs to request that the courtroom be closed during the time when GA-ASI's documents are disclosed. Forcing Plaintiffs to make such request when the documents contain no confidential information would undermine Plaintiffs counsel's credibility with the court. Additionally, GA-ASI's provision imposing automatic sanctions for inadvertent disclosures without the option to cure is patently unfair. Inadvertent mistakes happen during litigation. Imposing automatic sanctions would restrict Plaintiffs use of the documents out of fear retaliation for an innocent mistake.

Plaintiffs and GA-ASI have negotiated over the scope and terms of this subpoena since February of 2008. Plaintiffs' rely on their composite exhibit as evidence that they negotiated in good faith and made every attempt to make compliance with the subpoena inexpensive and simple for GA-ASI. (Ex. 1). A review of the record presented shows that it is GA-ASI that has refused to negotiate in good faith. Plaintiffs have taken all necessary steps to minimize the burden on GA-ASI. Under the facts and circumstances of the instant case, it is clear that there is no basis for this Court to conclude that Plaintiffs' counsel abused the subpoena power. Any unnecessary delays or costs GA-ASI incurred was caused by its own misconduct. Accordingly, GA-ASI's request for sanctions must be denied.

**III.    Conclusion**

Based on the arguments and evidence presented, Plaintiffs respectfully request this Court to deny GA-ASI's Motion to Quash or Enter a Protective Order. If the Court enters a protective order, Plaintiffs' request that such order be limited in scope and eliminate the two unconscionable

4

1  provisions GA-ASI is requesting.   Finally, as there is no justifiable legal basis for imposing

2  sanctions on Plaintiffs' counsel, GA-ASI's request for sanctions must also be denied.

3  / / /

J. DANIEL HOLSENBACK, APC


By:   s/ J. Daniel Holsenback
      J. Daniel Holsenback
      Attorney for Plaintiffs
      Theodore & Lois Koziol

5

**Kozoil v. United States of America**
**USDC, Southern District of California, Case No. 3:08-cv-00947-DMS-BLM**

### PROOF OF SERVICE

I am a resident of the State of California, over the age of 18 years and not a party to the within action. My business address is HOLSENBACK APC, 625 Broadway, Suite 906, San Diego, California 92101.

On July 11, 2008, I caused to be electronically filed the foregoing document(s), described as:

**PLAINTIFFS' RESPONSE TO GENERAL ATOMICS CROSS-MOTION TO QUASH OR TO ENTER A PROTECTIVE ORDER;**

**DECLARATION OF ARTHUR ALAN WOLK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO GA-ASI'S MOTION TO QUASH OR ENTER A PROTECTIVE ORDER;**

with the Clerk of the United States District Court for the Southern District of California, using the CM/ECF System. The Court's CM/ECF System will send an e-mail notification of the foregoing filing to the following parties and counsel of record who are registered with the Court's Cm/ECF System:

Paul A. Tyrell, pat@procopio.com
United States Attorneys' Office, efile.dtk.civ@usdoj.gov
Daniel A. Lowenthal, dalowenthal@pbwt.com
Sarah Goodstine, sgoodstine@pbwt.com

Pursuant to the CM/ECF System, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities.

I declare penalty of perjury under the laws of the State of California, that the above is true and correct.

Executed on July 11, 2008, at San Diego, California.


/s/ Patrick  Todd
Patrick Todd

**PROOF OF SERVICE**

J. Daniel Holsenback, Esq. (SBN 145640)
**J. DANIEL HOLSENBACK, APC**
625 Broadway, Suite 906
San Diego, California  92101
Telephone:      (619) 269-4634
Facsimile:      (619) 269-4635

Attorneys for Plaintiffs Theodore & Lois Koziol

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THEODORE AND LOIS KOZIOL<br>24 Seagoin Road<br>Brick Town, NJ 08723<br><br>                              Plaintiffs,<br><br>                    vs.<br><br>THE UNITED STATES OF AMERICA<br>The Executive Office<br>Office of the Legal Adviser<br>Room 5519<br>United States Department of State<br>2201 C Street, NW<br>Washington, DC 20520-6310<br><br>                              Defendants. | Case No. 08cv947-DMS(BLM)<br><br>(E.D. Pa. No. 07-3432)<br><br><br><br>**DECLARATION OF ARTHUR ALAN WOLK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO GA-ASI'S MOTION TO QUASH OR ENTER A PROTECTIVE ORDER**<br><br>Hon.           Barbara L. Major<br>Courtroom:   TBD<br>Date:          August 13, 2008<br>Time:          1:30 p.m.<br><br>**[FRCP 45]** |

I, Arthur Alan Wolk, declare:

1.   I represent Plaintiffs in the above-referenced action in their effort to compel production of documents pursuant to subpoenas issued by this District Court to non-party General Atomics as part of the discovery process in <u>Koziol v. USA</u>, E.D. Pa.  No. 07-3422.

1

1       2. To the best of my knowledge Composite Exhibit 1 contains true and correct copies of the

2   correspondence I had with GA-ASI's counsel to negotiate the scope and terms of the subpoena and

3   protective order. All of the correspondence took place between March 5, 2008 and July 1, 2008.

4       3. Composite Exhibit 2 contains true and accurate copies of a sampling of the documents

5   Plaintiffs received in connection with their FOIA requests.  The documents concern accident

6   investigations for the faulty Rotax engines and the Air Force's request for a new engine to power the

7   Predator.

8

9       4. I have negotiated hundreds of Protective Orders and Confidentiality Agreements in my forty

10  year career litigating air crash cases.  The allegation by GA-ASI that the protective order it

11  proposed is standard is contrary to my experiences.

12      5. Composite Exhibit 3 contains true and accurate copies of other protective orders and

13  confidentiality agreements negotiated by our firm.  None of these orders contain a provision which

14  imposes automatic sanctions for inadvertent disclosure or requires my firm to request to close the

15
    courtroom before using the documents at issue.  The documents sought to be protected by those
16
    orders, unlike the documents sought to be protected by GA-ASI, are sensitive drawings, pictures
17

18  and secrets. Notwithstanding the real sensitivity of those documents, the sample orders Plaintiffs

19  present are far less draconian.

20

21
        I declare under penalty of perjury that the foregoing is true and correct.  Executed in
22
    Philadelphia, PA on July 11, 2008.
23

24

25                 Respectfully submitted,

26

27                 Arthur Alan Wolk

28

# Exhibit 1

**From:** Cheryl DeLisle
**Sent:** Wednesday, March 05, 2008 4:09 PM
**To:** Arthur Alan Wolk
**Cc:** Cynthia Devers
**Subject:** Koziol

Dan Lowenthal (212-336-2720) called in response to the subpoena served on his client, General Atomics.  Please call him.

Cheryl DeLisle
THE WOLK LAW FIRM
1710-12 Locust Street
Philadelphia, PA 19103
(215) 545-4220
Fax:  (215) 545-5252

---

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Friday, March 07, 2008 6:27 PM
**To:** Arthur Alan Wolk
**Cc:** Goodstine, Sarah (x2476)
**Subject:** Koziol Subpoena to General Atomics

Art,

I write on behalf of our client General Atomics International Services Corporation. Pursuant to our call today, this confirms that you have agreed to the following:

(1) to adjourn the date and time for General Atomics to respond to the Subpoena issued to General Atomics in Koziol v. United States of America, Civ. No. 07-3432 (E.D. Pa.), to a date no earlier than 30 days after you provide written notice to General Atomics to respond to the Subpoena; and

(2) to propose language early next week to narrow the scope of the 10 document production requests set forth in the Subpoena.

We also understand that the time frame for the production sought is 2000 to 2004.

Pursuant to your request, my contact information is set forth below.

Regards,

Dan

Daniel A. Lowenthal
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Direct: 212-336-2720
Cell: 914-980-3794
Fax: 212-336-1253
dalowenthal@pbwt.com
www.pbwt.com

-----------------------------------------------

Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

-----------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

===============================================================================
-----------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

-----------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

===============================================================================

**From:** Arthur Alan Wolk
**Sent:** Saturday, March 08, 2008 5:06 PM
**To:** Lowenthal, Daniel A. (x2720); Cynthia Devers
**Cc:** Paul Rosen; Andrew DeFalco
**Subject:** RE: Koziol Subpoena to General Atomics

Dan,

I understood our conversation a little differently. I thought you were going to check with your client to see if it wanted to litigate or fight the subpoena, whether it wanted to allow you to accept service of a subpoena that added the suffix to your client's identification, a suffix missing in anything I can find on them as the call themselves "General Atomics" and they clearly knew who we were serving, what we were after and which of their unidentified companies was to be responding. I may be mistaken that you first wanted a limitation of the scope of the subpoena before you approached your client but since it has house counsel I am quite sure the determination has already been made as whether the scope is onerous or not. I believe it is not.

I met with RICO counsel this morning and they suspect, as do I, that General Atomics is in paper chase mode and we will have to fight to get compliance so I have elected to do the following:

1. You may disregard the subpoena return date as I agreed but if I respectfully urge General Atomics (whatever) to start assembling documents as I will not grant extensions when they are re-served since they and you know what we are looking for. You may consider April 5th, the day to either object or produce documents under the subpoena served. As to any other subpoena no such extension will be granted other than to make production.

2. When I re-serve, likely under and in the RICO case we shall provide the suffix you directed but will verify with the contracts I have from the Air Force whether that is appropriate given the subject matter and may serve other General Atomics entities or employees.

3. The person most knowledgeable about it's contacts with Rotax will likely be deposed after the documents have been received if we are required to litigate as our RICO case is based upon a nationwide conspiracy to hide Rotax's presence in the United States to avoid jurisdiction and we would have to see of General Atomics was complicit by stonewalling this information. This in no manner should be misconstrued as a threat of litigation. It is a statement of what our litigation is about and why we must be cautious in the RICO case about that subject.

3. I am asking that your client not dispose of any documents that would be responsive to the items mentioned in the subpoena you have already been served with since the re-service is in our view an utter waste of time and money.

As to the matters in the served subpoena, as I explained, in consideration of a willingness to comply, I would reduce the relevant time frame from 2000 to 2004 even though it would relevant, admissible evidence of Rotax's continuing contacts with the U.S. to have a larger time frame. I reserve the right to request that in any re-served subpoena.

As I further explained the purpose of the subpoena was not to be intrusive to General Atomics, to be certain that it was done at least cost and inconvenience to the company and without unnecessary cost of litigation. It was to obtain evidence of Rotax's continuous involvement in soliciting, seeking and shipping engines into the U.S. for use in products General Atomics makes and to verify the names of the individuals from Rotax making trips into the United States for that purpose. I am not interested in processes, secrets, proprietary data or anything that would embarrass or harm General Atomics competitively. Indeed I am willing to keep confidential except for use in the RICO or Products cases any such document, file them under seal and return any copies after the case is over of that would be of assistance tro General Atomics.

Toward that end and without prejudice to our rights to conduct further discovery or enlarge the scope of any subsequently served subpoena, I ask that you consider producing documents in the following categories for the

period above.

1. Any notes, memos or letters that confirm the presence of Rotax personnel in the U.S.

2. Any documents that confirm the presence of Rotax personnel at the General Atomics facilities in the U.S.

3. Any documents that relate to the shipment of Rotax engines into the United States.

4. Any documents that confirm or relate to Rotax's involvement in accident investigations involving Rotax engines.

5. Any reports of accident investigations involving failures of Rotax engines.

6. Any document that concerns or relates to Rotax's business activities in the United States with General Atomics during the time period.

7. These request include any company acting as agent for or representative of Rotax including but not limited to Bombardier Rotax (including all suffixes), Rotax (including all suffixes) Kodiak (Including all suffixes like Kodiak Research, Rotech etc.) and any other company that serves as the agent, importer, alleged independent shipper of Rotax engines.

8. Correspondence relating to the sale, purchase or malfunctions of Rotax engines with any of those entities described in par. 7.

I would appreciate your letting me know early next week of your client's intentions.

Arthur

**From:** Cynthia Devers [mailto:cyndi@airlaw.com]
**Sent:** Monday, March 10, 2008 10:15 AM
**To:** Lowenthal, Daniel A. (x2720)
**Cc:** Paul Rosen; Andrew DeFalco; Arthur Alan Wolk
**Subject:** RE: Koziol Subpoena to General Atomics

Dan:

We would like to amend the requests listed in the previous e-mail pasted below to include the following:

9. Any and all contracts, specifications, purchase orders, invoices, bills of lading, reports, notes, correspondence, electronic data, and/or other documents regarding the testing, sale, and/or shipment of Rotax engines to The Naval Air Warfare Center Aircraft Division in Lakehurst, New Jersey.
10. Any and all contracts, specifications, purchase orders, invoices, bills of lading, reports, notes, correspondence, electronic data, and/or other documents regarding the testing, sale, and/or shipment of Rotax engines to The U.S. Army Communications Electronic Command in Fort Monmouth, New Jersey.

Thanks,

Cynthia Devers, *Law Clerk*

---

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Monday, March 10, 2008 6:14 PM
**To:** Arthur Alan Wolk
**Cc:** Goodstine, Sarah (x2476)
**Subject:** Koziol Subpoena to General Atomics

Arthur,

We will proceed with the understanding that April 5 is the adjourned deadline for General Atomics to respond to your subpoena, with Exhibit B to the subpoena modified by both your email on Saturday and Cynthia Devers' email earlier today (both of which appear below), and that the time frame for the documents requested is 2000-2004.

Dan

**From:** Arthur Alan Wolk
**Sent:** Monday, March 10, 2008 6:42 PM
**To:** Lowenthal, Daniel A. (x2720)
**Cc:** Cynthia Devers
**Subject:** RE: Koziol Subpoena to General Atomics

Dan,

I will amend Nos 9 and 10 in an effort to make it easier and less cumbersome for your client to respond by editing them below. However I was of the clear understanding that you were to let me know this week your client's intentions and not wait until April 5 to object. If the latter is your intention I will give you a week to object until March 17th to do that. You file your objections by the close of business that day.

I have requested RICO counsel to obtain letters rogatory in the event you feel it is a more prudent course to litigate.

The April 5th date was for you to produce documents. Why would I give someone a month to object, it was a courtesy to you and your client to gather the documents in the spirit of cooperation?

Just so you understand Bombardier, Rotax, Kodiak and their lawyers are defendants in a RICO action for obsructing justice nationwide by conspiring to hide information concerning their business activities in this country and New Jersey and Florida in particular. They have already lost a Motion to Dismiss. Please be guided accordingly.

No. 9 will be amended to read
Any document that concerns or relates to business activities of Rotax or Bombardier Rotax in the State of New Jersey including but not limited to contacts with the U.S. Army Communications, Electronics Command in Fort Monmouth, New Jersey.

No 10 will be amended to read:
Any document that concerns or relates to business activities of Rotax or Bombardier Rotax in the State of New Jersey including but not limited to contacts with the United States Navy and/ or the United States Navy Air Warfare Center, Aircraft Division, Lakehurst New Jersey.

You may consider this subpoena served on any General Atomics entity at the served address with access to or right to access the information requested.

The purpose of these amendements is to further reduce the time and effort requested of your client to obtain documents responsive to the requests. We will not re-serve the subpoena in this case as my research indicates it is properly served.

Thanks,

Arthur

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Thursday, March 13, 2008 12:05 PM
**To:** Arthur Alan Wolk
**Cc:** Goodstine, Sarah (x2476)
**Subject:** Koziol Subpoena

Dear Arthur:

In our continued effort to cooperate with the subpoena issued by Plaintiffs Koziol in Koziol v. United States of America, Civ. No. 07-3432 (E.D. Pa.) to General Atomics, we have worked to determine the scope of the production encompassed by your requests.

We do not concede that General Atomics Aeronautical Services, Inc. (GA-ASI) is subject to the subpoena issued to General Atomics (GA). Nevertheless, in an effort to make this process as efficient as possible, we have asked both GA and GA-ASI to scope the production. Although we do not concede that the subpoena received by GA also requires a response from GA-ASI, both GA and GA-ASI voluntarily agreed to determine the potential volume of documents.

The estimate is that production would take a significant amount of time and could result in as many as 100 boxes of documents.

This level of production presents an extraordinary and undue burden.

We propose that each of the requests within the subpoena be amended to command production of "documents sufficient to show" the underlying facts you propose to illicit with each of your subpoena requests.

If you are willing to agree to this reduction in scope, we propose to open a dialogue with you regarding sufficiency and proceed according to the timeframe you initially agreed to - that is, 30 days from the receipt of written notice from you of such deadline.

Dan


Daniel A. Lowenthal
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Direct: 212-336-2720


7/10/2008

Cell: 914-980-3794
Fax: 212-336-1253
dalowenthal@pbwt.com
www.pbwt.com

----------------------------------------------

Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

----------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

===============================================================================

**From:** Arthur Alan Wolk
**Sent:** Thursday, March 13, 2008 12:38 PM
**To:** 'Lowenthal, Daniel A. (x2720)'
**Cc:** 'Andrew DeFalco'
**Subject:** RE: Koziol Subpoena

Dan,

It just occurred to me after re-reading your e-mail.
Are you going to produce the reduced volume of documents by the 5th of April? That is my interpretation but I want to make sure we are on the same page?
Thanks,
Arthur

## Jessica Toplin

| | |
|---|---|
| **From:** | Lowenthal, Daniel A. (x2720) [dalowenthal@pbwt.com] |
| **Sent:** | Thursday, March 13, 2008 6:08 PM |
| **To:** | Arthur Alan Wolk |
| **Cc:** | Goodstine, Sarah (x2476) |
| **Subject:** | Koziol Subpoena |

Arthur:

In the course of our continued and ongoing negotiations over production pursuant to the subpoena issued by Plaintiff Koziol in Koziol v. United States of America, Civ. No. 07-3432 (E.D. Pa.), by telephone today, we agreed to the following:

(1) In place of all prior dates and deadlines that have been set by you and by us so far, by the close of business on Wednesday March 19, 2008, we will let you know the timeframe within which we can produce a sample of documents sufficient to show each of the requests within your subpoena to the extent documents exist for each request.

(2) A protection order must be in place prior to production of any documents, and you will send to us a proposed draft protective order pursuant to which documents may be produced.

Dan


Daniel A. Lowenthal
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Direct: 212-336-2720
Cell: 914-980-3794
Fax: 212-336-1253
dalowenthal@pbwt.com
www.pbwt.com


----------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

7/9/2008

------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

============================================================================

**From:** Goodstine, Sarah (x2476) [mailto:sgoodstine@pbwt.com]
**Sent:** Wednesday, March 19, 2008 6:27 PM
**To:** Arthur Alan Wolk
**Cc:** Lowenthal, Daniel A. (x2720)
**Subject:** Koziol Subpoena

Dear Arthur:

We write to let you know the timeframe within which we can produce a sample of documents sufficient to show each of the requests within your subpoena, to the extent documents exist for each request.

We understand that GA and GA-ASI are in the process of collecting documents and we anticipate that we will be able to produce a sample of documents from the categories from which documents are available by April 5, 2008.

As stated previously, a protection order must be in place prior to production of any documents. Please provide to us a proposed draft protective order.

Sarah

Sarah Goodstine, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas, NY, NY 10036
P: 212.336.2476
E: sgoodstine@pbwt.com
F: 212.336.7952

**From:** Arthur Alan Wolk
**Sent:** Wednesday, March 19, 2008 6:38 PM
**To:** Goodstine, Sarah (x2476)
**Subject:** RE: Koziol Subpoena

Sarah

Thanks, working on it.

Arthur

**From:** Arthur Alan Wolk
**Sent:** Wednesday, March 19, 2008 8:45 PM
**To:** Goodstine, Sarah (x2476)
**Subject:** RE: Koziol Subpoena

Dear Sarah,

See if this works for your client. It is simple but accomplishes I think what you and your client will want but let me know what additional terms are important and I will try to accommodate you.

Confidentiality Agreement

All documents produced pursuant to a subpoena issued against GA by the United States District Court for the Southern District of California and served upon responding entities GA and GA-SI shall be presumed confidential unless specifically waived in writing by the producing entity.
These documents may be used in litigation between certain parties and Bombardier-Rotax entities, Rotax entities, Kodiak Research or affiliates or subsdiaries thereof and others but only if such documents are placed in an envelope marked confidential and then supplied to the court with a request that they be treated as if produced under seal.
Copies of these documents may be provided to other litigants provided they agree with the terms of this confidentiality agreement.
Once the litigation and related actions are over and all appeals have been exhausted, these documents shall be returned to the responding parties' counsel or destroyed upon his direction.
Nothing in this agreement shall prevent recipients from utilizing the documents for all purposes permitted by the Rules of Civil Procedure of the relevant Court.
If in the event, the relevant court decides that the documents produced may not be filed under seal, nonetheless the recipients shall file such documents in an envelope as if they were and shall treat them as such to the extent practicable.
Even if the relevant court were to determine that the documents were either not worthy of protection as confidential or were compromised, they shall nonetheless be returned or destroyed at the end of proceedings as if their were under seal and confidential.
In the event copies of the produced documents are supplied to experts or other consultants, they shall be required to see this agreement and accede to its terms. At the close of proceedings experts or consultants shall return or destroy all copies of the documents as counsel for the producing entity directs.

**From:** Arthur Alan Wolk
**Sent:** Wednesday, March 19, 2008 10:16 PM
**To:** Arthur Alan Wolk
**Subject:** RE: Koziol Subpoena

Dear Sarah,

I don't think an order is going to work as that is going to require me to get approval either from this court or the New Jersey Court which will either delay production or perhaps we may not be able to get one because these documents are not really confidential. I just suggested that we treat them as such to give your client an additional comfort level.
I think the agreement should be okay for now.

Arthur

**From:** Goodstine, Sarah (x2476) [mailto:sgoodstine@pbwt.com]
**Sent:** Wednesday, April 02, 2008 4:49 PM
**To:** Arthur Alan Wolk
**Cc:** Lowenthal, Daniel A. (x2720)
**Subject:** Koziol Subpoena


Dear Arthur:

Further to my e-mail dated March 19, 2008, I write to update you on the timeframe within which we anticipate that we can produce a sample of documents sufficient to show each of the requests within your subpoena, to the extent documents exist for each request.

We have received documents and are well into the process of our review of the documents. We will provide you with a draft protective order to govern the production of the documents in the near future.

As we discussed previously, in an effort to facilitate the process of responding to your subpoena, we have initiated efforts to collect documents from General Atomics Aeronautical Systems, Inc. ("GA-ASI") even though the operative subpoena dated February 21, 2008 was issued to General Atomics ("GA") and is not, as a matter of law, applicable to GA-ASI. Because GA is not synonymous with GA-ASI, please serve a separate subpoena on GA-ASI, pursuant to which GA-ASI may produce documents. In an effort to avoid additional expense, we agree to accept service of the subpoena on behalf of GA-ASI.

Regards,
Sarah


Sarah Goodstine, Esq.

Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas, NY, NY 10036

P: 212.336.2476

E: sgoodstine@pbwt.com

F: 212.336.7952


------------------------------------------------
Privileged/Confidential Information may be contained in this message. If you are no the addressee indicated in this message (or responsible for delivery of the message such person), you may not copy or deliver this message to anyone. In such case, you

should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================================

**From:** Arthur Alan Wolk
**Sent:** Thursday, April 03, 2008 9:49 AM
**To:** Goodstine, Sarah (x2476)
**Subject:** RE: Koziol Subpoena

Thank you. Subpoena will be e-mailed to you tomorrow. Send me a draft of the protective order as soon as you can but I thought we discussed an agreement rather than an oredr which you can convert to an order if there is a breach.

Hope to hear from you soon.

Arthur

**Jessica Toplin**

| | |
|---|---|
| **From:** | Goodstine, Sarah (x2476) [sgoodstine@pbwt.com] |
| **Sent:** | Friday, April 04, 2008 10:53 AM |
| **To:** | Arthur Alan Wolk |
| **Cc:** | Lowenthal, Daniel A. (x2720) |
| **Subject:** | Protective Order |
| **Attachments:** | GA and GA-ASI Protective Order.DOC |

Dear Arthur:

I have attached below a draft protective order which will govern the production of documents pursuant to the subpoena dated February 21, 2008 you served on General Atomics, and the subpoena you have agreed to serve (via electronic mail to us) on General Atomics Aeronautical Systems, Inc.

Please let me know if you have any questions.

Sarah


<<GA and GA-ASI Protective Order.DOC>>

Sarah Goodstine, Esq.

Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas, NY, NY 10036

P: 212.336.2476

E: sgoodstine@pbwt.com

F: 212.336.7952

------------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================

7/9/2008

COUNSEL LISTED ON LAST PAGE

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### SAN DIEGO DIVISION

| | |
|---|---|
| THEODORE AND LOIS KOZIOL, | ) Miscellaneous No._____ |
| | ) |
| *Plaintiffs,* | ) Civ. No.: 07-3432 |
| | ) Eastern District of Pennsylvania |
| v. | ) |
| | ) **JOINT MOTION FOR** |
| | ) **STIPULATED** |
| | ) **PROTECTIVE ORDER** |
| UNITED STATES OF AMERICA, | ) **REGARDING** |
| | ) **CONFIDENTIAL MATERIALS** |
| *Defendant.* | ) **REQUESTED BY SUBPOENA** |
| | ) **TO NON-PARTIES** |
| | ) **GENERAL ATOMICS AND** |
| | ) **GENERAL ATOMICS** |
| | ) **AERONAUTICAL SYSTEMS, INC.** |
| | ) |
| | ) Date: |
| | ) Time: |
| | ) Dept: |
| | ) Judge: |

**WHEREAS,** non-parties General Atomics ("GA") and General Atomics Aeronautical

Systems, Inc. ("GA-ASI") (each a "Producing Non-Party," collectively, the "Producing Non-

Parties") and Theodore and Lois Koziol, Plaintiffs in the action captioned <u>Koziol v. United</u>

<u>States of America</u>, Civ. No. 07-3432 (E.D. Pa.) (the "Action") believe that the information

encompassed by the subpoenas dated February 21, 2008 and [_____] issued

by Plaintiffs Koziol to GA and GA-ASI in connection with the Action (the "Subpoenas"), may

constitute trade secrets or other confidential research, development and/or proprietary

commercial information within the meaning of Rules 26 and 45 of the Federal Rules of Civil

Procedure and/or any other applicable Local Rule of the Court, GA, GA-ASI and Plaintiffs

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.          1          CASE NO. 07-3432 (E.D. Pa.)
MISCELLANEOUS NO. _____

1445114v.4

Koziol, by their respective counsel, hereby agree and stipulate to the following provisions concerning the confidentiality of certain documents, information and/or testimony exchanged or obtained pursuant to the Subpoenas in the Action; and

**IT IS HEREBY ORDERED** that:

1.      This Protective Order shall govern the receipt, use and handling of all information, including documents (including graphic and electronically stored information) or depositions, or any portions, copies, excerpts, or summaries thereof, things, testimony, and any other form of evidence or discovery contemplated under Rules 26 through 36 and 45 of the Federal Rules of Civil Procedure that is produced or otherwise disclosed by the Producing Non-Parties in connection with, or in response to the Subpoenas (the "Material").

2.      All Material produced or disclosed pursuant to the Subpoenas shall be used solely for the purposes of the Action, and no person shall make use of the Material in any other legal proceeding, whether in the United States or elsewhere, or make any other use of the Material whatsoever. All Material shall be disclosed only to those persons identified in Paragraph [6] (the "Receiving Parties"), and only to the extent that such Receiving Parties use the Material solely with respect to the conduct of the Action.

3.      All Material produced or disclosed by any Producing Non-Party consists entirely of "Confidential Information," which may include, but is not limited to, proprietary business information, trade secrets or other confidential research, development, personal, manufacturing, supply, distribution, purchasing, financial, licensing, marketing, risk management, operations, product analysis or commercial information, and will be deemed "Confidential" and subject to this Protective Order.

4.      All documents (including copies, portions or summaries thereof ) and physical objects produced or disclosed by any Producing Non-Party shall be deemed in their entirety to be "Confidential" and will be subject to this Protective Order without any requirement for

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.        2        CASE NO. 07-3432 (E.D. Pa.)
                                                              MISCELLANEOUS NO. _____

1445114v.4

the Producing Non-Parties to stamp or affix a specific designation to any documents or physical objects identifying such documents or physical objects as "Confidential."

5.        Testimony or information disclosed at a deposition may be designated by a Producing Non-Party as Confidential Information by indicating on the record at the deposition the specific testimony which contains the Confidential Information that is to be made subject to the provisions of this Protective Order.  Alternatively, a Producing Non-Party may designate testimony or information disclosed at a deposition as Confidential Information by notifying the recipient of the Confidential Information in writing within thirty (30) days of receipt of the deposition transcript of the specific pages and lines of the transcript that are to be so designated.  Whether or not designation is made at the time of a deposition, all depositions shall be treated as Confidential Information from the time of the taking of the depositions until thirty (30) days after receipt of the deposition transcript.

6.        Confidential Information may be disclosed only in accordance with Paragraph [7] below, and only to the following persons:

(a)        Counsel of record in the Action;

(b)        The Court, Court reporters, stenographers, videographers, and/or Court personnel;

(c)        Deponents noticed or subpoenaed in the Action, to the extent necessary to examine such deponents or to prepare them for deposition;

(d)        Independent photocopying or litigation support services employed by the persons or their counsel to assist in the Action; and

(e)        Any other person to whom the Producing Non-Party agrees in writing.

7.        Any person being given access to Confidential Information shall, prior to being given such access, be advised of the terms of this Protective Order and shall thereby become subject to such terms, including, without limitation, the provision that such Confidential Information may not be disclosed to any person or in any manner other than as described

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.        3        CASE NO. 07-3432 (E.D. Pa.)
MISCELLANEOUS NO. _____

1445114v.4

above, and shall be used solely for the purpose of the Action. In addition, no person described in Paragraph [6] above may be given access to Confidential Information, until and unless such person has executed an undertaking in the form attached as <u>Exhibit A</u> (the "Confidentiality Undertaking"), which undertaking shall be obtained and maintained by the attorney of record who provides such Confidential Information. If a party to the Action wishes to examine such a person with respect to Confidential Information, but such person refuses to execute the Confidentiality Undertaking, the party may not use the Confidential Information for the examination without an Order from the Court requiring the person to treat the Confidential Information subject to the terms of this Protective Order.

8.       Any Receiving Party who wishes to file Confidential Information with the Court as part of any motion, paper or other filing with the Court shall move for permission to file such documents under seal. Such motion shall accompany the filing that includes Confidential Information. Any filing that is to be kept in whole or in part under seal pursuant to this Order shall be filed in the Clerk's Office in a sealed envelope or other appropriate sealed container on which shall be endorsed the title and docket number of this action, an identification of the nature of the contents of the sealed envelope or container, and a statement substantially in the following form:

> CONFIDENTIAL (OR Highly Confidential) INFORMATION SUBJECT TO PROTECTIVE ORDER ENTERED IN CIVIL ACTION NO.
> _____. This envelope, containing documents that are filed in this case by [name of person], is not to be opened nor are the contents thereof to be displayed or revealed except by Order of the Court.

If the Court decides that the Material may not be filed under seal, the Receiving Party shall nonetheless file such documents in an envelope as if they were and shall treat them as such to the extent practicable.

9.       Any Producing Non-Party may redact or excise information subject to the attorney-client and/or work product privileges. Documents and things that have been redacted

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.       4       CASE NO. 07-3432 (E.D. Pa.)
                                                        MISCELLANEOUS NO. _____

1445114v.4

shall bear the identification "REDACTED" in the locations on the documents and things where such matter has been redacted.  If produced copies have been so redacted or excised, the Producing Non-Party will maintain complete originals which will be available to the Court in accordance with any Order by the Court.

10.      If Confidential Information produced in accordance with this Order is disclosed to any person other than in the manner authorized by this Order, the person responsible for the disclosure shall immediately bring all pertinent facts relating to such disclosure to the attention of all counsel of record and, without prejudice to other rights and remedies available to the Producing Non-Parties, make every effort to obtain the return of the disclosed Confidential Information and prevent further disclosure of such Confidential Information.

11.      Any person who receives Confidential Information shall be subject to contempt of court and discovery sanctions (including without limitation, an award of reasonable attorneys' fees) in the event that such person discloses Confidential Information to persons not authorized by Paragraph [6] above or uses such Confidential Information for any other purpose than the Action.

12.      Nothing in this Order shall prevent a Receiving Party from using Confidential Information at depositions, trial, during a hearing, or the like, in accordance with the restrictions herein.  However, the Receiving Party using such Confidential Information must do the following:

      (a)      Prior to the use of the Confidential Information at a trial, hearing, or the like, the Receiving Party must request the Court to close the courtroom during the presentation of any Confidential Information disclosed in such motion, hearing, or trial; and

      (b)      Following the use of the Confidential Information at a trial, hearing, or the like, the Receiving Party must request that the portion of the proceeding where said use is made shall be designated as "Confidential

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.          5          CASE NO. 07-3432 (E.D. Pa.)
                                                                                        MISCELLANEOUS NO. _____

1445114v.4

Information" and that the transcript of that portion of the proceeding be maintained under seal in accordance with Paragraph [8], with access thereto limited to persons entitled to access under this Protective Order.

13.     Nothing in this Protective Order in any manner:

(a)     may be construed as an agreement or admission that any information, document or the like, designated as Confidential Information is in fact confidential or a trade secret;

(b)     waives any objection to the relevancy, materiality or admissibility of any Material or any other information or document or to the applicability of the Subpoenas to any Producing Non-Party;

(c)     waives any claims or defenses that may apply; or

(d)     defines the scope of material to be produced in response to the Subpoenas.

14.     Neither the entry into this Stipulation and Protective Order nor the designation of any information, document, or the like as Confidential Information hereunder shall constitute evidence with respect to any issue in any action.

15.     If any Producing Non-Party, through inadvertence, produces any document or information that it believes is immune from discovery pursuant to the attorney-client privilege or the work product privilege, such production shall not be deemed a waiver of any privilege, and the Producing Non-Party may give written notice to the recipient that the document or information produced is deemed privileged and that return of the document or information is requested. Upon receipt of such written notice, the recipient shall immediately gather the original and all copies of the document or information of which the Receiving Party is aware and shall immediately return the original and all such copies to the Producing Non-Party.

16.     Within sixty (60) days after the final conclusion of the Action, all documents, objects, and other materials produced or designated as Confidential Information, and all

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.          6          CASE NO. 07-3432 (E.D. Pa.)
                                                                 MISCELLANEOUS NO. _____

1445114v.4

reproductions thereof, shall be returned to the Producing Non-Party or shall be destroyed, at the option of counsel to the Producing Non-Party of Confidential Information.

17.        This Order is without prejudice to the right of the Producing Non-Party or the Producing Non-Parties to seek relief from the Court, to impose additional restrictions on the disclosure of any information or material produced.

18.        The term "person" or "recipient" as used in this Protective Order will be interpreted broadly to include, without limitation, any corporation, company, partnership or individual.

19.        If any terms hereof or the application thereof to any person or circumstance shall be determined to be null and void, ineffectual, invalid, or unenforceable by any competent tribunal, the remaining terms hereof and the application of such term to persons or circumstances other than to those which were determined to be invalid or unenforceable shall not be affected thereby and shall continue in full force and effect.

20.        The provisions of this Protective Order shall continue to be binding and survive termination of the Action.

All counsel have agreed to the form and entry of this Order.



JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.        7        CASE NO. 07-3432 (E.D. Pa.)
                                                            MISCELLANEOUS NO. _____

1445114v.4

**IT IS SO STIPULATED:**

Dated: _____  By: _____
                              Arthur Alan Wolk

                              THE WOLK LAW FIRM
                              1710-12 Locust Street
                              Philadelphia, PA 19103
                              (215) 545-4220
                              (215) 545-5252
                              *Attorneys for Plaintiffs Theodore and Lois Koziol*

Dated: _____  By: _____
                              Paul A. Tyrell

                              PROCOPIO, CORY, HARGREAVES & SAVITCH   LLP
                              530 B Street, Suite 2100
                              San Diego, CA 92101
                              (619) 238-1999
                              (619) 235-0398 facsimile

Dated: _____  By: _____
                              Daniel A. Lowenthal (*pro hac vice* admission pending)

                              PATTERSON BELKNAP WEBB & TYLER LLP
                              1133 Avenue of the Americas
                              New York, New York 10036
                              Telephone:  (212) 336-2720
                              Facsimile:  (212) 336-2222

                              *Attorneys for General Atomics and General Atomics
                              Aeronautical Systems, Inc.*

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.        8    CASE NO. 07-3432 (E.D. Pa.)
                                                        MISCELLANEOUS NO. _____

1445114v.4

1  **It Is So Ordered.**

2

3

4  _____     _____
   Hon.                                    Date
5  Judge of the District Court



28  JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.     9     CASE NO. 07-3432 (E.D. Pa.)
                                                      MISCELLANEOUS NO. _____

1445114v.4

## EXHIBIT A TO PROTECTIVE ORDER

| | |
|---|---|
| THEODORE AND LOIS KOZIOL, | ) Miscellaneous No._____ |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. No. 07-3432 |
| | ) Eastern District of Pennsylvania |
| | ) |
| UNITED STATES OF AMERICA, | ) **CONFIDENTIALITY** |
| | ) **UNDERTAKING** |
| Defendant. | ) |
| | ) |

## <u>CONFIDENTIALITY UNDERTAKING</u>

I acknowledge that I have read and understand the Protective Order dated

[_____], entered by the Court on [_____], and agree to abide without

exception by its terms and conditions. I fully understand that violation of the terms of that

Protective Order by me or anyone acting under my directions may subject me to penalties. I

hereby submit to the jurisdiction of the above Court (and any Court to which appeals may be

taken with respect to proceedings in such Court) with respect to the enforcement of this

Undertaking and the Protective Order.

Dated: _____         _____
                              Signature

                              _____
                              Printed Name

Executed on _____

JOINT MOTION FOR STIPULATED PROTECTIVE ORDER
REGARDING CONFIDENTIAL MATERIALS REQUESTED BY
SUBPOENA TO NON-PARTIES GENERAL ATOMICS AND
GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC.          CASE NO. 07-3432 (E.D. Pa.)
                                                   MISCELLANEOUS NO. _____

1445114v.4

**From:** Goodstine, Sarah (x2476) [mailto:sgoodstine@pbwt.com]
**Sent:** Friday, April 04, 2008 10:56 AM
**To:** Arthur Alan Wo k
**Cc:** Lowenthal, Daniel A. (x2720)
**Subject:** Re: Koziol Subpoena

Dear Arthur:

I write to respond to your e-mail dated April 3, 2008. We have not agreed to protect the confidentiality of the material produced or otherwise disclosed in connection with the February 21, 2008 subpoena, or the subpoena that is forthcoming, by entry into a private confidentiality agreement with you. Instead, pursuant to our previous discussions, I have sent to you under separate cover a draft stipulation and protective order.

Regards,
Sarah

Sarah Goodstine, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas, NY, NY 10036
P: 212.336.2476
E: sgoodstine@pbwt.com
F: 212.336.7952

-----------------------------------------------
Privileged/Confidential Information may be contained in this message. If you are no the addressee indicated in this message (or responsible for delivery of the message such person) you may not copy or deliver this message to anyone. In such cas    you should destroy this message and kindly notify the sender by reply email. Please adv immediately if you or your employer do not consent to Internet email for messages of kind.

7/8/2008

-------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

========================================================================

**From:** Arthur Alan Wolk
**Sent:** Friday, April 04, 2008 1:20 PM
**To:** Goodstine, Sarah (x2476)
**Cc:** Paul Rosen
**Subject:** RE: Protective Order

Dear Sarah,

This was not the deal and the information was also to be used in the New Jersey litigation. Kindly respond to the subpoena so we can litigate how this non trade secret information should be handled.
Sorry but I am not going to be in a position that what is produced is useless. This is misleading a court by a company that makes billions in this country and claims it does no business here. This was a simple task. Kindly respond by Monday so I can file a motion next week.
Thank you,

Arthur Wolk

| | |
|---|---|
| **From:** | Goodstine, Sarah (x2476) [sgoodstine@pbwt.com] |
| **Sent:** | Monday, April 07, 2008 6:28 PM |
| **To:** | Arthur Alan Wolk |
| **Cc:** | Lowenthal, Daniel A. (x2720) |
| **Subject:** | Koziol Subpoena |
| **Attachments:** | General Atomics Response and Objections to February 21, 2008 Subpoena.pdf |

Dear Arthur:

Please see the attached.


<<General Atomics Response and Objections to February 21, 2008 Subpoena.pdf>>


Sarah Goodstine, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas, NY, NY 10036
P: 212.336.2476
E: sgoodstine@pbwt.com
F: 212.336.7952

------------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

=========================================================================

1   Paul A. Tyrell (CA Bar No. 193798)
    Sahyeh S. Fattahi (CA Bar No. 223938)
2   PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
    530 B Street, Suite 2100
3   San Diego, California 92101
    Telephone: 619.238.1900
4   Facsimile: 619.235.0398
5   pat@procopio.com
    ssf@procopio.com
6
    OF COUNSEL:
7   Daniel A. Lowenthal
    Sarah E. Goodstine
8   PATTERSON BELKNAP WEBB & TYLER LLP
9   1133 Avenue of the Americas
    New York, New York 10036
10  Telephone: 212.336.2000
    Facsimile: 212.336.2222
11  dalowenthal@pbwt.com
12  sgoodstine@pbwt.com

13  Attorneys for Nonparty General Atomics

14

15               IN THE UNITED STATES DISTRICT COURT

16           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

17  Concerning a subpoena issued in the matter of:

18  _____  )   Miscellaneous No._____
    THEODORE AND LOIS KOZIOL,            )
19                                        )   Civ. No.: 07-3432-MMB
20                         Plaintiffs,   )   Eastern District of Pennsylvania
                                          )
21           v.                           )   **RESPONSES AND OBJECTIONS OF**
                                          )   **NONPARTY GENERAL ATOMICS**
22                                        )   **TO PLAINTIFFS'**
    UNITED STATES OF AMERICA,            )   **SUBPOENA DUCES TECUM**
23                                        )
                                          )
24                         Defendant.    )
    _____  )
25

26

27

28

Nonparty General Atomics ("GA") hereby responds and objects to the February 21, 2008 subpoena duces tecum (the "Subpoena") issued by Plaintiffs Theodore and Lois Koziol (the "Plaintiffs") in the United States District Court for the Southern District of California in connection with the case captioned *Koziol v. United States of America*, Civ. No. 07-3432-MMB (E.D. Pa.) (the "Action"). Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure and within the time for response and objection to the Subpoena as set forth in correspondence dated April 4, 2008 from counsel for Plaintiffs, GA responds and objects as follows:

## GENERAL RESPONSES AND OBJECTIONS

The following General Responses and Objections apply to and are incorporated by reference in each and every response and objection, whether or not specifically stated:

1. GA objects to the Subpoena, including the documents-and-things requests (each, a "Request"), to the extent that they purport to impose obligations beyond those required by the Federal Rules of Civil Procedure, and/or the Local Rules of the United States District Courts for the Southern District of California and the Eastern District of Pennsylvania.

2. GA objects to each Request of the Subpoena to the extent that it seeks documents and things protected by the attorney-client privilege, the attorney work-product doctrine, the military safety privilege or any other applicable privilege, doctrine, immunity, statute, regulation or rule. GA hereby invokes such privileges and protections to the extent implicated by each Request, and excludes privileged and protected information from its responses. Any inadvertent disclosure of such information shall not be deemed a waiver of any privilege or protection with respect to such information.

3. GA objects to each Request of the Subpoena to the extent that it is overbroad, vague and would subject GA to oppression and undue burden and expense.

4. GA objects to each Request of the Subpoena to the extent that it purports to require the production of electronically stored information from sources that are not reasonably accessible because of undue burden and cost.

5. GA objects to each Request of the Subpoena to the extent that it seeks the production

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

1449584v.1

1

of documents, information, and things that are not relevant to any claim or defense of any party and to the extent that each Request does not appear reasonably calculated to lead to the discovery of admissible evidence.

6.     GA objects to the definition of "General Atomics" to the extent that it extends to persons and/or entities not under the control of GA.

7.     GA objects to each Request of the Subpoena to the extent that it seeks documents, information and things that are outside its possession, custody, and/or control.

8.     GA objects to each Request of the Subpoena to the extent that it seeks the production of documents, information, and/or things that contain trade secrets or other confidential research, development, proprietary and/or commercial information.

9.     GA objects to each Request of the Subpoena to the extent that it seeks the production of documents, information, and things that have already been obtained or that may be obtained from other sources, including the parties to the Action, rendering the Subpoena duplicative and unduly burdensome.

10.     GA objects to each Request to the extent that it is not submitted for the purpose of obtaining production or disclosure of documents, information or things that are relevant to the Action, but instead it is submitted for the purposes of harassment and abuse against GA, which is not a party to the Action.

11.     Any provision of documents or things responsive to any Request does not constitute an acceptance by GA of the factual assertions or characterizations made by Plaintiffs in the Request, an acceptance by GA of Plaintiffs' definitions of the terms used in the Request, or an admission that the information Requested is relevant, material or admissible.  GA's responses to these Requests are made subject to, and without in any way waiving or intending to waive, any future objections as to competency, relevance, materiality, privilege, admissibility and/or any other proper grounds.

12.     Any responses and objections to the Requests are based on information currently known to GA following a reasonable search and inquiry, with the time and resources available, and GA reserves the right to supplement, amend, modify, or correct its responses based on GA's further

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

1449584v.1

2

1   investigation and/or discovery, or on facts and circumstances which may come to GA's knowledge.

2       13.    GA has responded to each Request as it interprets and understands the Request. GA

3   reserves the right to amend or supplement the objections and responses to these Requests if Plaintiffs

4   subsequently assert an interpretation that differs from GA's interpretation or understanding of the

5   Requests.

6       14.    All responses are made on express reservation of objections and subject to each

7   General Response and Objection. No response or objection shall be deemed, and is specifically

8   stated not to be, a waiver of these objections, whether or not these objections are referred to in any

9   Specific Response or Objection.

10              **SPECIFIC RESPONSES AND OBJECTIONS**

11      Without conceding that any documents exist responsive to any Request or that documents are

12  properly discoverable, relevant to any claim or defense of any party in the Action, or admissible in

13  evidence, GA makes the following Specific Responses and Objections:

14  **REQUEST FOR PRODUCTION NO. 1:**

15      "Any notes, memos or letters that confirm the presence of Rotax personnel in the U.S."

16  Pursuant to correspondence from Plaintiffs' counsel dated March 8, 2008, this request "include[s] any

17  company acting as agent for or representative of Rotax including but not limited to Bombardier Rotax

18  (including all suffixes), Rotax (including all suffixes) Kodiak (Including all suffixes like Kodiak

19  Research, Rotech etc.) and any other company that serves as the agent, importer, alleged independent

20  shipper of Rotax engines." Pursuant to an agreement between counsel for GA and counsel for the

21  Plaintiffs on March 13, 2008, this Request was amended to include "documents sufficient to show" the

22  subject of the Request.

23  **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

24      GA hereby incorporates the General Responses and Objections stated above. In addition, GA

25  specifically objects to this Request on the grounds that it is unduly burdensome, overly broad, and

26  vague, that it seeks the production of documents, information, and things that are not relevant to the

27  claim or defense of any party to the extent that it does not appear reasonably calculated to lead to the

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE
MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

1449584v.1                                                                            3

discovery of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or defense of any party, that it requires disclosure of a trade secret, or other confidential research, development or commercial information, and that it may call for the production of documents, information, and things protected from discovery by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

Subject to and without waiving these Specific Objections and the General Responses and Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents and/or things in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 2:**

"Any documents that confirm the presence of Rotax personnel at the General Atomics facilities in the U.S." Pursuant to correspondence from Plaintiffs' counsel dated March 8, 2008, this request "include[s] any company acting as agent for or representative of Rotax including but not limited to Bombardier Rotax (including all suffixes), Rotax (including all suffixes) Kodiak (Including all suffixes like Kodiak Research, Rotech etc.) and any other company that serves as the agent, importer, alleged independent shipper of Rotax engines." Pursuant to an agreement between counsel for GA and counsel for the Plaintiffs on March 13, 2008, this Request was amended to include "documents sufficient to show" the subject of the Request.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

GA hereby incorporates the General Objections stated above. In addition, GA specifically objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it seeks the production of documents, information, and things that are not relevant to the claim or defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or defense of any party, that it requires disclosure of a trade secret, or other confidential research, development or commercial information, and that it may call for the production of documents, information, and things protected from discovery by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

4

1449584v.1

1    Subject to and without waiving these Specific Objections and the General Responses and

2    Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents

3    and/or things in its possession, custody, or control.

4    **REQUEST FOR PRODUCTION NO. 3:**

5    "Any documents that relate to the shipment of Rotax engines into the United States."

6    Pursuant to correspondence from Plaintiffs' counsel dated March 8, 2008, this request "include[s] any

7    company acting as agent for or representative of Rotax including but not limited to Bombardier Rotax

8    (including all suffixes), Rotax (including all suffixes) Kodiak (Including all suffixes like Kodiak

9    Research, Rotech etc.) and any other company that serves as the agent, importer, alleged independent

10    shipper of Rotax engines." Pursuant to an agreement between counsel for GA and counsel for the

11    Plaintiffs on March 13, 2008, this Request was amended to include "documents sufficient to show" the

12    subject of the Request.

13    **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

14    GA hereby incorporates the General Objections stated above. In addition, GA specifically

15    objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it

16    seeks the production of documents, information, and things that are not relevant to the claim or

17    defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery

18    of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose

19    of seeking information relevant to any claim or defense of any party, that it requires disclosure of a

20    trade secret, or other confidential research, development or commercial information, and that it may

21    call for the production of documents, information, and things protected from discovery by the

22    attorney-client, work-product, military safety or other applicable privilege, law or rule.

23    Subject to and without waiving these Specific Objections and the General Responses and

24    Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents

25    and things in its possession, custody, or control.

26

27

28

---

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

5

1449584v.1

1  **REQUEST FOR PRODUCTION NO. 4:**

2      "Any documents that confirm or relate to Rotax's involvement in accident investigations

3  involving Rotax engines." Pursuant to correspondence from Plaintiffs' counsel dated March 8, 2008,

4  this request "include[s] any company acting as agent for or representative of Rotax including but not

5  limited to Bombardier Rotax (including all suffixes), Rotax (including all suffixes) Kodiak (Including

6  all suffixes like Kodiak Research, Rotech etc.) and any other company that serves as the agent,

7  importer, alleged independent shipper of Rotax engines." Pursuant to an agreement between counsel

8  for GA and counsel for the Plaintiffs on March 13, 2008, this Request was amended to include

9  "documents sufficient to show" the subject of the Request.

10  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

11      GA hereby incorporates the General Objections stated above. In addition, GA specifically

12  objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it

13  seeks the production of documents, information, and things that are not relevant to the claim or

14  defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery

15  of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose

16  of seeking information relevant to any claim or defense of any party, that it requires disclosure of a

17  trade secret, or other confidential research, development or commercial information, and that it may

18  call for the production of documents, information, and things protected from discovery by the

19  attorney-client, work-product, military safety or other applicable privilege, law or rule.

20      Subject to and without waiving these Specific Objections and the General Responses and

21  Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents

22  and things in its possession, custody, or control.

23  **REQUEST FOR PRODUCTION NO. 5:**

24      "Any reports of accident investigations involving failures of Rotax engines." Pursuant to

25  correspondence from Plaintiffs' counsel dated March 8, 2008, this request "include[s] any company

26  acting as agent for or representative of Rotax including but not limited to Bombardier Rotax

27  (including all suffixes), Rotax (including all suffixes) Kodiak (Including all suffixes like Kodiak

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE
MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

6

1449584v.1

1    Research, Rotech etc.) and any other company that serves as the agent, importer, alleged independent

2    shipper of Rotax engines." Pursuant to an agreement between counsel for GA and counsel for the

3    Plaintiffs on March 13, 2008, this Request was amended to include "documents sufficient to show" the

4    subject of the Request.

5    **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

6        GA hereby incorporates the General Objections stated above. In addition, GA specifically

7    objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it

8    seeks the production of documents, information, and things that are not relevant to the claim or

9    defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery

10   of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose

11   of seeking information relevant to any claim or defense of any party, that it requires disclosure of a

12   trade secret, or other confidential research, development or commercial information, and that it may

13   call for the production of documents, information, and things protected from discovery by the

14   attorney-client, work-product, military safety or other applicable privilege, law or rule.

15       Subject to and without waiving these Specific Objections and the General Responses and

16   Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents

17   and things in its possession, custody, or control.

18   **REQUEST FOR PRODUCTION NO. 6:**

19       "Any document that concerns or relates to Rotax's business activities in the United States with

20   General Atomics during the time period. Pursuant to correspondence from Plaintiffs' counsel dated

21   March 8, 2008, this request "include[s] any company acting as agent for or representative of Rotax

22   including but not limited to Bombardier Rotax (including all suffixes), Rotax (including all suffixes)

23   Kodiak (Including all suffixes like Kodiak Research, Rotech etc.) and any other company that serves

24   as the agent, importer, alleged independent shipper of Rotax engines." Pursuant to an agreement

25   between counsel for GA and counsel for the Plaintiffs on March 13, 2008, this Request was amended

26   to include "documents sufficient to show" the subject of the Request.

27

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE
MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

7

1449584v.1

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

GA hereby incorporates the General Objections stated above.  In addition, GA specifically objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it seeks the production of documents, information, and things that are not relevant to the claim or defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or defense of any party, that it requires disclosure of a trade secret, or other confidential research, development or commercial information, and that it may call for the production of documents, information, and things protected from discovery by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

Subject to and without waiving these Specific Objections and the General Responses and Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents and things in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 7:**

"Correspondence relating to the sale, purchase or malfunctions of Rotax engines." Pursuant to correspondence from Plaintiffs' counsel dated March 8, 2008, this request "include[s] any company acting as agent for or representative of Rotax including but not limited to Bombardier Rotax (including all suffixes), Rotax (including all suffixes) Kodiak (Including all suffixes like Kodiak Research, Rotech etc.) and any other company that serves as the agent, importer, alleged independent shipper of Rotax engines." Pursuant to an agreement between counsel for GA and counsel for the Plaintiffs on March 13, 2008, this Request was amended to include "documents sufficient to show" the subject of the Request.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

GA hereby incorporates the General Objections stated above.  In addition, GA specifically objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it seeks the production of documents, information, and things that are not relevant to the claim or defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

1449584v.1

8

1  of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose

2  of seeking information relevant to any claim or defense of any party, that it requires disclosure of a

3  trade secret, or other confidential research, development or commercial information, and that it may

4  call for the production of documents, information, and things protected from discovery by the

5  attorney-client, work-product, military safety or other applicable privilege, law or rule.

6       Subject to and without waiving these Specific Objections and the General Responses and

7  Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents

8  and things in its possession, custody, or control.

9  **REQUEST FOR PRODUCTION NO. 8:**

10      "Any document that concerns or relates to business activities of Rotax or Bombardier Rotax in

11  the State of New Jersey including but not limited to contacts with the U.S. Army Communications,

12  Electronics Command in Fort Monmouth, New Jersey."  Pursuant to agreement between counsel for

13  GA and counsel for the Plaintiffs on March 13, 2008, this Request was amended to include

14  "documents sufficient to show" the subject of the Request.

15  **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

16      GA hereby incorporates the General Objections stated above.  In addition, GA specifically

17  objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it

18  seeks the production of documents, information, and things that are not relevant to the claim or

19  defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery

20  of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose

21  of seeking information relevant to any claim or defense of any party, that it requires disclosure of a

22  trade secret, or other confidential research, development or commercial information, and that it may

23  call for the production of documents, information, and things protected from discovery by the

24  attorney-client, work-product, military safety or other applicable privilege, law or rule.

25

26

27

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

9

1449584v.1

Subject to and without waiving these Specific Objections and the General Responses and Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents and things in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 9:**

"Any document that concerns or relates to business activities of Rotax or Bombardier Rotax in the State of New Jersey including but not limited to contacts with the United States Navy and/ or the United States Navy Air Warfare Center, Aircraft Division, Lakehurst New Jersey." Pursuant to agreement between counsel for GA and counsel for the Plaintiffs on March 13, 2008, this Request was amended to include "documents sufficient to show" the subject of the Request.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

GA hereby incorporates the General Objections stated above. In addition, GA specifically objects to this Request on the grounds that it is unduly burdensome, overly broad, and vague, that it seeks the production of documents, information, and things that are not relevant to the claim or defense of any party to the extent that it does not appear reasonably calculated to lead to the discovery of admissible evidence, that it is abusively drawn and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or defense of any party, that it requires disclosure of a trade secret, or other confidential research, development or commercial information, and that it may call for the production of documents, information, and things protected from discovery by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

10

1449584v.1

1    Subject to and without waiving these Specific Objections and the General Responses and

2  Objections set forth above, GA responds that it has no responsive, relevant, unprivileged documents

3  and things in its possession, custody, or control.

4

5                                        **GENERAL ATOMICS**

6                                        By its attorneys,

7

8  DATED: April 7, 2008

9                                        PROCOPIO, CORY, HARGREAVES & SAVITCH
                                         LLP

10                                       Paul A. Tyrell (Bar No. 193798)
11                                       *pat@procopio.com*
                                         530 B Street, Suite 2100
12                                       San Diego, California 92101
                                         Telephone: 619.238.1900
13                                       Facsimile: 619.235.0398

14

15                                       OF COUNSEL:

16                                       PATTERSON BELKNAP WEBB & TYLER LLP
                                         Daniel A. Lowenthal
17                                       *dalowenthal@pbwt.com*
                                         Sarah E. Goodstine
18                                       *sgoodstine@pbwt.com*
                                         1133 Avenue of the Americas
19                                       New York, New York 10036
                                         Telephone: 212.336.2000
20                                       Facsimile: 212.336.2222

21

22

23

24

25

26

27

28
─────────────────────────────────────────────────────────
RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE
MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)
                                                                                          11
1449584v.1

1

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

3  *Concerning a subpoena issued in the matter of:*

4  THEODORE AND LOIS KOZIOL,                    )          Miscellaneous No. _____
                                               )          Civ. No.  07-3432-MB
5                    *Plaintiffs,*              )          Eastern District of Pennsylvania
                                               )
6            v.                                 )          **DECLARATION OF SERVICE**
                                               )
7                                              )          Person Served:
   UNITED STATES OF AMERICA,                   )          Arthur Alan Wolk
8                                              )
                     *Defendant.*              )          Date Served:
9                                              )          April 7, 2008

10  I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a

11  party to this action; that I served the above named person the following documents:  Responses and

12  Objections of General Atomics to Plaintiffs' Subpoena Duces Tecum, in the following manner: (check

13  one)

14      1.  ☐  By personally delivering copies to the person served.

15      2.  ☐  By leaving, during usual office hours, copies in the office of the person served with the
             person who apparently was in charge and thereafter mailing (by first-class mail, postage
16           prepaid) copies to the person served at the place where the copies were left.

17      3.  ☐  By leaving copies at the dwelling house, usual place of abode, or usual place of
             business of the person served in the presence of a competent member of the household or a
18           person apparently in charge of his office or place of business, at least 18 years of age,
             who was informed of the general nature of the papers, and thereafter mailing (by first-class
19           mail, postage prepaid) copies to the person served at the place where the copies were left.

20      4.  **X**  By placing two copies in separate envelopes, each with postage fully prepaid and
             addressed to the addressee listed below, and depositing one copy in the U.S. Mail via
21           certified mail, return receipt requested, and one copy in the U.S. Mail via first class mail,
             both at 6:30 p.m. EST on April 7, 2008, and by transmitting one copy via electronic mail at
22           6:30 p.m. EST on April 7, 2008.

23                          Arthur Alan Wolk, Esq.
                            *arthurwolk@airlaw.com*
24                          1710-12 Locust Street
                            Philadelphia, PA  19103
25

26  Executed on      6:30 p.m. EST  on April 7, 2008.

27

28                                    Sarah E. Goodstine

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE
MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)

1449584v.1

| From: | Goodstine, Sarah (x2476) [sgoodstine@pbwt.com] |
|---|---|
| Sent: | Thursday, April 10, 2008 2:43 PM |
| To: | Arthur Alan Wolk |
| Cc: | Lowenthal, Daniel A. (x2720) |
| Subject: | Koziol Subpoena |
| Attachments: | iNYC01_1450617_1.PDF |

Dear Arthur:


Please see attached.


<<iNYC01_1450617_1.PDF>>

Sarah Goodstine, Esq.

Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas, NY, NY 10036

P: 212.336.2476

E: sgoodstine@pbwt.com

F: 212.336.7952


---------------------------------------------

Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

---------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

==============================================================================

1  Paul A. Tyrell (Bar No. 193798)
   Sahyeh S. Fattahi (Bar No. 223938)
2  PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
   530 B Street, Suite 2100
3  San Diego, California 92101
   Telephone: 619.238.1900
4  Facsimile: 619.235.0398
   pat@procopio.com
5  ssf@procopio.com
6
   OF COUNSEL:
7  Daniel A. Lowenthal
   Sarah E. Goodstine
8  PATTERSON BELKNAP WEBB & TYLER LLP
   1133 Avenue of the Americas
9  New York, New York 10036
   Telephone: 212.336.2000
10 Facsimile:  212.336.2222
   dalowenthal@pbwt.com
11 sgoodstine@pbwt.com
12
13 Attorneys for Nonparty General Atomics Aeronautical Systems, Inc.
14
15          IN THE UNITED STATES DISTRICT COURT
16       FOR THE SOUTHERN DISTRICT OF CALIFORNIA
17
18 Concerning a subpoena issued in the matter of:
19 _____
                                      )  Miscellaneous No._____
20 THEODORE AND LOIS KOZIOL,          )
                                      )  Civ. No.: 07-3432-MMB
21             Plaintiffs,            )  Eastern District of Pennsylvania
                                      )
22       v.                           )  RESPONSES AND OBJECTIONS OF
                                      )  NONPARTY GENERAL ATOMICS
23                                    )  AERONAUTICAL SYSTEMS, INC.
                                      )  TO PLAINTIFFS'
24 UNITED STATES OF AMERICA,          )  SUBPOENA DUCES TECUM
                                      )
25             Defendant.             )
   _____   )
26
27
28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____
1449633v.1

1        Nonparty General Atomics Aeronautical Systems, Inc. ("GA-ASI") hereby responds and

2   objects to the April 4, 2008 subpoena duces tecum (the "Subpoena") issued by Plaintiffs Theodore and

3   Lois Koziol (the "Plaintiffs") in the United States District Court for the Southern District of California

4   in connection with the case captioned *Koziol v. United States of America*, Civ. No. 07-3432-MMB

5   (E.D. Pa.) (the "Action"). Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure and

6   within the time for compliance as set forth within the Subpoena, GA-ASI responds and objects as

7   follows:

8                    **GENERAL RESPONSES AND OBJECTIONS**

9        The following General Responses and Objections apply to and are incorporated by reference in

10  each and every response and objection, whether or not specifically stated:

11       1.    GA-ASI objects to the Subpoena, including the documents-and-things requests (each,

12  a "Request"), to the extent that they purport to impose obligations beyond those required by the

13  Federal Rules of Civil Procedure, and/or the Local Rules of the United States District Courts for the

14  Southern District of California and the Eastern District of Pennsylvania.

15       2.    GA-ASI objects to the Subpoena and each Request therein on the ground that the

16  Subpoena fails to allow reasonable time for compliance because it was served on April 4, 2008 and

17  mandates compliance at 12:00 p.m. (Pacific Standard Time) on April 10, 2008.

18       3.    GA-ASI objects to each Request of the Subpoena to the extent that it seeks

19  documents and things protected by the attorney-client privilege, the attorney work-product doctrine,

20  the military safety privilege or any other applicable privilege, doctrine, immunity, statute, regulation

21  or rule. GA-ASI hereby invokes such privileges and protections to the extent implicated by each

22  Request, and excludes privileged and protected information from its responses. Any inadvertent

23  disclosure of such information shall not be deemed a waiver of any privilege or protection with

24  respect to such information.

25       4.    GA-ASI objects to each Request of the Subpoena to the extent that it is oppressive,

26  overbroad, vague and would subject GA-ASI to undue burden and expense.

27       5.    GA-ASI objects to each Request of the Subpoena to the extent that it purports to

28  require the production of electronically stored information from sources that are not reasonably

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. PA.) MISCELLANEOUS NO. _____

1449633v.1

1  accessible because of undue burden and cost.

2       6.    GA-ASI objects to each Request of the Subpoena to the extent that it seeks the
3  production of documents, information, and things that are not relevant to any claim or defense of any
4  party and to the extent that each Request does not appear reasonably calculated to lead to the
5  discovery of admissible evidence.

6       7.    GA-ASI objects to each Request of the Subpoena to the extent that it seeks
7  documents, information and things that are outside its possession, custody, and/or control.

8       8.    GA-ASI objects to each Request of the Subpoena to the extent that it seeks the
9  production of documents, information, and/or things that contain trade secrets or other confidential
10  research, development, proprietary and/or commercial information.

11       9.    GA-ASI objects to each Request of the Subpoena to the extent that it seeks the
12  production of documents, information, and things that have already been obtained or that may be
13  obtained from other sources, including the parties to the Action, rendering the Subpoena duplicative
14  and unduly burdensome.

15       10.    GA-ASI objects to each Request of the Subpoena to the extent that it is not submitted
16  for the purpose of obtaining production or disclosure of documents, information or things that are
17  relevant to the Action, but instead is submitted for the purposes of harassment and abuse against GA-
18  ASI, which is not a party to the Action.

19       11.    Any response by GA-ASI to any Request does not constitute an acceptance by GA-
20  ASI of the factual assertions or characterizations made by Plaintiffs in the Request, an acceptance by
21  GA-ASI of Plaintiffs' definitions of the terms used in the Request, or an admission that the
22  information Requested is relevant, material or admissible. GA-ASI's responses to these Requests are
23  made subject to, and without in any way waiving or intending to waive, any future objections as to
24  competency, relevance, materiality, privilege, admissibility and/or any other proper grounds.

25       12.    The General and Specific Responses and Objections to the Requests are based on
26  information currently known to GA-ASI following a reasonable search and inquiry, with the time
27  and resources available, and GA-ASI reserves the right to supplement, amend, modify, or correct its
28  Responses and/or Objections based on GA-ASI's further investigation and/or discovery, or on facts

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

2

1 and circumstances which may come to GA-ASI's knowledge.

2       13.    GA-ASI has responded to each Request as it interprets and understands the Request.
3 GA-ASI reserves the right to amend or supplement the General and Specific Responses and
4 Objections to the Requests if Plaintiffs subsequently assert an interpretation that differs from GA-
5 ASI's interpretation or understanding of the Requests.

6       14.    All Specific Responses and Objections are made on express reservation of objections
7 and subject to each General Response and Objection. No response or objection shall be deemed, and
8 is specifically stated not to be, a waiver of these objections, whether or not these objections are
9 referred to in any Specific Response or Objection.

10       15.    GA-ASI objects to each Request of the Subpoena as imposing undue burden and
11 expense on a nonparty to the Action, and requests and preserves all rights to compensation for all
12 fees (including attorneys fees) and other expenses and costs associated with responding to the
13 Subpoena.

14               **SPECIFIC RESPONSES AND OBJECTIONS**

15       Without conceding that any documents exist responsive to any Request or that documents are
16 properly discoverable, relevant to any claim or defense of any party in the Action, or admissible in
17 evidence, GA-ASI makes the following Specific Responses and Objections:

18 **REQUEST FOR PRODUCTION NO. 1:**

19       "Any and all records of visits to the respondent by officers, employees or representatives of
20 Bombardier-Rotax GmbH; BRP-Rotax GmbH & CO. KG; Bombardier-Rotax GmbH & CO. KG;
21 and/or Bombardier-Rotax GmbH & CO."

22 **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

23       GA-ASI hereby incorporates the General Responses and Objections stated above. In addition,
24 GA-ASI specifically objects to this Request on the grounds that the time provided for compliance with
25 the Subpoena is insufficient, and that this Request is vague, overbroad and unduly burdensome to the
26 extent that it is not limited to a specific time period and to the extent that it seeks "any and all"
27 records. GA-ASI further objects to this Request to the extent that it seeks the production of
28 documents, information, and things that are not relevant to any claim or defense of any party to the

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. PA.) MISCELLANEOUS NO. _____

3

1  Action and to the extent that it does not appear reasonably calculated to lead to the discovery of

2  admissible evidence. GA-ASI also objects to this Request as abusively drawn and harassing in that it

3  is not drawn for the purpose of seeking information relevant to any claim or defense of any party to

4  the Action. Additionally GA-ASI objects to this Request to the extent that it requires disclosure of a

5  trade secret, or other confidential research, development, commercial and/or proprietary information,

6  and that it may call for the production of documents, information, and things protected from discovery

7  by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

8  **REQUEST FOR PRODUCTION NO. 2:**

9      "Any and all contracts, specifications, purchase orders, invoices, bills of lading, reports, notes,

10  correspondence, electronic data, and/or other documents exchanged between you and the United

11  States government which involve the sale, shipment, purchase and/or receipt of Rotax engines."

12  **RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

13      GA-ASI hereby incorporates the General Responses and Objections stated above. In addition,

14  GA-ASI specifically objects to this Request on the grounds that the time provided for compliance with

15  the Subpoena is insufficient, and that this Request is vague, overbroad and unduly burdensome to the

16  extent that it is not limited to a specific time period and to the extent that it seeks "any and all"

17  documents in the categories listed in the Request. GA-ASI further objects to this Request to the extent

18  that it seeks the production of documents, information, and things that are not relevant to any claim or

19  defense of any party to the Action and to the extent that it does not appear reasonably calculated to

20  lead to the discovery of admissible evidence. GA-ASI also objects to this Request as abusively drawn

21  and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or

22  defense of any party to the Action. Additionally GA-ASI objects to this Request to the extent that it

23  requires disclosure of a trade secret, or other confidential research, development, commercial and/or

24  proprietary information, and that it may call for the production of documents, information, and things

25  protected from discovery by the attorney-client, work-product, military safety or other applicable

26  privilege, law or rule.

27

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

4

1449633v.1

**REQUEST FOR PRODUCTION NO. 3:**

"Any and all documents sent to or received from the manufacturer and/or distributor of Rotax engines that refer and/or relate to maintenance, repair and or overhaul of Rotax engines."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

GA-ASI hereby incorporates the General Responses and Objections stated above. In addition, GA-ASI specifically objects to this Request on the grounds that the time provided for compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks "any and all" documents listed in the Request. GA-ASI further objects to this Request to the extent that it seeks the production of documents, information, and things that are not relevant to any claim or defense of any party to the Action and to the extent that it does not appear reasonably calculated to lead to the discovery of admissible evidence. GA-ASI also objects to this Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or defense of any party to the Action. Additionally GA-ASI objects to this Request to the extent that it requires disclosure of a trade secret, or other confidential research, development, commercial and/or proprietary information, and that it may call for the production of documents, information, and things protected from discovery by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

**REQUEST FOR PRODUCTION NO. 4:**

"Any and all documents sent to or received from the manufacturer and/or distributor of Rotax engines that refer and/or relate to malfunctions or failures of Rotax engines."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

GA-ASI hereby incorporates the General Responses and Objections stated above. In addition, GA-ASI specifically objects to this Request on the grounds that the time provided for compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks "any and all" documents listed in the Request. GA-ASI further objects to this Request to the extent that it seeks the production of documents, information, and things that are not relevant to any claim or defense of any

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

5

1449633v.1

1  party to the Action and to the extent that it does not appear reasonably calculated to lead to the

2  discovery of admissible evidence. GA-ASI also objects to this Request as abusively drawn and

3  harassing in that it is not drawn for the purpose of seeking information relevant to any claim or

4  defense of any party to the Action. Additionally GA-ASI objects to this Request to the extent that it

5  requires disclosure of a trade secret, or other confidential research, development, commercial and/or

6  proprietary information, and that it may call for the production of documents, information, and things

7  protected from discovery by the attorney-client, work-product, military safety or other applicable

8  privilege, law or rule.

9  **REQUEST FOR PRODUCTION NO. 5:**

10  "Any and all contracts, specifications, purchase orders, invoices, bills of lading, reports, notes,

11  correspondence, electronic data, and/ or other documents regarding the sale and/or shipment of Rotax

12  engines to The Naval Air Warfare Center Aircraft Division, Lakehurst, New Jersey."

13  **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

14  GA-ASI specifically objects to this Request on the grounds that the time provided for

15  compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly

16  burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks

17  "any and all" documents and things in the categories listed in the Request. GA-ASI further objects to

18  this Request to the extent that it seeks the production of documents, information, and things that are

19  not relevant to any claim or defense of any party to the Action and to the extent that it does not appear

20  reasonably calculated to lead to the discovery of admissible evidence. GA-ASI also objects to this

21  Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking

22  information relevant to any claim or defense of any party to the Action. Additionally GA-ASI objects

23  to this Request to the extent that it requires disclosure of a trade secret, or other confidential research,

24  development, commercial and/or proprietary information, and that it may call for the production of

25  documents, information, and things protected from discovery by the attorney-client, work-product,

26  military safety or other applicable privilege, law or rule.

27

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

6

1449633v.1

**REQUEST FOR PRODUCTION NO. 6:**

"Any and all contracts, specifications, purchase orders, invoices, bills of lading, reports, notes, correspondence, electronic data, and/ or other documents regarding the sale and/or shipment of Rotax engines to The Naval Air Warfare Center Aircraft Division in Lakehurst, New Jersey."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

GA-ASI specifically objects to this Request on the grounds that the time provided for compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks "any and all" documents and things in the categories listed in the Request. GA-ASI further objects to this Request to the extent that it seeks the production of documents, information, and things that are not relevant to any claim or defense of any party to the Action and to the extent that it does not appear reasonably calculated to lead to the discovery of admissible evidence. GA-ASI also objects to this Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking information relevant to any claim or defense of any party to the Action. Additionally GA-ASI objects to this Request to the extent that it requires disclosure of a trade secret, or other confidential research, development, commercial and/or proprietary information, and that it may call for the production of documents, information, and things protected from discovery by the attorney-client, work-product, military safety or other applicable privilege, law or rule.

**REQUEST FOR PRODUCTION NO. 7:**

"Any and all contracts, specifications, purchase orders, invoices, bills of lading, reports, notes, correspondence, electronic data, and/or other documents regarding the sale and/or shipment of Rotax engines to The U.S. Army Communications Electronics Command in Fort Monmouth, New Jersey."

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

GA-ASI specifically objects to this Request on the grounds that the time provided for compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks "any and all" documents and things in the categories listed in the Request. GA-ASI further objects to

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

7

1449633v.1

1    this Request to the extent that it seeks the production of documents, information, and things that are
2    not relevant to any claim or defense of any party to the Action and to the extent that it does not appear
3    reasonably calculated to lead to the discovery of admissible evidence. GA-ASI also objects to this
4    Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking
5    information relevant to any claim or defense of any party to the Action. Additionally GA-ASI objects
6    to this Request to the extent that it requires disclosure of a trade secret, or other confidential research,
7    development, commercial and/or proprietary information, and that it may call for the production of
8    documents, information, and things protected from discovery by the attorney-client, work-product,
9    military safety or other applicable privilege, law or rule.

10   **REQUEST FOR PRODUCTION NO. 8:**

11        "Any and all reports, photographs, notes, letters, electronic data, and/or other documents
12   related to investigations of aircraft accidents which involved Rotax engines."

13   **RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

14        GA-ASI specifically objects to this Request on the grounds that the time provided for
15   compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly
16   burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks
17   "any and all" documents and things in the categories listed in the Request. GA-ASI further objects to
18   this Request to the extent that it seeks the production of documents, information, and things that are
19   not relevant to any claim or defense of any party to the Action and to the extent that it does not appear
20   reasonably calculated to lead to the discovery of admissible evidence. GA-ASI also objects to this
21   Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking
22   information relevant to any claim or defense of any party to the Action. Additionally GA-ASI objects
23   to this Request to the extent that it requires disclosure of a trade secret, or other confidential research,
24   development, commercial and/or proprietary information, and that it may call for the production of
25   documents, information, and things protected from discovery by the attorney-client, work-product,
26   military safety or other applicable privilege, law or rule.

27

28

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

8

1449633v.1

1 **REQUEST FOR PRODUCTION NO. 9:**

2     "Any and all reports, photographs, notes, letters, electronic data, and/or other documents

3 related to the design., manufacture and/or sale of the Rotax engines installed in military aircraft you

4 manufactured."

5 **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

6     GA-ASI specifically objects to this Request on the grounds that the time provided for

7 compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly

8 burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks

9 "any and all" documents and things in the categories listed in the Request. GA-ASI further objects to

10 this Request to the extent that it seeks the production of documents, information, and things that are

11 not relevant to any claim or defense of any party to the Action and to the extent that it does not appear

12 reasonably calculated to lead to the discovery of admissible evidence. GA-ASI also objects to this

13 Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking

14 information relevant to any claim or defense of any party to the Action. Additionally GA-ASI objects

15 to this Request to the extent that it requires disclosure of a trade secret, or other confidential research,

16 development, commercial and/or proprietary information, and that it may call for the production of

17 documents, information, and things protected from discovery by the attorney-client, work-product,

18 military safety or other applicable privilege, law or rule.

19 **REQUEST FOR PRODUCTION NO. 10:**

20     "Any and all reports, photographs, notes, letters, electronic data, and/or other documents

21 related to the accident investigation of other accidents where there has been an engine fire involving

22 Rotax engines."

23 **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

24     GA-ASI specifically objects to this Request on the grounds that the time provided for

25 compliance with the Subpoena is insufficient, and that this Request is vague, overbroad and unduly

26 burdensome to the extent that it is not limited to a specific time period and to the extent that it seeks

27 "any and all" documents and things in the categories listed in the Request. GA-ASI further objects to

28 this Request to the extent that it seeks the production of documents, information, and things that are

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.) MISCELLANEOUS NO. _____

9

1449633v.1

1   not relevant to any claim or defense of any party to the Action and to the extent that it does not appear

2   reasonably calculated to lead to the discovery of admissible evidence.  GA-ASI also objects to this

3   Request as abusively drawn and harassing in that it is not drawn for the purpose of seeking

4   information relevant to any claim or defense of any party to the Action.  Additionally GA-ASI objects

5   to this Request to the extent that it requires disclosure of a trade secret, or other confidential research,

6   development, commercial and/or proprietary information, and that it may call for the production of

7   documents, information, and things protected from discovery by the attorney-client, work-product,

8   military safety or other applicable privilege, law or rule.

9           **GENERAL ATOMICS AERONAUTICAL**
            **SYSTEMS, INC.**
10

11          By its attorneys,

12

13  DATED:  April 10, 2008

14          _____
            PROCOPIO, CORY, HARGREAVES & SAVITCH
            LLP

15

16          Paul A. Tyrell (Bar No. 193798)
            Sahyeh S. Fattahi (Bar No. 223938)
17          pat@procopio.com
            ssf@procopio.com
18          530 B Street, Suite 2100
            San Diego, California  92101
19          Telephone: 619.238.1900
            Facsimile: 619.235.0398
20

21          OF COUNSEL:
            PATTERSON BELKNAP WEBB & TYLER LLP
22          Daniel A. Lowenthal
            dalowenthal@pbwt.com
23          Sarah E. Goodstine
            sgoodstine@pbwt.com
24          1133 Avenue of the Americas
            New York, New York 10036
25          Telephone: 212.336.2000
            Facsimile:  212.336.2222
26

27

28
    RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA
    DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)  MISCELLANEOUS NO. _____

                                                                                          10

    1449633v.1

| | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| | **SOUTHERN DISTRICT OF CALIFORNIA** |
| 2 | |

*Concerning a subpoena issued in the matter of:*

| | | |
|---|---|---|
| 4 | THEODORE AND LOIS KOZIOL, | ) |
| | | ) |
| 5 | *Plaintiffs,* | ) |
| | | ) |
| 6 | v. | ) |
| | | ) |
| 7 | | ) |
| | UNITED STATES OF AMERICA, | ) |
| 8 | | ) |
| | *Defendant.* | ) |
| 9 | | ) |

Miscellaneous No. _____
Civ. No. 07-3432-MMB
Eastern District of Pennsylvania

**DECLARATION OF SERVICE**

Person Served:
Arthur Alan Wolk

Date Served:
April 10, 2008

I, the undersigned declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; that I served the above named person the following documents: Responses and Objections of Nonparty General Atomics Aeronautical Systems, Inc. to Plaintiffs' Subpoena Duces Tecum, in the following manner: (check one)

1.  ☐  By personally delivering copies to the person served.

2.  ☐  By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

3.  ☐  By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4.  **X**  By placing two copies in separate envelopes, each with postage fully prepaid and addressed to the addressee listed below, and depositing one copy in the U.S. Mail via certified mail, return receipt requested, and one copy in the U.S. Mail via first class mail, both at 2:00 p.m. (EST) on April 10, 2008, and by transmitting one copy via electronic mail at 2:30 p.m. (EST) on April 10, 2008.

Arthur Alan Wolk, Esq.
The Wolk Law Firm
*arthurwolk@airlaw.com*
1710-12 Locust Street
Philadelphia, PA 19103

Executed at 1:55 p.m. (EST) on April 10, 2008.

_____
Sarah E. Goodstine

RESPONSES AND OBJECTIONS OF NONPARTY GENERAL ATOMICS AERONAUTICAL SYSTEMS, INC. TO PLAINTIFFS' SUBPOENA DUCES TECUM ISSUED IN THE MATTER OF CIV. NO. 07-3432-MMB (E.D. Pa.)  MISCELLANEOUS NO. _____

1449633v.1

**From:** Arthur Alan Wolk
**Sent:** Friday, June 27, 2008 2:25 PM
**To:** dalowenthal@pbwt.com
**Cc:** dan@holsenbackapc.com
**Subject:** Stipulated Order

And now upon consideration of this stipulation it is ordered:

1. GA and GA-ASI shall make a diligent good faith effort to produce the documents subpoenaed as revised by plaintiffs' counsel.
2. Production shall take place in plaintiffs' counsel's office in Philadelphia by July 5, 2008.
3. All documents produced shall be considered confidential and proprietary.
4. Plaintiffs may use the documents in both this action and a New Jersey State Court Action now filed under seal.
5. Should plaintiffs file any of the documents in any action they shall be filed under seal with a copy of this order attached.
6. Plaintiffs may provide the documents produced to counsel for other parties provided that they are made aware of this order.
7. Whether or not anyone to whom the documents are provided agree this court considers them bound by this order.
8. The documents provided may be used for litigation purposes in the two actions and may be disclosed to employees of the attorneys, the court, consultants, court reporters and those persons ordinarily expected to receive them but they shall be accompanied by a copy of this order.
9. Upon the conclusion of the two litigations the documents shall either be destroyed or returned to GA and GA-ASI as directed by their counsel.
10. In the event GA and/or GA-ASI produce documents that are redacted, they shall immediately be produced in un-redacted versions to this court with an explanation for the redactions but in no event shall the redactions make the documents useless for the purposes plaintiffs' counsel has made clear nor shall redactions be made that are unnecessary.
11. Once a good faith production has been made by GA and GA-ASI plaintiffs' counsel shall notify this court and in that event plaintiffs' counsel shall withdraw his Motion for Sanctions Attorneys Fees and Costs.

So Stipulated and Ordered this _____day of _____2008

For Plaintiffs


Daniel Holsenbach


For GA and GA-ASI


7/8/2008

Daniel Lowenthal

By the Court

_____

7/8/2008

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Friday, June 27, 2008 3:52 PM
**To:** Arthur Alan Wolk
**Cc:** Goodstine, Sarah (x2476)
**Subject:** Koziol - Draft Protective Order

Arthur,

Here's the updated draft.  Please call us tonight with your comments.

Dan

Daniel A. Lowenthal
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY  10036
Direct:  212-336-2720
Cell:  914-980-3794
Fax:  212-336-1253
dalowenthal@pbwt.com
www.pbwt.com


<<v.2 Joint Motion for Protective Order.DOC>>

-----------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

-----------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

======================================================================

**From:** Arthur Alan Wolk
**Sent:** Friday, June 27, 2008 4:49 PM
**To:** Lowenthal, Daniel A. (x2720)
**Subject:** RE: Koziol - Draft Protective Order

Dan and Sarah,

Comment -Since I am not admitted pro hac vice in this proceeding I cannot be listed on the Motion or the Order except as a signatory to the Order as representing the plaintiffs.

Par 4 should add: All documents produced by the Producing Non Party shall bear a Bates number for identification in a place that does not interfere with the legibility of the document.

Par. 5 should add: Receiving persons may dispute the designations of "Confidential" and submit any such dispute to the Court in which case the deposition was taken or this court.

Par. 6 should add: (e) Any mediator or arbitrator in the New Jersey action.
(f) As otherwise ordered by any court presiding over the case in which the documents and things are used or this court.

Par. 7 remove (a) and add after "person" with the exception of a judge or tribunal in the New Jersey Action.

Par. 8. Put period after "envelope" and remove the rest of the sentence.
And change "the" to that court at the end of the par.

Par. 9 add "made" before available to the court. Delete "in accordance…. And add "if requested"

Par.12 Delete sub. Par. (a) and use "shall instead of "must"

Par. 13 Add (f) "imposes on any Court any obligation not specifically undertaken opr provided for in the Rules of Civil Procedure of that Court nor shall disclosure by a Court of Confidential information to others in any opinion or published document constitute a breach or contempt of this order by any receiving party or person.

Par. 16 add with the exception of any judge or tribunal.

Par. 10 add: Nothing in this order shall be intended to impose any sanction for the inadvertent disclosure to persons or parties who are not listed in Par. 6 but the disclosing person shall take all reasonable steps to obtain the return of the documents inadvertently produced. Nothing in

this order is intended to impose any sanction including attorneys' fees against anyone not directly responsible for the impermissible disclosure of documents. Nothing in this Order with respect to sanctions and attorneys' fees shall apply to Daniel Holsenback who will not receive documents and whose role in this matter has been limited to assisting in bringing the Motion to Enforce the Subpoena.

If we can get agreement on these changes what I propose is that we ask the court jointly to postpone your obligation to file a brief for one month. If the documents produced are a good faith effort to comply then I will withdraw our petition.


Arthur

---

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Friday, June 27, 2008 5:50 PM
**To:** Arthur Alan Wolk
**Cc:** Goodstine, Sarah (x2476)
**Subject:** Koziol - Updated Draft Protective Order

Arthur,

Here's a new draft. We have accepted most of your changes. Paragraph 12(a) is still in the document because we need to review your request to delete it with our clients.

It appears that we have just that issue and perhaps one or two others to resolve. We can reconvene on Monday morning.

Please confirm by reply email that we will jointly call the Court on Monday to adjourn the briefing schedule.

Dan

Daniel A. Lowenthal
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Direct: 212-336-2720
Cell: 914-980-3794
Fax: 212-336-1253
dalowenthal@pbwt.com
www.pbwt.com

<<v.3 Joint Motion for Protective Order.DOC>>

-----------------------------------------------
Privileged/Confidential Information may be contained in this message. If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone. In such case, you
should destroy this message and kindly notify the sender by reply email. Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

-----------------------------------------------

7/10/2008

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================================
------------------------------------------------
Privileged/Confidential Information may be contained in this message.  If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone.  In such case, you
should destroy this message and kindly notify the sender by reply email.  Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

------------------------------------------------

IRS Circular 230 disclosure:  Any tax advice contained in this communication (includ
any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

================================================================================

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Friday, June 27, 2008 8:48 PM
**To:** Arthur Alan Wolk
**Cc:** Goodstine, Sarah (x2476)
**Subject:** RE: Koziol - Updated Draft Protective Order

Arthur,

I write solely to respond to the following language in your email below:

"I also wish to confirm that you told me you have had no discussions with Rotax or Bombardier's counsel about these subpoenas and have not shared with them the documents or substance of them. I intend to depose them on that subject."

During our call late this afternoon, you asked if I had given Rotax documents. I told you that I had not. I did not tell you that I had no discussions with Rotax or Bombardier's counsel. That is not something that you and I discussed. As your local counsel knows, a lawyer for Rotax phoned us about your motion to compel and the subpoenas. Rotax's counsel said he knew about the motion because someone at Rotax had seen it on PACER.

Dan

**From:** Arthur Alan Wolk [mailto:ArthurWolk@airlaw.com]
**Sent:** Fri 6/27/2008 9:44 PM
**To:** Lowenthal, Daniel A. (x2720)
**Subject:** RE: Koziol - Updated Draft Protective Order

Dan,

You are correct that 12 (a) is a problem because if I ask the Court to do that he is going to look at me like I have two heads and I am not prejudicing my client by asking for something that is hardly called for by any documents you are likely producing.

Also the provision relating to inadvertent disclosure is important as although I think it is remote anything can happen and since there are no trade secrets, processes or other documents that will disclose the business of General Atomics I am not taking the risk that an inadvertent disclosure is seized upon for sanctions or attorneys fees especially when you are asking me to relieve you of sanctions and attorneys fees. I have a sense you will not be as generous as you are asking me to be.

None of the documents in the categories I reduced the scope to can prejudice anyone but Rotax thus much of what you are requesting is curiously for its benefit only. I am becoming increasingly concerned and am appropriately suspicious. How could a communication or confirmation of appointment with Rotax reps. for example in this country have any bearing on the business of General Atomics? So what's the concern about Dan? What's confidential here Dan? Is it because Rotax and its lawyers took affidavits and gave depositions of Rotax and Bombardier witnesses in courts all over the country saying they didn't do business in the States? Why should General Atomics be concerned about that especially since even the Air Force makes no bones about its displeasure with the Rotax engine and the fires, accidents and investigations that led to that request to General Atomics that it provide another engine choice.
Just so we understand each other Dan, I haven't been waiting for General Atomics to decide when and if and whether it would comply with the subpoena.

I believe your Confidentiality Order is not for your client's protection but for your client's vendor's protection and I will think about it this weekend whether I am interested in protecting Rotax or Bombardier from anything.
I also wish to confirm that you told me you have had no discussions with Rotax or Bombardier's counsel about these subpoenas and have not shared with them the documents or substance of them. I intend to depose them on that subject.

Thanks and I will speak to you Monday.

Arthur

7/10/2008

**From:** Arthur Alan Wolk
**Sent:** Saturday, June 28, 2008 12:46 AM
**To:** Lowenthal, Daniel A. (x2720)
**Subject:** RE: Koziol - Updated Draft Protective Order

Dan,

I know what I heard. I think you need to brief the Motion and we will do the same. I suspect and with good reason that you are just wasting our time our money and you intend along with your patron, Rotax to sandbag us as you have since the inception of this journey.
We can discuss what we will agree to **after** I see the documents.
You have wasted far more time than this deserves and I intend to request the court to award counsel fees for these two days of continued wasted effort and ask our New Jersey counsel to add this charade of Rotax as an additional act in the RICO complaint. You are completely aware of the RICO litigation including the parties and allegations and your claim you couldn't find out anything about it was false.

Arthur

---

**From:** Lowenthal, Daniel A. (x2720) [mailto:dalowenthal@pbwt.com]
**Sent:** Tuesday, July 01, 2008 12:36 PM
**To:** Arthur Alan Wolk
**Cc:** dan@holsenbackapc.com; Goodstine, Sarah (x2476)
**Subject:** Koziol

Arthur,

I called you last week to try to resolve our dispute, and I have called both Dan Holsenback and you twice today to request again to meet and confer. I have not reached Dan and left him a detailed message. Your office told me you are not available by phone today. They said I could send you an email.

We are making a motion to quash your subpoenas today and, even though your last email on Friday night/Saturday morning said we should brief the matter, I am reaching out to you again. Please call me.

Dan


Daniel A. Lowenthal
Partner
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Direct: 212-336-2720
Cell: 914-980-3794
Fax: 212-336-1253
dalowenthal@pbwt.com
www.pbwt.com

---------------------------------------------
Privileged/Confidential Information may be contained in this message. If you are no
the addressee indicated in this message (or responsible for delivery of the message
such person), you may not copy or deliver this message to anyone. In such case, you
should destroy this message and kindly notify the sender by reply email. Please adv
immediately if you or your employer do not consent to Internet email for messages of
kind.

---------------------------------------------

IRS Circular 230 disclosure: Any tax advice contained in this communication (includ

any attachments or enclosures) was not intended or written to be used, and cannot be
used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (
promoting, marketing or recommending to another party any transaction or matter addr
in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S.
Treasury regulations governing tax practitioners.)

===========================================================================

**From:** Arthur Alan Wolk
**Sent:** Tuesday, July 01, 2008 5:00 PM
**To:** Lowenthal, Daniel A. (x2720)
**Cc:** Cheryl DeLisle; dan@holsenbackapc.com
**Subject:** RE: Koziol

Dan,

Meet and confer does not require me to spend months having useless conversations that bear no resolution of the issues.
Everything you tell me I learn is not truthful and I have attempted to accommodate every request you have made.
I reduced the scope several times. I have reduced the period of the requests. I have reduced the quantity that you need to produce. I have reduced the subjects. I have extended the production time several times.
I agreed to a Confidentiality Agreement which I proposed, not an order.
It was only after the Draconian Order you proposed that I stopped conferring and filed a motion.
Now you have attempted to impose even more arduous and time consuming and complicated procedures and trip wires including the temerity to order me to tell a judge he has to clear his courtroom before your documents that are benign nothings can be used.
Everything you have done has been not for your client's protection but for Rotax's and that is not the entity that you are entitled to protect in this proceeding.
You must file what you want and brief what you want. We will litigate the subpoena. I am not going to waste any more time meeting and conferring with someone who never tells me the truth and acts and speaks to me in a condescending manner. My time can better be expended briefing the issues and preparing for the hearing that you unilaterally postponed.
I'll be happy to look at the documents you are willing to produce, keep what I see confidential until we can negotiate a protective agreement,  and if I think they have been done in good faith I will withdraw my motion for sanctions and attorneys fees.
Meet and confer imposes no requirement that I be abused.

Arthur

7/10/2008

# Exhibit 2

# Study on Impact of Foreign Sourcing of Systems



## January 2004

## Office of the Deputy Under Secretary of Defense for Industrial Policy

## 2.8.  Predator Unmanned Aerial Vehicle

General Atomics Aeronautical Systems is the prime contractor for the Predator Unmanned Aerial Vehicle (UAV) for the U.S. Air Force and the Italian Air Force. Predator is a semi-autonomous, retaskable, unmanned aerial vehicle reconnaissance system providing reconnaissance, surveillance, target acquisition and direct strike capability to theater commanders. Flying at medium altitudes (15-20K ft), Predator has endurance in excess of 24 hours and can  provide real-time full motion video, synthetic aperture radar, and limited laser designation for precision guided munitions.  Some Predators, and all Predators currently in production, can carry two Hellfire laser-guided missiles for ground attack.  Predator has supported numerous operational deployments to EUCOM and CENTCOM.  During the height of fighting in Operations Iraqi Freedom, four Predators were airborne at the same time, a first, with command and control for most Predators being maintained by units located in the CONUS.

### Extent of Foreign Sourcing

The value of the prime contract is $30.6 million.  The value of subcontract effort identified for this program totaled $7.1 million.  Of this amount, foreign-sourced subcontracts totaled $1.1 million (about 15 percent of the value of all subcontracts and less than 4 percent of the value of the prime contract).  Respondents identified a total of 29 first tier subcontractors (3 of which were foreign), nine second tier subcontractors (2 were foreign), and no third tier foreign subcontractors.  Foreign subcontractors are from Belgium, Austria, the United Kingdom, Switzerland, and Japan.

### Predator Foreign Subcontractors

| TIER | ITEM(S) | APPLICATION | COUNTRY |
|------|---------|-------------|---------|
| 1 | Heads up Display System | Ground Control Station | Belgium |
| 1 | Rotax Engine | Engine | Austria |
| 1 | CRU and PMC Computer Boards | Vehicle Avionics | United Kingdom |
| 2 | SATCOM Data Terminals | Ground Station and Air Vehicle | Switzerland |
| 2 | VCR and Hi-8mm | Ground Station and Air Vehicle | Japan |

### Availability and Foreign Vulnerability

*Availability*: Demonstrated and projected availability is not a concern.  All identified foreign subcontractors have demonstrated the ability to meet performance, schedule, and cost requirements in the past, including during the active combat phases of

Operations Enduring Freedom and Iraqi Freedom. All are projected to continue to do so in the future.

***Foreign Vulnerability:*** Utilization of the identified foreign suppliers does not constitute a foreign vulnerability. Foreign suppliers are located in Belgium, Austria, the United Kingdom, Switzerland, and Japan. Of the five foreign subcontractors identified, none were identified as a sole source. Supply disruption is not likely since the current suppliers have demonstrated reliability in the past and multiple domestic suppliers are available should the current suppliers falter. In any event, none of the foreign-sourced items is classified or offers unique military superiority.

## Impact on National Technology and Industrial Base

The economic viability of the national technology and industrial base is not endangered by use of the identified foreign sources for this program. The value of all foreign subcontracts is only $7.1 million. Domestic electronics, engine, and avionics suppliers are capable, competitive, and will continue to be capable of competing for this and similar business.

## Availability of Domestic Sources

Although domestic suppliers are not now utilized for certain items for this program, multiple domestic suppliers with comparable capabilities are available to produce the foreign-sourced items, given some additional qualification time and cost. The satellite communication (SATCOM) data terminals are commercial-off-the-shelf (COTS) hardware and the Swiss vendor was chosen due to the technical capability of its product. Customers (prime contractors and first tier subcontractors) reported that foreign subcontractors were selected for price, performance, and/or schedule considerations.

### Predator

| Tier | Item(s) | Country | Domestic Suppliers? |
|---|---|---|---|
| 1 | Heads up Display System | Belgium | Many |
| 1 | Rotax Engine | Austria | Many |
| 1 | CRU and PMC Computer Boards | United Kingdom | Many |
| 2 | SATCOM Data Terminals | Switzerland | Many |
| 2 | VCR and Hi-8mm | Japan | Many |

IQ-1B, 05-3112, 20070117KLSV505A



**DEPARTMENT OF THE AIR FORCE**
DETACHMENT 3, 658 MATERIEL SQUADRON (AFMC)
16764 VIA DEL CAMPO COURT
SAN DIEGO, CA 97127

12 March 2007

MEMORANDUM FOR SAFETY INVESTIGATION BOARD (SIB) (Lt. Col. Douglas)

FROM: DET 3, 658th AESS

SUBJECT: Predator MQ-1B SIB for A/C 3112

1. The memorandum serves to provide additional information explaining my recommendation to develop a heavy fuel engine (HFE) for the MQ-1B.

2. This office is in the process of fielding an improved block for the ROTAX 914 engine. This improved engine, p/n UPA41040.6/8, addresses some known issues with the UPA 41040.5 mishap engine. The first 18 improved engines have been fielded, and we plan to replace all fielded engines within the next 6 months. Because this engine is commercial-off-the-shelf, we do not have definitive engineering design data regarding all aspects of the improvements. Based on our discussions with the prime contractor, the improved engine block reduces the risk of engine failure to include this mishap failure. Although we cannot quantify the level of risk reduction, the improved engine will be more reliable than the previously fielded engine. Therefore, it is our opinion that the level of risk associated with flying the improved engine is acceptable.

3. In addition to fielding an improved ROTAX 914 engine, we are concurrently pursuing a major MQ-1 program upgrade that includes a higher reliability heavy fuel engine. Based on our inability to adequately effect and verify changes in this commercial ROTAX product line, the program plans to allocate resources toward a long-term engine replacement solution.

4. If you have any questions, please contact me at

BRIAN D. RADUENZ, LT COL, USAF
Chief Engineer

Cc:    658th AESS (Lt Col James)

*MQ-1B, 03-3112, 20070117KLSV505A*



**DEPARTMENT OF THE AIR FORCE**
DETACHMENT 3 646 MATERIEL SQUADRON (AFMC)
16781 VIA DEL CAMPO COURT
SAN DIEGO, CA 92127

12 March 2007

MEMORANDUM FOR SAFETY INVESTIGATION BOARD (SIB) (Lt. Col. Douglas)

FROM: DET 3, 658th AESS

SUBJECT: Predator MQ-1B SIB for A/C 3112

1.  Based on our experience with the ROTAX 914 engine, our review of the facts in this mishap, and analysis and conclusions from previous engine related failures, our opinion regarding this mishap is as follows:

    The ROTAX 914 engine on aircraft #3112 failed due to an undetected internal flaw in the crankshaft. This flaw eventually led to a failure in the bearing, and subsequent catastrophic engine failure.

2.  The memorandum at Attachment 1 provides additional details regarding this conclusion.

3.  This conclusion most closely resembles the contractor report conclusion #2. In our opinion, this conclusion is more likely than conclusion #1, as potential misalignment of the crankshaft is less likely.

4.  The metallurgist report at Attachment C to the contractor report finds excessive wear and galling from a lack of lubrication to be causal. In our opinion, excessive wear was resultant from and subsequent to failure of internal engine components. There is no analytical basis for damage due to oil starvation.

5.  Recommendation: Design and integrate a high reliability heavy fuel engine (HFE) to increase the mean time between engine failures.

6.  If you have any questions, please contact me at

ORLAN D. RADUENZ, LT COL, USAF
Chief Engineer

Cc:    658th AESS (Lt Col James)

EXECUTIVE SUMMARY
AIRCRAFT ACCIDENT INVESTIGATION
MQ-1B PREDATOR S/N 03-3112
DEPLOYED LOCATION
17 January 2007

On 17 January 2007 at 2035Z, an MQ-1B PREDATOR, S/N 03-3112, 15th Reconnaissance Squadron, Creech AFB, Nevada, crashed during a reconnaissance mission while operating from a deployed location in the Central Command Area of Responsibility. Upon ground impact, the unmanned aircraft was severely damaged with losses valued at $4,160,391.00  No one was injured in the accident. Other than the Mishap Aircraft (MA), there was no damage to government or private property. There was very limited media interest. Approximately 14 hours into a 20 hour sortie, the aircraft sustained a momentary (two (2) seconds) drop in engine rotations per minute (RPM) followed 15 minutes later by catastrophic engine failure. Data logger analysis of changes in RPM, oil pressure, turbo oil temperature, and propeller pitch subsequent to the original two second RPM drop indicate the engine was failing over a period of approximately 15 minutes. However, monitored engine parameters remained within normal ranges until approximately the last minute before the engine seized. Therefore, the MA did not generate any form of caution or warning to the pilot of the impending failure until approximately 60 seconds prior to the engine completely failing.

There is clear and convincing evidence that the first point of failure was a crack in the crankshaft which propagated over time to the area of the #4 connecting rod bearing. The # 4 connecting rod ultimately failed and wedged itself in the opposing #3 cylinder causing the crankshaft to immediately stop approximately 15 minutes after the initial two second drop in engine RPM.

The pilot took appropriate actions to establish a glide to an unpopulated area with the intent to land the MA via KU band (satellite) control. By telephone, the Combined Air Operations Center (CAOC) directed the Mission Commander (MCC) to crash the MA rather than attempt a landing if there were no friendly personnel to secure the aircraft. The CAOC decision was based on the classified equipment the MA was carrying and the two Hellfire missiles. The CAOC determined that there were no friendly forces to secure the MA on the ground nearby so the Mishap Pilot 2 (MP2) intentionally crashed the MA into an unpopulated area. The remains of the MA and all classified equipment and weapons were recovered.

*Under 10 US.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.*

# UNITED STATES AIR FORCE
# AIRCRAFT ACCIDENT INVESTIGATION
# BOARD REPORT



## MQ-1B, S/N 03-3112

### 15th Reconnaissance Squadron
### 57th Wing
### Nellis AFB, NV



## LOCATION: Deployed Location
## DATE OF ACCIDENT: 17 January 2007

## BOARD PRESIDENT:
## LIEUTENANT COLONEL STEVEN J. PRESTON

## Conducted IAW Air Force Instruction 51-503



DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR COMBAT COMMAND
LANGLEY AIR FORCE BASE, VIRGINIA

15 AUG 2007

OFFICE OF THE COMMANDER
205 DODD BOULEVARD SUITE 100
LANGLEY AFB VA 23665-2788

**MEMORANDUM FOR ACC/JA**

**SUBJECT: AFI 51-503, Aerospace Accident Investigation Report – MQ-1B, S/N 03-3112, 15th Reconnaissance Squadron, 57th Wing, Nellis AFB, NV, 17 January 2007**

I have reviewed the Accident Investigation Board Report regarding the MQ-1B Predator, S/N 03-3112, that crashed in the AOR on 17 January 2007. The report prepared by Lieutenant Colonel Steven J. Preston complies with the requirements of AFI 51-503. This report is approved.

**RONALD E. KEYS**
**General, USAF**
**Commander**

**Attachment:**
**Accident Investigation Board Report**

*Global Power For America*

EXECUTIVE SUMMARY
AIRCRAFT ACCIDENT INVESTIGATION
MQ-IB PREDATOR S/N 03-3112
DEPLOYED LOCATION
17 January 2007

On 17 January 2007 at 2035Z, an MQ-1B PREDATOR, S/N 03-3112, 15th Reconnaissance Squadron, Creech AFB, Nevada, crashed during a reconnaissance mission while operating from a deployed location in the Central Command Area of Responsibility. Upon ground impact, the unmanned aircraft was severely damaged with losses valued at $4,160,391.00 No one was injured in the accident. Other than the Mishap Aircraft (MA), there was no damage to government or private property. There was very limited media interest. Approximately 14 hours into a 20 hour sortie, the aircraft sustained a momentary (two (2) seconds) drop in engine rotations per minute (RPM) followed 15 minutes later by catastrophic engine failure. Data logger analysis of changes in RPM, oil pressure, turbo oil temperature, and propeller pitch subsequent to the original two second RPM drop indicate the engine was failing over a period of approximately 15 minutes. However, monitored engine parameters remained within normal ranges until approximately the last minute before the engine seized. Therefore, the MA did not generate any form of caution or warning to the pilot of the impending failure until approximately 60 seconds prior to the engine completely failing.

There is clear and convincing evidence that the first point of failure was a crack in the crankshaft which propagated over time to the area of the #4 connecting rod bearing. The # 4 connecting rod ultimately failed and wedged itself in the opposing #3 cylinder causing the crankshaft to immediately stop approximately 15 minutes after the initial two second drop in engine RPM.

The pilot took appropriate actions to establish a glide to an unpopulated area with the intent to land the MA via KU band (satellite) control. By telephone, the Combined Air Operations Center (CAOC) directed the Mission Commander (MCC) to crash the MA rather than attempt a landing if there were no friendly personnel to secure the aircraft. The CAOC decision was based on the classified equipment the MA was carrying and the two Hellfire missiles. The CAOC determined that there were no friendly forces to secure the MA on the ground nearby so the Mishap Pilot 2 (MP2) intentionally crashed the MA into an unpopulated area. The remains of the MA and all classified equipment and weapons were recovered.

*Under 10 US.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.*

# SUMMARY OF FACTS AND STATEMENT OF OPINION
# MQ-IB, S/N 03-3112, PREDATOR ACCIDENT
# 17 January 2007
# TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| TABLE OF CONTENTS | | | i |
| COMMONLY USED ACRONYMS & ABBREVIATION | | | 2 |
| SUMMARY OF FACTS | | | |
| 1. | AUTHORITY, PURPOSE, AND CIRCUMSTANCES | | 3 |
| | a. | Authority. | 3 |
| | b. | Purpose. | 4 |
| | c. | Circumstances. | 4 |
| 2. | ACCIDENT SUMMARY | | 4 |
| 3. | BACKGROUND | | 4 |
| | a. | 15th Reconnaissance Squadron | 4 |
| | b. | 57th Wing | 5 |
| | c. | U.S. Air Force Warfare Center | 5 |
| | d. | Predator System | 5 |
| 4. | SEQUENCE OF EVENTS | | 6 |
| | a. | Mission. | 6 |
| | b. | Planning. | 6 |
| | c. | Preflight. | 7 |
| | d. | Flight. | 7 |
| | e. | Impact. | 12 |
| 5. | MAINTENANCE | | 12 |
| | a. | Forms Documentation. | 12 |
| | b. | Inspections. | 13 |
| | c. | Maintenance Procedures. | 13 |
| | d. | Maintenance Personnel and Supervision: | 13 |
| | e. | Fuel, Hydraulic and Oil Inspection Analysis. | 14 |
| | f. | Unscheduled Maintenance. | 14 |
| 6. | AIRCRAFT AND AIRFRAME, MISSILE, OR SPACE VEHICLE SYSTEMS | | 18 |
| | a. | Condition of Systems. | 18 |
| | b. | Testing. | 18 |
| 7. | WEATHER | | 18 |
| 8. | CREW QUALIFICATIONS | | 18 |
| | a. | Mishap Pilot 1 | 18 |
| | b. | Mishap Pilot 2 | 19 |
| | c. | Mishap Sensor Operator | 19 |
| 9. | MEDICAL | | 19 |
| | a. | Review of Medical Records. | 19 |
| | b. | Lifestyle Factors. | 19 |
| | c. | Review of Personal Histories. | 19 |
| | d. | Toxicology Results. | 19 |

10.   OPERATIONS AND SUPERVISION                                          20
      a.    Operations.                                                    20
      b.    Supervision.                                                   20
11.   HUMAN FACTORS ANALYSIS                                              20
      a.    Procedures/Guidance                                           21
      b.    Communication                                                  21
      c.    Attention Management                                          21
12.   GOVERNING DIRECTIVES AND PUBLICATIONS                               21
      a.    Primary Operations Directives and Publications.               21
      b.    Maintenance Directives and Publications.                      22
      c.    Legal Instructions                                            22
      d.    Known or Suspected Deviations from Directives or Publications. 22

13.   NEWS MEDIA INVOLVEMENT                                              23

STATEMENT OF OPINION                                                     24

INDEX OF TABS                                                            26

## COMMONLY USED ACRONYMS AND ABBREVIATIONS

AAR – Air to Air Refueling

AEF – Air Expeditionary Force

AFB - Air Force Base

AGL – Above Ground Level

AMXS – Aircraft Maintenance Squadron

ARMS – Automated Records Management System

ATO – Air Tasking Order

B-CAB –assistant mission director for CAOC

CAB – mission director for CAOC

CAOC – Combined Air Operations Center

CAP – Critical Action Procedure

CCO – Chief of Operations

CFAC – Combined Forces Air Component

CHAT – internet text communications

DCFAC – Deputy Combined Forces Air Component Commander

DNIF – Duties Not to Include Flying

DO – Director of Operations

DVD – digital video disc

EGTs – Exhaust Gas Temperature

EOD – Explosive Ordinance Disposal

KU – Satellite Link Frequency Band

LNO – Liaison Officer

LRE - Launch Recovery Element

MC – Mishap Crew

MCC – Mission Commander

MIRC - Multi-user Internet Relay Chat

MP1 – Mishap Pilot 1

MP2 – Mishap Pilot 2

OG – Operations Group

OPS - Operations

PCA – Permanent Chance of Assignment

PCS – Permanent Change of Station

POC – Predator Operations Center

POC-N – Predator Operations Center - Nellis

RAP-CON – Radar Approach Control

RPM – Revolutions per minute

RTB – Return to Base

SFO – Simulated Flame Out

SIDO – Intelligence Duty Officer

SIPRNET - SECRET Internet Protocol Router Network

ERS - Expeditionary
Reconnaissance Squadron

SMC – Senior Mission
Coordinator

FEF - Flight Evaluation
Folder

SO – Sensor Operator

FOL – Forward Operating
Location

SODO – Senior Operations
Duty Officer

GA – General Atomics

TDY – Temporary Duty

GCS – Ground Control
Station

TiVo – DVD recorder

IDMT – Independent Duty
Medical Technician

TS – top secret

IDO – Installation
Deployment Officer

UAV – unmanned aerial
vehicle

IED – Improvised Explosive
Device

UCMJ – Uniform Code of
Military Justice

ISR – Intelligence,
Surveillance and
Reconnaissance

VIT-1 – Variable Information
Table

ISRIS – classified information
data system

VOIP – Voice Over Internet
Phone

JF – Joint Forces

VPP – Variable Pitch
Propeller

KIAS – Knots indicated
airspeed

VVI – Vertical Velocity
Indicator

The above list was compiled from the Summary of Facts, the Statement of Opinion, the Index of Tabs, DoD Dictionary of Military Terms (http://www.dtic.mil/doctrine/jel/doddict/), and witness testimony.


# 1. AUTHORITY, PURPOSE, AND CIRCUMSTANCES

### a. Authority

On 16 March 2007, by Special Order M-07.4A, amending SO M-07.04, dated 23 February 2007, General Ronald E. Keys, Commander Air Combat Command, appointed Lieutenant Colonel Steven J. Preston to conduct an aircraft accident investigation of the 17 January 2007 crash of an MQ-1B Predator unmanned aerial vehicle (UAV) aircraft, serial number (S/N 03-3112), in Iraq. The investigation at Nellis Air Force Base (AFB), NV, from 27 March 2007 through [ending date]. Technical advisors were Major Jennifer E. Fournier (legal advisor), Major Matthew L. Soria (pilot advisor), Captain James W. Ellison (maintenance advisor), Captain Ryan N. Harris (medical advisor), and Technical Sergeant Teresa Jo Ulring (recorder/paralegal). (Tab Y-1, Y-2).

### b. Purpose

This aircraft accident investigation was convened under Air Force Instruction (AFI) 51-503, *Aerospace Accident Investigations*. The primary purpose is to gather and preserve evidence for claims, litigation, and disciplinary and administrative actions. In addition to setting forth factual information concerning the accident, the board president is also required to state his opinion as to the cause of the accident or the existence of factors, if any, that substantially contributed to the accident. This investigation is separate and apart from the safety investigation, which is conducted pursuant to AFI 91-204, *Safety Investigations and Reports*, for the purpose of mishap prevention. The report is available for public dissemination under the Freedom of Information Act (5 United States Code (U.S.C.) §552) and the Air Force Supplement to Department of Defense Regulation 5.400.7, *Department of Defense Freedom of Information Act Program*.

### c. Circumstances

The accident board was convened to investigate the Class A accident involving MQ-1B Predator unmanned aerial vehicle (UAV) aircraft, serial number (S/N 03-3112), assigned to the 15th Reconnaissance Squadron, 57th Wing, Nellis AFB, NV, which crashed on 17 January 2007.

## 2.    ACCIDENT SUMMARY

The mishap aircraft (MA), MQ-1B Predator, S/N 03-3112, was performing an intelligence, surveillance, and reconnaissance (ISR) mission at a Forward Operating Location (FOL) in support of Operation Iraqi Freedom (Tab K-3). The Mishap Crew (MC) consisted of Lt Col Eric Johnson, the mishap pilot (MP1), Major Richard Kattau, mishap pilot (MP2), and SMSgt Darrel Chipman, mishap sensor operator (MSO) (Tab B-3). Capt Jason Grandy was working in the Predator Operations Center – Nellis (POC-N) as the mission commander (MCC) with TSgt Joe Heit as the mission coordinator. The mission was a scheduled 20-hour sortie. Approximately 14 hours into the flight, the MA lost altitude due to a lack of thrust and crashed (Tab C-3). The MA did not survive the impact and sustained severe structural damage. The remains and key components of the aircraft were recovered and analyzed. The loss is valued at $4,160,391.00 (Tab P 3-4). There were no injuries associated with the accident; other than damage to the MA, there was no damage to government or private property. There was minimal media interest (Tab EE-1).

## 3.    BACKGROUND

### a. 15th Reconnaissance Squadron

The 15th Reconnaissance Squadron's primary mission is to provide theater commander-in-chiefs with deployed long endurance, real-time aerial reconnaissance, surveillance, and target acquisition flying the MQ-1A Predator. Operating with medium altitude multi-sensor platforms, they report battlefield conditions to warfighters in addition to collecting and distributing imagery products to commanders and national leadership. The squadron operates out of Nellis AFB, NV (Tab CC-1.1).

**b. 57th Wing**

The 57th Wing oversees the dynamic and challenging missions for all flying operations at Nellis AFB, NV, including the US Air Force Weapons School, "Red Flag" and "Air Warrior" training, the US Air Force Air Demonstration Squadron (Thunderbirds) and the U. S. Air Force Warfare Center's (USAFWC) test and evaluation activities. The Wing was reorganized in 1992 to reflect the current structure. The Wing includes the 57th Operations Group, 57th Maintenance Group, USAF Advanced Maintenance and Munitions Officers School, USAF Air Ground Operations School and the USAF Weapons School (Tab CC-1.1).

**c. U. S. Air Force Warfare Center**

The U.S Air Force Warfare Center, headquartered at Nellis AFB, NV, manages advanced pilot training and integrates many of the Air Force's test and evaluation requirements. The center was formally established in 1966 as the USAF Tactical Fighter Weapons Center, which concentrated on the development of forces and weapons systems that were specifically geared to tactical air operations in conventional (non-nuclear) war and contingencies. It continued to perform this mission for nearly 30 years, undergoing several name changes in the 1990s. In 1991, the center became the United States Air Force (USAF) Fighter Weapons Center. In 1992, the USAF Weapons and Tactics center, and in October 1995, became the Air Warfare Center. The USAFWC uses the vast ranges of the 2.9 million-acre restricted air and land and five million additional acres shared with commercial aircraft Nellis Range Complex – the largest such range in the United States. The Eglin AFB, Florida ranges add even greater depth to the center's capabilities, providing water and additional electronic expertise to the center. The USAFWC oversees operations of the 57th Wing, 98th Range Wing, and 99th Air Base Wing at Nellis AFB, NV, the UAV Battlelab at Creech AFB, NV, the 53rd Wing at Eglin AFB, FL. (Tab CC-1.5–1.6).

**d. Predator System**

The RQ-1 and MQ-1 Predator aircraft are medium-altitude, long endurance, UAVs. The MQ-1's primary mission is interdiction and conducting armed reconnaissance against critical perishable targets. When the MQ-1 is not actively pursuing its primary mission, it augments the RQ-1 as a Joint Forces Air Component Commander-owned theater asset for reconnaissance, surveillance and target acquisition in support of the Joint Force Commander. (Tab CC-2)

The RQ-1 and MQ-1 Predator aircraft are advanced weapons systems, not just aircraft. A fully operational system consists of four aircraft (with sensors), a ground control station (GCS), a Predator Primary Satellite Link (PPSL), and approximately 82 personnel for continuous 24-hour operations. (Tab CC-2)

The minimum number of crewmembers for the Predator aircraft is one pilot and one sensor operator. They fly the aircraft from inside the GCS via a line-of-sight (LOS) data link or a satellite data link for beyond LOS flight. The aircraft is equipped with a nose camera with color resolution (generally used by the pilot for flight control), a day variable-aperture television camera, a variable aperture infrared (IR) camera (for low light/night), and a synthetic aperture

radar (SAR) for looking through smoke, clouds or haze. The cameras produce full-motion video and still frame radar images. The sensor operator (SO) monitors and operates various types of sensor equipment (e.g. IR, video) that can be uploaded on the Predator aircraft. (Tab CC-2)

The MQ-1 Predator carries the Multi-spectral Targeting System (MTS) with inherent Hellfire missile targeting capability and integrates electro-optical, IR, laser designator, and laser illuminator into a single sensor package. The aircraft can employ two laser-guided Hellfire anti-tank missiles with the MTS ball. (Tab CC-2)

Each Predator aircraft can be disassembled into six main components and loaded into a container nicknamed "The Coffin." This enables all system components and support equipment to be rapidly deployed worldwide. The largest component in the Predator deployment package is the GCS and is designed to be rolled into a C-130 cargo aircraft. The air transportable PPSL is a satellite system mounted on a trailer. It provides communications between the GCS and the aircraft when it is beyond LOS and is a link into secondary intelligence dissemination networks. The Predator system needs 5,000 feet by 75 feet (1,524 meters by 23 meters) of hard surface runway with clear LOS to each end from the GCS to the air vehicles (IAW TO 1Q-1(M)B-1, p 5-1). (Tab CC-2)

## 4.    SEQUENCE OF EVENTS

### a. Mission

The MA was flying an ISR mission in support of OIF. The MA, callsign Primal 23, was launched from a FOL. The mission was directed by a classified Air Tasking Order (ATO). All crew members were trained and qualified to operate in their assigned capacities. MP2 was not an original part of the crew but joined the crew to assist them when abnormal flight indications developed (Tab G -20-33, R-21).

### b. Planning

The mission was planned as an ISR flight, with the option to change roles as required to fulfill Hellfire missile employment taskings (Tab K-3-4). Due to the nature of on-going Predator Operation Center Nellis (POC-N) operations, standard procedures have been developed for mission preparation. Classified mission materials such as Air Tasking Order (ATO), communications card, target deck, notices to airmen (NOTAMs), and current area of responsibility (AOR)-specific special instructions (SPINs) were prepared by the previous shift for the MC. The MC arrived at work at 0600 local time (L) to sign-out, check the flight crew information file (FCIF), and fill out Personal Risk Factor sheets, discussed in the next paragraph. The MC attended a mass flight brief shortly after their arrival at 0630L (Tab V-1.1, R-10). The mass brief included current weather conditions, an emergency procedure of the day brief, a current intelligence brief, and a mission overview. The MC then performed a crew pre-mission briefing at approximately 0650L, which covered Hellfire missile operations, handing off of aircraft emergencies, and crew resource management (CRM). The MP led this discussion with inputs from the crew (Tab V-1.1, R-10).

The Operational Risk Management (ORM) program of the 15 RS is a supervisory tool to identify potential high risk situations for aircrew operating Predator aircraft. The crews use ORM to identify tasks that may require extra briefing attention or possibly a change of plan (Tab K-7). Supervision uses the overall scores to identify missions that may need additional attention.

### c. Preflight

Prior to the crew re-locating to the GCS the MC received a brief from the MCC that included a weather update. The MC proceeded to the GCS at approximately 1045L (Tab V-1.1). Personnel involved in the preflight, start, taxi and takeoff of the aircraft reported nothing out of the ordinary during the launch phase of the mishap mission (Tab D-8,14).

### d. Flight

The aircraft was launched during the previous day from the FOL at 0558 zulu (Z) time and was planned for a 20 hour sortie (Tab K-10). The initial POC-N crew received control of the MA from the launch crew at 0630Z (Tab K-10). The aircraft operated in the AOR conducting mission work for 12 hours and was controlled by 6 previous crews working 2 hour shifts prior to the MC taking over (Tab K-9). Aircraft forms showed no significant malfunctions or problems had been noted by any of the previous crews (Tab D-8). The MC arrived at the GCS to replace the previous crew at 1100L (Tab V-1.1, K-9) The MC received a changeover brief from the previous crew, which included flight administrative details, the status of the current target, the status of aircraft systems, and the emergency mission settings (Tab R-15).

MC was seated in the GCS with the MP1 in the left (pilot) seat and the MSO in the right (sensor operator) seat (IAW TO 1Q-1(M)B-1,p1-16). The MP2 was not originally part of the crew but joined them to offer aid after the event developed. The MP1 performed an operations check and ensured aircraft systems were functioning normally (Tab V-1.1). These operations checks are performed hourly with a shortened check performed every half hour. Among other tasks, these require the pilot to enter aircraft fuel and oil quantities and propeller pitch servo temperatures into a Microsoft Excel spreadsheet on a computer screen located between the pilot and sensor seats (Tabs K-9).

The MSO continued the observation of a target that the previous crew had been observing (Tab R-15). In doing so, the MSO was keeping the sensor pointed at and zoomed in around the target area. Because the target area was nearly dark, the preferred camera on the Predator was the IR camera. Both the MP1 and the MSO had the IR video displayed on their screens. As the IR camera was being used to observe the target, there was no forward looking video available to the MP that showed the horizon; this is a normal procedure. However, in this configuration the only horizon reference is the heads-up display (HUD) overlay on the pilot's video display screen.

The MP1 had the aircraft flying in preprogram mode. In this mode, the aircraft flies a preprogrammed flight path as determined by a certain number of points included in operational mission data that is sent to the aircraft. This operational data will include airspeeds, altitudes, IFF data, and many other commands similar to a complete auto-pilot system. The Predator will

essentially fly itself along designated navigational waypoints while operating in this mode (IAW TO 1Q-1(M)B-1, p1-84). Operational missions are used to keep the aircraft in a desired location to observe a particular target while reducing the pilot workload. This allows the pilot to focus attention on other pilot tasks. This mission had the aircraft flying at 8500 feet mean sea level (MSL) in close proximity to the target area (Tab V-1.2).

According to aircraft tapes, testimony and teardown inspection and evaluation of General Atomics Aeronautical Systems Incorporated (GA/ASI) report and Fracture Investigations Metallurgical report of engine (P/N UPA41040-5, S/N 4418738) revealed the aircraft was operating unremarkably for the first 14.1 hours of flight. At 20:03:20Z (3,317 sec on data logger) the engine had been operating, with all auto-pilot features enabled, at a consistent 4,000 rpm but experienced a momentary drop for 1-2 seconds down to 2,600 rpm . The engine resumed its operations at 4,000 rpm at which it remained for another 16 minutes which was adequate to maintain level flight. Concurrently, the aircraft's propeller pitch changed from a stable +17 degrees to +15 degrees but had decreased to a minimal value of +9 degrees for 1-2 seconds (Tab J-27). The propeller pitch stabilized and remained at +15 degrees for the next 16 minutes (until 4295 seconds on data logger Tab J-31). The oil pressure also experienced a temporary drop from 45 psi to 31 psi. (J-31). During this short period of time the MC did not detect the temporary dip in engine rpm, the propeller pitch change, or the drop in engine oil pressure as all systems remained within normal operating limits and did not trigger any warnings or indications on the heads down displays for the next 15.5 minutes (IAW TO 1Q-1(M)B-1, p 5-2).

Post crash analysis stated, "The most plausible cause of the failure of this engine is an undetected internal flaw in the crank shaft. This flaw in the crankshaft over time and cycles propagated to a point where it reached the surface of the #4 crankshaft rod bearing throw, and created knife edge that began cutting away the softer material of the #4 connecting rod bearing." During the temporary engine rpm event the #4 bearing material was shaved away, increasing the clearance between the crankshaft and the rod end (Tab J-124). The MA engine continued to deteriorate until 4250 seconds at which time the engine rpm became erratic while the Variable Pitch Prop (VPP) changed from 12 degrees to 8 degrees (Tab J-27). The cumulative effects of the damage created a large amount of debris, filling the oil return line banjo fitting. This stopped the return oil and exhaust gas from escaping the engine block. As pressure built up, it most likely caused the propeller shaft seal to fail, allowing the engine oil to escape", Metallurgical report (J-124). At time 4310, the oil level
dropped from 100% to 0% in 64 seconds and remained for the duration of the sortie (Tab J-11,28). The compromised propeller shaft seal allowed the escaping oil to leak into the internal engine compartment with no detectable exterior indications (Tab V-1.2).

Even though the monitored engine parameters were within normal limits, the internal components of the engine continued to disintegrate, "the missing rod bearing materiel effectively lengthened the connecting rod, allowing the piston to hit the cylinder head and intake and exhaust valves (IAW TO 1Q-1(M)B-1,p 5-2). This continual hammering led to the failure of the piston top, resulting in the piston top separating from the piston wristpin and connecting rod. This allowed the connecting rod and wristpin to hit the bottom of the piston, forcing it to the top of the cylinder. The continual hammering of the number #4 connecting rod led to the crankshaft

becoming misaligned and allowing the crankshaft counter weights to begin hitting the rest of the cylinders" (Tab J-124). This misalignment, combined with a lack of lubrication, fatigue and crankshaft overloading, resulted in fracture of both the #4 connecting rod that got lodged into the crankcase, and fracture of the crankshaft itself. Compromise of these two engine components resulted in a catastrophic engine failure and seizure, occurring at 4410 sec, 20:21.32Z (Tab J-10, 11).

The aircraft experienced two significant events which were recorded on the data loggers; the 1-2 second dip and recovery of the engine rpm at 20:03:20Z and the final deterioration and seizure sequence at 20:21:32Z (Tab J-27). The MC did not note any abnormalities with aircraft performance until the engine seized because all Variable Information Table (VIT-1) readouts were within normal operating ranges for all engine variables, the aircraft maintained speed and altitude, and because no HDD warnings displayed (Tab J-27, V-1.2). The first indication to the crew that the aircraft and its engine were operating abnormally was the audible warning tone to the aircrew alerting them to look at their HDD warning area. The system alerts aircrew to abnormal conditions with three simultaneous indications to direct their attention to the HDD warning screen area. The letter "E" in the HUD illuminated, the audible warning tone activated, and HDD messages displayed in programmed priority. MP1 stated, "the alarm continued to sound and the SO announced warnings as they appeared, low oil quantity....low oil pressure...rpm sensor 1 fail...rpm sensor 2 fail and so on" (Tab V-1.2 & IAW TO 1Q-1(M)B-1,p4-8).

MP1 stated, "I made the determination that the engine had failed when I read my RPM indications on the HUD as 0 and associated it with 0 OIL QUANTITY and 0 OIL PRESSURE on the HDD. I noticed EGTs were dropping below 1000 on VIT-2 and RPM 0" (Tab-V1.2). MP1 "concluded that the engine had seized" and noted that the plane began an initial descent with a vertical velocity indicator (VVI) of -150 feet per minute. The MSO commanded the MTS ball aft to view the aircraft's fuselage. The MC noted there were no exterior indications of an oil leak and that the propeller was wind-milling MP1 concluded there was a failure and disconnect somewhere between the engine and the propeller (Tab V-1.2).

The MC accomplished appropriate Critical Action Procedures (CAPs) associated with in-flight engine failure by running the "Engine Failure" checklist in accordance with Dash-1 procedures (Tab-V1.2). MP1 commanded the aircraft to maintain 66 KIAS and commanded a Westerly heading toward the initial landing runway (Tab-V1.2). MP1 contacted air traffic control (ATC) and notified them of the aircraft's descent out of its assigned altitude and declared an emergency (Tab-V1.3). During this time the Mission Controller who was aware of the aircraft's condition notified the CAOC Predator LNO via a secure chat channel, alerted the Mission Commander (MCC) and alerted the rest of the nearby members of the POC-N that the aircraft declared an emergency and it had engine problems (Tab R-15, V-1.3). The MCC was one of the members present to hear the mission controller's call in the POC-N and he too was on the phone with the Predator LNO (Tab R-15). The CAOC Predator LNO was informed of the aircraft's loss of engine and loss of altitude and engine emergency at 20:25Z (Tab N-3).

The MC accomplished appropriate Critical Action Procedures (CAPs) associated with in-flight engine failure by running the "Engine Failure" checklist in accordance with Dash-1 procedures

(Tab-V1.2). MP1 commanded the aircraft to maintain 66 KIAS and commanded a Westerly heading toward the initial landing runway (Tab-V1.2). MP1 contacted air traffic control (ATC) and notified them of the aircraft's descent out of its assigned altitude and declared an emergency (Tab-V1.3). During this time the Mission Controller who was aware of the aircraft's condition notified the CAOC Predator LNO via a secure chat channel, alerted the Mission Commander (MCC) and alerted the rest of the nearby members of the POC-N that the aircraft declared an emergency and it had engine problems (Tab R-15, V-1.3). The MCC was one of the members present to hear the mission controller's call in the POC-N and he too was on the phone with the Predator LNO (Tab R-15). The CAOC Predator LNO was informed of the aircraft's loss of engine and loss of altitude and engine emergency at 20:25Z (Tab N-3).

A civilian airfield was located beyond the unpopulated field and was a possible landing site for a period of time (Tab V-1.2). The MC attempted to contact the civil airfield's control tower on emergency guard frequency but had no successful contact (Tab-V1.3). The MA did not receive time critical clearance to enter the civil airfields' airspace and was forced to turn away from its border. MP1 stated, "I had no radio contact for de-confliction with tower. The turn away forced my decision not to attempt a landing at the civil airfield and I discontinued contact attempts with tower" (Tab V-1.3). Once the MA turned away from the airfield it no longer possessed sufficient altitude and energy to recover to the civil airfield and required another suitable location for recovery. Concurrently, Radar Approach Control (RAPCON) was notified via secure chat that the MA was in a descent and needed airspace clear of manned aircraft (Tab V-1.3). RAPCON advised the MC the airspace they were operating in was clear of other aircraft and later provided a contact frequency for the civil tower controllers (Tab V-1.3). MP1 stated, "At this point we were a glider and the only thing I put importance on was maintaining control, selecting a suitable landing site, clearing manned aircraft and avoiding populated areas" (Tab V-1.3).

MP1 stated, "My desire was to preserve as much of the aircraft as much as possible for recovery" (Tab-V1.3). The MC was not trained in Launch and Recovery operations (LRE) which is a normal procedure of Predator remote split operations. They were a qualified mission aircrew, which had never been trained to perform MQ-1B Predator landings (Tab G-21). MP2 entered the GCS as the aircraft was approximately 4000' MSL and joined the crew as another member to aid MP1 and MSO (Tab R-23). While assessing the situation, MP2 stated, "VIT-1 was pretty much all red" and "the very top one was engine stopped" (R-21). MP2 verified that the original mishap crew had all switches and settings in proper position in accordance with emergency procedures and replaced MP1 as the pilot in the seat (MP2 was an instructor and fully qualified to land the MQ-1) and in control of the aircraft (Tab R-24). MP2 and the rest of the MC intended to salvage as much as possible of the plane and force land it in the best suitable position of the un-populated field below (Tab R-26). During the aircraft's descent the CAOC was in contact with the MC via secure chat and telephone between the Predator LNO and the mission controller. The direction the MC received was to safely land the aircraft if it could be accomplished near friendly forces who could secure the site (Tab R-18, 22, 24). If friendly forces were not identified or available to secure the crash site then the crew was to impact the aircraft into the ground with intentions of maximum destruction to the aircraft and its equipment (Tab R-18, 22, 24).

MP2 stated, at this point we "discussed whether we wanted to try to take it to the civil airfield which was what we were looking at out it front. I said it probably wasn't the best idea because if something happened there, if we lost control between here and there we'd be over a populated area. Right now we are over an unpopulated area and there's no need to put people at risk to try to save it at this point" (Tab R-22). MP1 stated he agreed with MP2's comments by saying, "That makes sense" (Tab R-22). The MC arrived at the same conclusion the second time they addressed the issue of force landing a weapon carrying MA at a civilian airfield without clearance to enter its airspace. The MC's conclusion is in accordance with TO 1Q-1(M)B-1,p3-19,32. During forced landings the decision to land at an airfield or unpopulated area rests with the pilot. TO 1Q-1(M)B-1,p3-19 Engine Failure checklist warning states, "When landing off the airfield, prioritize actions to minimize collateral damage, injury, and/or loss of life." The MC considered this guidance and added AGM-114 withdrawl distance of nonessential personnel of 4,000 ft (IAW TO 1Q-1(M)B-34-1CL-1). The MC, therefore made a decision to not force land the MA at a civil airfield which could expose an unknown population to the dangers of burning weapons and toxic materials associated with an MQ-1B post crash fire.

The MC turned the MA toward the unpopulated field below. MP1 lowered the aircraft landing gear in accordance with proper emergency procedures because the remaining battery voltage was 24.2V which was near the minimum to guarantee full gear extension (Tab- V1.3). Seven minutes after engine failure, the MC changed their plan to no longer recover the aircraft at the civil airfield (Tab R-24, Z-1). The MC turned the aircraft toward a large unpopulated field with intensions of a full aircraft recovery (R-26).

The MC was in control of the aircraft throughout its descent to the desert floor. During this time, the MC commanded 4 descending spirals to set up an approach to what was perceived as the best location to force land the aircraft (Tab Z-1). During the descent that took 14.5 minutes the crew continued to perform checklists in association with recovering an aircraft with a non functioning engine. The MC intended to land the aircraft and effect minimal damage even though command and return link was limited to KU satellite link which has a 2-3 second delay (IAW TO 1Q-1(M)B-1,p5-19 & Tab V-1.3). The aircraft system is required to be launched and recovered in LOS from a GCS which is located on scene at the operating airfield (IAW TO 1Q-1(M)B-1,p1-238). A satellite controlled forced landing is considered an emergency procedure and performed only as a last resort (IAW TO 1Q-1(M)B-1,p3-33). The aircraft did not have adequate elevation to glide back to its departure airfield (IAW TO 1Q-1(M)B-1,p3-39). The MC properly analyzed this and selected a suitable minimally populated area within glide distance and within a limited amount of battery life which remained on the aircraft's batteries (Tab V-1.3).

MP2 attempted to command the aircraft in a manner as to keep both options open for a long as possible to not damage the aircraft unless deemed necessary by the CAOC chain of command (Tab R-24). Passing 1,000 MSL at 20:35:30Z the Predator LNO relayed via telephone to the mission coordinator in the POC-N who then via interphone notified the MC that the order was to destroy the aircraft (Tab R-24, 26; V-1.4). MP1 stated "The IP set up an approach pitched down accelerated rolled left and impacted the ground at 17/2035Z. Speed was about 138-140IAS at impact" (Tab V-1.4). The aircraft video recording matches testimony as the impact occurred at 20:35:48Z at and angle of approximately 20 degrees nose low (Tab Z-1).

### e. Impact

On 17 January 2007, the MA impacted the ground at a 20:35:48Z at a remote FOL. The MA impacted with the landing gear fully extended (Tab V-1.3; Z-1). The MP2 testimony and video recording from the IR camera show that the aircraft struck the ground nose first with a depression angle of approximately 20 degrees nose low at a speed of 140KIAS (Tab Z-1). The MA was destroyed on impact with no large, significant parts surviving the impact. The MA did not appear to slide along the ground as over-head video provided from another Predator showed near complete destruction (Tab Z-2). The two AGM-114 Hellfire missiles were recovered (Tab N-4). Upon impact with the ground, all communication was lost between the GCS and the aircraft. Once the MC was sure the aircraft crashed, they secured all pertinent information and data and secured the GCS until the 57th Wing Safety Office could impound the GCS (Tab R-9, 10). No injuries were sustained during this sortie (Section 9).

## 5. MAINTENANCE

### a. Forms Documentation

Every aircraft in the USAF inventory has a dedicated set of both written and electronic maintenance records used to record all flight and maintenance activities on the aircraft. The Air Force Technical Order (AFTO) Form 781 series of forms, as well as a computerized database known as the Core Automated Maintenance System (CAMS) collectively provide maintenance, inspection, servicing, configuration, status, and flight records. These combine to track every maintenance action on the aircraft. As maintenance actions are completed on the aircraft, the AFTO Form 781s are removed from the aircraft's active forms binder at the end of the flying period and stored in a jacket file, along with all other aircraft historical data. Additional documentation kept in the jacket file may include Time Compliance Technical Orders (TCTO). TCTOs contain critical maintenance information and instructions for a specific airframe. TCTOs are released as a quick means to update Technical Orders (TOs) or maintenance directives. These updates may direct certain maintenance tasks to be performed on similar airframes within a specified time.

A thorough and comprehensive review of the MAs AFTO Form 781 series forms and jacket file was conducted. The review encompassed 90 days preceding the mishap to the mishap date. This review revealed no evidence of a pending failure of any of the aircraft's systems or more specifically the engine components. There were no uncorrected maintenance discrepancies documented in the aircraft forms which were relevant to the mishap. Additionally, no TCTO's were overdue or coming due in the near future. The AFTO 781 forms for the GCS system were not reviewed as they were not relevant to the cause of the mishap.

While there were no clear indicators found in the forms that would point the investigation to any causal factors; it is important to note that there were numerous inconsistencies found in the forms. Inspection timelines from one section did not match up with other inspections in another section yet both occurred on the same day (D-8). Additionally, a large section of forms were identified as missing (U-1).

The AIB reviewed CAMS data from 90 days prior to the mishap up to the actual mishap flight. CAMS data indicated no maintenance trends existed and no "could not duplicate" or repeat discrepancies had been annotated.

### b. Inspections

A routine 60 day engine inspection was conducted on 11 January 2007. This inspection was annotated in the aircraft forms (D-37) and all routine follow on maintenance for this inspection was also accomplished and documented correctly. Additionally, there is no documented evidence of any engine abnormality discovered during the inspection or during the subsequent engine run.

All other maintenance documentation, other than the minor discrepancies listed in section "s" was satisfactorily accomplished in accordance with all applicable maintenance directives.

There are two possible causes that most likely led to the failure of the crankshaft:

A possible cause of the crankshaft failure was the propagation of a stress riser that developed during a possible propeller strike during an off-runway incident when the mishap engine was installed on a different aircraft. According to Tab J, the metallurgical analysis received from the SIB revealed the engine installed on the MA,(S/N 4418738) was involved in an off-runway incident where the propeller assembly (S/N 3239) had to be sent back to the manufacturer to solve an out of balance problem. The engine was also removed and investigated for damage. A four hour engine run was performed with no engine anomalies noted. The engine was returned to service and performed flawlessly for the next 746 hours of engine operating time. At the time of the crankshaft failure, the engine had accumulated 954 total operating hours out of the 1,080hour engine life cycle. The engine analysis determined this as the least likely cause of failure and impossible to determine 746 engine hours after the possible propeller strike.

The probable cause of the crankshaft failure was determined to be internal failure of the crankshaft due to an undetected material failure. Page 124 of Tab J states: "The most plausible cause of the failure of this engine is an undetected internal flaw in the crankshaft. This flaw was most likely missed during the manufacturing and assembly process."

### c. Maintenance Procedures

A complete review of all contract maintenance documentation showed that all maintenance practices of the maintenance personnel were in compliance with all TO's, safety operating instructions and local operating directives. Based on all the information gathered and reviewed by the AIB there was nothing found to be causal in procedures conducted by any contract maintainer.

### d. Maintenance Personnel and Supervision

The FOL is completely contract maintenance. General Atomics/Aeronautical Systems Incorporated (GA/ASI) and its technicians are solely responsible for all aircraft and support

equipment assigned to the FOL. They conduct all maintenance and perform all inspections for the aircraft assigned to that location. All technicians involved at the time of the mishap and at both locations were current in their training and able to perform all assigned duties (G-4.1- 4.2).

Additionally, based on an informal phone call to the deployed site lead during the time of the mishap, the site lead stated that operations tempo was not a factor during this timeframe. The technicians were not under abnormal stress due to their flying mission requirements, nor were there any aircraft maintenance issues prevalent that would have played a role in the mishap.

### e. Fuel, Hydraulic and Oil Inspection Analysis

Tab J revealed to the AIB that analysis of the fuel cart used on the MA prior to takeoff was conducted and found to be within normal operational levels. Post impact fire made retrieval of any additional fluids difficult; however, a small amount of oil was recovered and tested. The results were consistent with having achieved these levels post engine destruction and impact.

### f. Unscheduled Maintenance

Based on the aircraft forms and all other data given there is no significant reason to believe that any unscheduled maintenance occurred that would have been contributory to the mishap. The latest inspection performed on the MA was a routine 60hr engine inspection (D-8). This inspection is conducted every 60 hours of engine operating time and is a very basic preventative maintenance check of the engine. This inspection takes place at the FOL and is conducted by one or two technicians. When performed properly the entire inspection should take approximately two hours. During the inspection spark plugs and spark plug wires are changed as well as other basic things of that nature. It is important to note that the crankshaft is not inspected during the 60 hour inspection. Even if the technicians would have thoroughly inspected the crankshaft there is no way they would have been able to see or detect the pending material failure.

The following pictures were retrieved from Tab J and provide the best visual representation of the crankshaft failure:

# EXECUTIVE SUMMARY

## AIRCRAFT ACCIDENT INVESTIGATION

## MQ-1L PREDATOR S/N 99-3062

## DEPLOYED LOCATION

## 17 AUGUST 2004

On 17 August 2004, at 0920 local time, an MQ-1L Predator, S/N 99-3062, call sign BUGSY 24, 15th Reconnaissance Squadron, crashed while flying in the CENTCOM Area of Responsibility (AOR) supporting the air base defense mission of a deployed airfield. Fire in the aft section of the aircraft caused the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact with the loss valued at $4,288,000. No one was injured in the accident and there was no damage to government or private property. Media interest was minimal.

The mishap mission was the first flight out phase after accomplishing the 60 hour engine and 120 hour airframe inspection. Approximately 28 minutes after takeoff, the aircrew received numerous warning tones at once indicating the engine failure, alternator failure and engine fire amongst other failure warnings. Visual observation from the sensor ball clearly showed a fire consuming the aft section of the aircraft. Over the next few minutes, the fire became catastrophic, with fire burning the propeller area, top of the engine area and the right tailboard servo area. The aircraft became uncontrollable during this period. The right tailboard departed the aircraft and the aircraft departed controlled flight and crashed.

**There is clear and convincing evidence that this mishap was caused by a fire in the engine compartment.** There is substantial evidence the fire was caused by the non-standard routing of the oil pump supply line bringing oil from the oil cooler to the oil pump. The line was routed over the engine block around #3 cylinder head and then to the oil pump. The location of the fire, routing of the oil line, condition of the oil line, flammability characteristics of the oil, and condition of the engine components tend to indicate that the oil supply line failed and the subsequent oil leak was the ignition point of the fire. The hose is made of a material that when exposed to the normal heat from the turbocharger or contact of the oil line to cylinder #3 exhaust would failed over time and expose oil to very hot surfaces, thus starting a fire. The fire, fed by airflow from the air scoops and fuel or coolant lines that were burned, grew to encompass the propeller area, and affected the structural integrity of Bulkhead 10 causing the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact. There is substantial evidence that two additional factors contributed to this mishap: (1) the maintenance technical orders do not give clear guidance on how to route the hoses; and (2) the very high Ops TEMPO for both the operations and maintenance crews.

*Under 10 U.S.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.*

# UNITED STATES AIR FORCE
# AIRCRAFT ACCIDENT INVESTIGATION
# BOARD REPORT



AIR COMBAT COMMAND

**MQ-1L "Predator," S/N 99-3062**
**15th Reconnaissance Squadron**
**57th Wing**
**Nellis Air Force Base, Nevada**



**DATE OF ACCIDENT:  17 August 2004**

**BOARD PRESIDENT:  Colonel Michael L. Rollison**

**Conducted IAW Air Force Instruction 51-503**



DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR COMBAT COMMAND
LANGLEY AIR FORCE BASE, VIRGINIA

**2 0 DEC 2004**

MEMORANDUM FOR ACC/JA

SUBJECT: AFI 51-503, Aerospace Accident Investigation Report – MQ-1L, S/N 99-3062,
15TH Reconnaissance Squadron, Nellis Air Force Base, NV 17 August 2004

I have reviewed the Accident Investigation Board Report regarding the MQ-1L that

crashed in the US CENTCOM AOR during a standard mission in direct support of the air

base defense mission on 17 August 2004. The report prepared by Colonel Michael L.

Rollison complies with the requirements of AFI 51-503. This report is approved.

BRUCE A. WRIGHT
Lieutenant General, USAF
Commander

Attachment:
Accident Investigation Board Report

*Global Power For America*

EXECUTIVE SUMMARY

AIRCRAFT ACCIDENT INVESTIGATION

MQ-1L PREDATOR S/N 99-3062

DEPLOYED LOCATION

17 AUGUST 2004

On 17 August 2004, at 0920 local time, an MQ-1L Predator, S/N 99-3062, call sign BUGSY 24, 15th Reconnaissance Squadron, crashed while flying in the CENTCOM Area of Responsibility (AOR) supporting the air base defense mission of a deployed airfield. Fire in the aft section of the aircraft caused the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact with the loss valued at $4,288,000. No one was injured in the accident and there was no damage to government or private property. Media interest was minimal.

The mishap mission was the first flight out phase after accomplishing the 60 hour engine and 120 hour airframe inspection. Approximately 28 minutes after takeoff, the aircrew received numerous warning tones at once indicating the engine failure, alternator failure and engine fire amongst other failure warnings. Visual observation from the sensor ball clearly showed a fire consuming the aft section of the aircraft. Over the next few minutes, the fire became catastrophic, with fire burning the propeller area, top of the engine area and the right tailboard servo area. The aircraft became uncontrollable during this period. The right tailboard departed the aircraft and the aircraft departed controlled flight and crashed.

**There is clear and convincing evidence that this mishap was caused by a fire in the engine compartment.** There is substantial evidence the fire was caused by the non-standard routing of the oil pump supply line bringing oil from the oil cooler to the oil pump. The line was routed over the engine block around #3 cylinder head and then to the oil pump. The location of the fire, routing of the oil line, condition of the oil line, flammability characteristics of the oil, and condition of the engine components tend to indicate that the oil supply line failed and the subsequent oil leak was the ignition point of the fire. The hose is made of a material that when exposed to the normal heat from the turbocharger or contact of the oil line to cylinder #3 exhaust would failed over time and expose oil to very hot surfaces, thus starting a fire. The fire, fed by airflow from the air scoops and fuel or coolant lines that were burned, grew to encompass the propeller area, and affected the structural integrity of Bulkhead 10 causing the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact. There is substantial evidence that two additional factors contributed to this mishap: (1) the maintenance technical orders do not give clear guidance on how to route the hoses; and (2) the very high Ops TEMPO for both the operations and maintenance crews.

*Under 10 U.S.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.*

# SUMMARY OF FACTS AND STATEMENT OF OPINION
# MQ-1L S/N 99-3062 PREDATOR ACCIDENT
# 17 AUGUST 2004

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i
COMMONLY USED ACRONYMS & ABBREVIATION .......................................... iii
SUMMARY OF FACTS..................................................................................................1
1. AUTHORITY, PURPOSE, AND CIRCUMSTANCES....................................1
   a. Authority.........................................................................................................1
   b. Purpose. .........................................................................................................1
   c. Circumstances.................................................................................................1
2. ACCIDENT SUMMARY ....................................................................................1
3. BACKGROUND...................................................................................................2
   a. 15th Reconnaissance Squadron .......................................................................2
   b. 46th Expeditionary Reconnaissance Squadron. ..............................................2
   c. 57th Operations Group.....................................................................................2
   d. 332d Expeditionary Operations Group. ...........................................................2
   e. 57th Wing. .......................................................................................................3
   f. 332d Air Expeditionary Wing. ........................................................................3
   g. Air Warfare Center..........................................................................................3
   h. Command Relationships...................................................................................3
   i. Predator...........................................................................................................4
4. SEQUENCE OF EVENTS ..................................................................................5
   a. Mission. ..........................................................................................................5
   b. Planning / Briefing..........................................................................................5
   c. Preflight. .........................................................................................................5
   d. Flight...............................................................................................................6
   e. Impact.............................................................................................................9
   f. Life Support Equipment, Egress, and Survival. ..............................................9
   g. Search and Rescue. .........................................................................................9
   h. Recovery of Remains......................................................................................9
5. MAINTENANCE.................................................................................................9
   a. Forms Documentation.....................................................................................9
   b. Inspections....................................................................................................10
   c. Maintenance Procedures...............................................................................10
   d. Maintenance Personnel and Supervision. .....................................................15
   e. Fuel, Hydraulic and Oil Inspection Analysis. ..............................................15
   f. Unscheduled Maintenance. ...........................................................................15
6. AIRCRAFT AND AIRFRAME, MISSILE, OR SPACE VEHICLE SYSTEMS ......15
   a. Condition of Systems....................................................................................15
   b. Testing. .........................................................................................................16
7. WEATHER .........................................................................................................16
   a. Forecast Weather. .........................................................................................16
   b. Observed Weather.........................................................................................16
   c. Space Environment........................................................................................17
   d. Conclusions...................................................................................................17
8. CREW QUALIFICATIONS ..............................................................................17
   a. Mishap Pilot One. .........................................................................................17

b.    Mishap Pilot Two.......................................................................................17
c.    Sensor Operator.........................................................................................17
d.    Supervisor of Flying...................................................................................18
9.    MEDICAL....................................................................................................18
a.    Qualifications.............................................................................................18
b.    Health.........................................................................................................18
c.    Toxicology...................................................................................................18
d.    Lifestyle......................................................................................................19
e.    Crew Rest and Crew Duty Time.................................................................19
10.  OPERATIONS AND SUPERVISION ..........................................................19
a.    Operations..................................................................................................19
b.    Supervision.................................................................................................19
11.  HUMAN FACTORS ANALYSIS ...................................................................20
a.    Environmental.............................................................................................20
      (1) Operations ............................................................................................20
      (2) Institutional / Management ...................................................................20
      (3) Logistics / Maintenance........................................................................20
      (4) Facilities Services.................................................................................21
      (5) Egress / Survival...................................................................................21
b.    Individual ....................................................................................................21
      (1) Physiological / Biodynamic ...................................................................21
      (2) Psychological.........................................................................................21
      (3) Psychosocial .........................................................................................21
12.  GOVERNING DIRECTIVES AND PUBLICATIONS ....................................21
a.    Primary Operations Directives and Publications. .....................................21
b.    Maintenance Directive and Publications....................................................22
c.    Known or Suspected Deviations from Directives or Publications. .............22
      (1) Mishap Crew..........................................................................................22
      (2) Maintenance. .........................................................................................22
13.  NEWS MEDIA INVOLVEMENT ...................................................................22
STATEMENT OF OPINION ...................................................................................23

## COMMONLY USED ACRONYMS & ABBREVIATION

| | | | |
|---|---|---|---|
| ACC | Air Combat Command | KS | Kansas |
| AFB | Air Force Base | L | Local Time |
| AFI | Air Force Instruction | LOS | Line of Sight |
| AFMAN | Air Force Manual | Lost Link | Loss of Communication between UAV and GCS |
| AFPAM | Air Force Pamphlet | LRE | Launch and Recovery Element |
| AFTO | Air Force Technical Order | LRGCS | Launch and Recovery Ground Control Station |
| AGL | Above Ground Level | MA | Mishap Aircraft |
| AIB | Accident Investigation Board | MC | Mishap Crew |
| AOR | Area of Responsibility | MCE | Mission Command Element |
| AP | Associated Press | Mil Std | Military Standard |
| ATO | Air Tasking Order | MP1 | Mishap Pilot One |
| AWFC | Air Warfare Center | MP2 | Mishap Pilot Two |
| C | Celsius | MSDS | Material Safety Data Sheet |
| CAMS | Core Automated Maintenance System | MSL | Mean Sea Level |
| CAOC | Combined Air Operations Center | MTS | Multi-spectral Targeting System |
| DNIF | Duties Not to Include Flying | NAFBI | Nellis Air Force Base Instruction |
| DO | Director of Operations | NOTAM | Notices to Airmen |
| DoD | Department of Defense | NV | Nevada |
| EGT | Exhaust Gas Temperature | ORM | Operational Risk Management |
| EO | Electro-optical | POC-N | Predator Operations Center Nellis |
| EOD | Explosive Ordinance Disposal | PPSL | Primary PREDATOR Satellite Link |
| F | Fahrenheit | PSO | Pilot Sensor Operator |
| FAA | Federal Aviation Administration | QA | Quality Assurance |
| FCF | Functional Check Flight | RPA | Remotely Piloted Aircraft |
| FCIF | Flight Crew Information File | RPM | Rotations per Minute |
| FL | Florida | RS | Reconnaissance Squadron |
| fpm | Feet per minute | SAR | Synthetic Aperture Radar |
| FTD | Field Training Detachment | SFO | Simulated Flame Out |
| GCS | Ground Control Station | SIB | Safety Investigation Board |
| GDT | Ground Data link Terminal | S/N | Serial Number |
| HAS | Hardened Aircraft Shelter | SO | Sensor Operator |
| HUD | Heads Up Display | SOF | Supervisor of Flying |
| IAW | In Accordance With | STU | Secure Telephone Unit |
| ID | Idaho | TCI | Time Change Item |
| INU | Inertial Navigation Unit | USAF | United States Air Force |

The above list was compiled from the Summary of Facts, the Statement of Opinion, the Index of Tabs, and witness testimony (Tab V).

# SUMMARY OF FACTS

## 1. AUTHORITY, PURPOSE, AND CIRCUMSTANCES

### a. Authority.

On 15 September 2004, General Hal M. Hornburg, Commander, Air Combat Command (ACC) appointed Colonel Michael L. Rollison to conduct an aircraft accident investigation of the 17 August 2004 crash of an MQ-1L Predator aircraft, serial number S/N 99-3062, at a deployed location within the United States Central Command (USCENTCOM) Area of Responsibility (AOR). The investigation convened at Nellis Air Force Base (AFB), NV, from 20 September 2004 through 15 October 2004. Technical advisors were Major Walter H. Reiss III (Pilot Advisor), Captain Kallie D. Woodward (Legal Advisor), Master Sergeant Ricardo V. Garcia, Jr., (Maintenance Advisor) and Technical Sergeant Teresa J. Herrera (Recorder) (Tab Y-2).

### b. Purpose.

This aircraft accident investigation was convened under Air Force Instruction (AFI) 51-503, *Aerospace Accident Investigations*. The purpose of this investigation is to provide a publicly releasable report of the facts and circumstances surrounding the accident, to include a statement of opinion on the cause or causes of the accident; to gather and preserve evidence for claims, litigation, disciplinary, and adverse administrative actions; and for all other purposes. In addition to setting forth factual information concerning the accident, the board president is also required to state his opinion as to the cause of the accident or the existence of factors, if any, which substantially contributed to the accident. This investigation is separate and apart from the safety investigation, which is conducted pursuant to AFI 91-204, *Safety Investigations and Reports*, for the purpose of mishap prevention. The report is available for public dissemination under the Freedom of Information Act (5 United States Code (U.S.C) §552) and the Air Force Supplement to Department of Defense (DoD) Regulation 5400.7 *Department of Defense Freedom of Information Act Program.*

### c. Circumstances.

The accident board was convened to investigate the Class A accident involving an MQ-1L Predator aircraft, S/N 99-3062, assigned to the 15th Reconnaissance Squadron (RS), 57th Wing, Nellis AFB, and deployed to the 46th Expeditionary Reconnaissance Squadron (ERS), 332[d] Air Expeditionary Wing (AEW) at a deployed location which crashed while flying air base defense mission of the deployed airfield on 17 August 2004.

## 2. ACCIDENT SUMMARY

Aircraft MQ-1L Predator, S/N 99-3062, was executing an Operation IRAQI FREEDOM, Air Tasking Order (ATO) tasked mission, supporting the air base defense mission of the deployed airfield. Fire in the aft section of the aircraft caused the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact. Debris from the mishap was isolated to a deserted area. A recovery team from the deployed base was dispatched to the site

where photographs were taken and a portion of the debris was removed. These recovered items, including the engine, Multi-spectral Targeting System (MTS) sensor ball, and some electronic components, were shipped to hangar 202 at Nellis AFB, for use by the Safety Investigation Board (SIB) and Accident Investigation Board (AIB). The aircraft was destroyed upon impact with the loss valued at $4,288,000 (Tab P-3). No one was injured in the accident and, other than the damage to the aircraft; there was no damage to government or private property. Media interest was minimal. 332$^d$ AEW Public Affairs published a news release on 17 August 2004 release No: 001 (Tab HH-2).

# 3. BACKGROUND

### a. 15th Reconnaissance Squadron

The 15 RS is currently in operation at Nellis AFB, and is the USAF's newest weaponized remotely piloted aircraft (RPA) squadron. The squadron is tasked to provide theater combatant commanders with deployable, long-endurance, real-time reconnaissance, surveillance, target acquisition, and precision munitions delivery. Operating medium altitude RQ-1B and MQ-1L Predator aircraft, the 15 RS utilizes the MTS sensor ball to collect, exploit, and distribute imagery and intelligence products to theater and national-level leadership.

### b. 46th Expeditionary Reconnaissance Squadron.

The 46 ERS is the Launch and Recovery Element (LRE) for the 15 RS. It operates at a forward-deployed location within the CENTCOM AOR in support of the Combined Air Operations Center (CAOC) and 332$^d$ AEW taskings. All operations personnel deployed to this unit are members of the 15 RS.

### c. 57th Operations Group.

The mission of the 57th Operations Group (OG) is to provide combat-ready remotely piloted aircraft (RPA) and combat support forces for worldwide deployment. This includes intelligence support and standardization and evaluation oversight to Nellis AFB operational, test, and training units, as well as providing air traffic control, airspace and airfield management, and base weather services. The 57 OG is responsible for Red and Maple Flag exercises, USAF Aggressors and all flying operations at Nellis AFB. The 57 OG oversees operations of eight squadrons: 11th Reconnaissance Squadron, 15th Reconnaissance Squadron, 17th Reconnaissance Squadron, 57th Operations Support Squadron, 64th Aggressors Squadron, 414th Combat Training Squadron, 507th Combat Training Squadron, and the 547th Intelligence Squadron.

### d. 332$^d$ Expeditionary Operations Group.

The mission of the 332 EOG is to provide operational support to the 332$^d$ Air Expeditionary Wing in accordance with (IAW) Joint Forces Commander (JFC) taskings within the CENTCOM AOR. It operates from a forward-deployed location. The 46 ERS is a subordinate unit of the 332 EOG.

e. **57th Wing.**

The 57th Wing accomplishes dynamic and challenging flying operations at Nellis AFB, including the Unites States Air Force (USAF) Weapons School, Red Flag and Air Warrior training, USAF Air Ground Operations School, and the USAF Air Demonstration Squadron.

The wing manages flying operations and aircraft maintenance at Nellis AFB through six assigned organizations: the 57th Operations Group, 57th Maintenance Group, USAF Weapons School, USAF Air Ground Operations School, USAF Air Demonstration Squadron (Thunderbirds) and 57th Wing Director of Tactics.

The commander is responsible for advanced aircrew training, aircraft maintenance, tactics development and publication, deployable combat search and rescue, deployable reconnaissance and surveillance, USAF Air Demonstration Squadron and intelligence dissemination for the United States and allied combat air forces worldwide. The 57th Wing employs A-10, B-1, B-2, B-52, F-15C, F-15E, F-16C, F-117, HH-60 aircraft and M/RQ-1 RPAs.

f. **332[d] Air Expeditionary Wing.**

The 332[d] Air Expeditionary Wing provides lethal expeditionary air power in support of USCENTCOM-directed contingency war planning and Operation IRAQI FREEDOM.

g. **Air Warfare Center.**

The mission of the Air Warfare Center (AWFC) is to manage advanced weapons and tactics training and is responsible for operational test, evaluation and tactics development for Air Force combat weapons systems. To accomplish its diverse mission, the AWFC uses the lands on Nellis Air Force Range Complex. The range occupies about three million acres of land, the largest such range in the United States, and another five-million-acre military operating area which is shared with civilian aircraft. The AWFC also uses Eglin AFB, FL, range which adds even greater depth to the center's capabilities, providing over water and additional electronic expertise to the center. The AWFC oversees operations of five wings: 57th Wing, 98th Range Wing, and 99th Air Base Wing at Nellis; 505th Command and Control Wing at Hurlburt Field, FL, and the 53[d] Wing at Eglin AFB, FL. Additionally, the AWFC oversees the operations of the Unmanned Aerial Vehicle BattleLab at Indian Springs Air Force Auxiliary Field, the Air Expeditionary Force Battlelab at Mountain Home AFB, ID and AWFC Det 1 at Ft. Leavenworth, KS.

h. **Command Relationships.**

With the advent of the remote-split operations concept for Predator, command relationships have become complex. While being flown by the deployed aircrew utilizing line-of-sight, as in this case, the Predator aircraft is under the control of the 46 ERS, 332 EOG, 332 AEW, and the Combined Air Operations Center (CAOC), respectively.

**i. Predator.**

The RQ-1 and MQ-1 Predators are medium-altitude, long-endurance RPA systems. The MQ-1's primary mission is interdiction and conducting armed reconnaissance against critical, perishable targets. When the MQ-1 is not actively pursuing its primary mission, it augments the RQ-1 as a Joint Forces Air Component Commander (JFACC)-owned theater asset for reconnaissance, surveillance and target acquisition in support of the JFC.



MQ-1   Aircraft in flight

The RQ-1 and MQ-1 Predators are systems, not just aircraft. A fully operational system consists of four aircraft (with sensors), a ground control station (GCS), a Predator Primary Satellite Link (PPSL), and approximately 82 personnel for continuous 24-hour operations.

The basic crew for the Predator is one pilot and one sensor operator (SO). They fly the aircraft from inside the GCS via a line-of-sight (LOS) data link or a satellite data link for beyond LOS flight. The aircraft is equipped with a color nose camera (generally used by the aerial vehicle operator for flight control), a day variable-aperture electro-optical (EO) television camera, a variable aperture infrared (IR) camera (for low light/night), and a synthetic-aperture radar (SAR) for looking through smoke, clouds or haze. The cameras produce full motion video and still frame radar images. The SO monitors and operates various types of sensor equipment (e.g., IR, video) that can be uploaded on the Predator aircraft.

The MQ-1 Predator carries the MTS with inherent Hellfire missile targeting capability and integrates EO, IR, and laser designator and laser illuminator into a single sensor package. The aircraft can employ two laser-guided Hellfire anti-tank missiles with the MTS ball.

Both the RQ-1 and MQ-1 are capable of executing preprogrammed missions which do not require pilot input. These missions fall into two distinct categories: operational missions and emergency missions.

➤ The operational mission is made up of a series of geographical waypoints which define the route of flight. Each waypoint is assigned attributes telling the aircraft how to fly the route (i.e. altitude, airspeed, loiter pattern, Lost Link – OK/Not OK, etc.).

➤ The emergency mission is designed to return the aircraft safely to the airfield of intended landing in the event pilot commands to the aircraft are lost. It is preprogrammed in the same manner as the operational mission and is automatically engaged when the uplink signal to the aircraft is lost.

When a waypoint within an operational mission is designated "Lost Link – OK," the aircraft will continue the operational mission even without an uplink signal from the GCS. At least one waypoint in an operational mission must be designated "Lost Link – Not OK" to ensure the aircraft would eventually enter the emergency mission and return to base. If the aircraft is proceeding to an operational mission waypoint designated as "Lost Link – Not OK," and there is no uplink being received by the aircraft, it will automatically execute the emergency mission, until the uplink is restored (Tab FF-4-5). These aircraft are designed with the capability to conduct autonomous operations with no pilot input from shortly after takeoff until just prior to landing. There is currently no auto-takeoff or auto-land capability for Predator.

Each Predator aircraft can be disassembled into six main components and loaded into a container nicknamed "the coffin." This enables all system components and support equipment to be rapidly deployed worldwide. The largest component is the GCS and it is designed to be rolled into a C-130. The air transportable PPSL consists of a satellite system mounted on a trailer. It provides communications between the GCS and the aircraft when it is beyond LOS and is a link into secondary intelligence dissemination networks. The Predator system needs 5,000 feet by 125 feet (1,524 meters by 38 meters) of hard surface runway with clear LOS to each end from the GCS to the air vehicles.

## 4. SEQUENCE OF EVENTS

### a. Mission.

MQ-1L Predator, S/N 99-3062, call sign BUGSY 24, was scheduled for a local sortie, lasting approximately 20 hours, in support of the air base defense at the deployed location (Tab V-12.10,V-13.12,). This was the first flight out of phase for a combined 60-hour engine and 120-hour airframe inspection in addition to multiple electrical servo time-change replacements (Tab D-4). The crew was as follows: Mishap Pilot One (MP1) was Major Rudy L. Ridenbaugh, Mishap Pilot Two (MP2) was Captain Jonathan M. Songer; and the SO was Airman First Class Stephanie L. Schulte. The SO monitors and operates the payload sensor, in this case the MTS, which includes EO and IR spectrum cameras, a laser target illuminator, and a laser target designator. The Supervisor of Flying (SOF) was Lieutenant Colonel Francis X. Carillo, and the aircraft crew chief was Staff Sergeant Randy W. Townsend.

### b. Planning / Briefing.

This was a standard mission flown daily in support of the air base defense mission of effort. Both pilots flew the same mission the day before and were well versed in the requirements of the mission (Tab V-12.15-16, V-13.17). The SO was also very familiar with the mission and its requirements (Tab V-15.1).

### c. Preflight.

The crew accomplished all required sign-out procedures and accomplished a step briefing to review any last minute updates or changes, signed off the Flight Crew Information Files (FCIF-local information for pilots relevant to the aircraft or flying procedures and conditions) and

reviewed all Notices to Airmen (NOTAMS-worldwide posting of information regarding airfield conditions, airspace, or communications) (Tab K-3, V-13.7). MP1 conducted a visual walk around inspection of the mishap aircraft (MA) and reviewed the AFTO 781 Forms for both the aircraft and the Launch and Recovery Ground Control Station (LRGCS). No discrepancies were noted. According to testimony the preflight, taxi and takeoff were normal (Tab V-13.8, V-4.17-18).

### d. Flight.

The aircraft launch, originally scheduled to depart at 0700L, was delayed by one hour and 42 minutes due to the Functional Check Flight (FCF) for aircraft which took off at 0734L and landed at 0759L (Tab N-8). MP1 and SO conducted the FCF. Following the completion of the FCF, MP1 and SO executed a normal aircraft launch of 99-3062, taking off at 0842L, and began climbing out from the airfield (Tab N-9). Once the aircraft was safely airborne with the Climb, Level Off, Cruise checklist complete, and no longer in a critical phase of flight, MP1 built an operational mission and selected "Lost Link – OK" for the climb and orbit waypoints, approved by Air Traffic Control and T.O. 1Q-1(M)B-1 (Tab N-4, FF-4). The Ground Datalink Terminal (GDT) transmitter was turned off and the aircraft line-of-sight transmitters were left on, allowing LRGCS 1 to monitor the aircraft flight while it continued on an autonomous climb to the assigned altitude of 10,000ft MSL. The aircraft was programmed to level-off and enter a circular holding pattern in preparation for the bore site of the laser target designator (Tab V-13.9). The SO left the LRGCS to assist MP2 in landing another Predator, call sign King Kong 26, being returned by the Predator Operations Center – Nellis (POC-N), utilizing LRGCS 2 at the site (Tab V-12.7, V-13.9, V-15.1).



| 17 August 04 OIF Predator Snapshot | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0700L | | | 0800L | | | 0900L | | | | |
| Deployed (LRE) | | | | | | | | | | | | |
| LRGCS 1 | | | | | | | | | | | | |
| LRGCS 2 | | | | | | | | | | | | |

| King Kong 26 | Completing msn flown from MCE. Handed-back to LRGCS 2 at 0836L. Land: 0906L. |
|---|---|
| Bugsy 22 | FCF flown by LRE 1 T/O: 0734L, Land: 0759L. |
| Bugsy 24 | Mishap aircraft T/O: 0842L, Declared lost at 0920L. |

Once a link had been established with King Kong 26 from LRGCS 2, the signal received from the MA in LRGCS 1 began to experience significant levels of interference due to the close proximity of the two GDTs located atop the Hardened Aircraft Shelter (HAS). The close proximity of the two GDTs was required due to the lack of space available at a high enough elevation and the length of the cables connecting the GDTs to their respective LRGCSs. As King Kong 26 flew closer to the base for recovery, the interference with the downlink from the MA became stronger. The following illustration shows the periods of interference experienced by the MA during its flight (Tab S-3). Any deviation from horizontal (highlighted in yellow) represents the accumulation of datalink errors. When the datalogger shows datalink errors,

LRGCS 1 is receiving neither telemetry nor video from the aircraft. The time scale, along the bottom, start at time zero when the datalogger is turned on, shortly before engine start.



Note: Yellow areas represent data drop-outs due to loss of aircraft downlink

The downlink consists of two elements: video and telemetry. In cases of minor interference, the video signal may be disrupted, as might be seen in poor television reception. The hierarchy of information gives precedence to the telemetry over the video. When experiencing more severe interference, both video and telemetry information to the LRGCS are interrupted. The video shows complete static or "snow," and the telemetry is frozen in the last known value. The areas of the illustration shown in yellow represent a severe disruption to the downlink from the aircraft. As King Kong 26 landed and taxied to the parking spot, just in front of the HAS, the downlink from the MA was completely unusable. No communications between LRGCS 1 and the MA were possible. During this period of severe interference, MP1 momentarily left the LRGCS 1 to use the restroom (Tab V-13.9). During this time, the aircraft was flying its operational mission and the downlink was receiving heavy interference from King Kong 26. This interference is predominant for the next ten minutes and only momentary links are made with the aircraft within this timeframe (Tab CC-37, DD-2, DD-4). Following the recovery and shutdown of the landing aircraft, the cause of the interference was removed and the downlink was fully restored from 99-3062 (Tab N-9, DD-4). While leaving the aircraft unattended is a deviation from accepted practices, this deviation had neither a causal role nor any effect on the final outcome of the mishap.

According to testimony, upon re-establishment of the downlink, the audible warning began to sound, alerting the crew to the engine loss on MA. MP2 and SO ran to the adjacent room to the LRGCS 1 for the MA, analyzed the situation, and began to take appropriate action (Tab V-12.9, V-15.1). MP1 was there seconds behind (Tab V-12.9, V-13.9). MP2 was at the controls initially when he saw the RPMs for the engine were at 1 and the alternator was off line (Tab V-12.12). During this investigation, analysis of the telemetry from the mishap aircraft showed that the engine failed during a period of lost downlink, lasting approximately 51 seconds (Tab DD-2, CC-37). MP2 enabled the GDT transmitter, which allowed commands to be given to the aircraft. MP2 asked MP1 if he would like to take the aircraft and MP1 replied that he would take the aircraft (Tab V-12.9, V-13.10). A seat swap was accomplished and MP1 remained at the pilot station the rest of the mishap sequence. Following the seat swap, MP1 disabled the pre-program mission to take control of the aircraft, performed the Engine Failure checklist, and set-up for a return to the deployed location. The aircraft was turned towards base and MP1 established best glide speed, to maximize the range the aircraft could travel without the engine operating, in an effort to make it back to the departure airfield approximately 12 nautical miles to the south. MP1 was very familiar with the process for engine failure, having accomplished a Simulated Flameout (SFO) pattern during the FCF a few hours previous. He directed MP2 to notify command post

and had SO read from the abbreviated checklist for engine failure procedures (Tab V-12.9, V-13.9-10). MP2 also backed up SO with the expanded emergency procedures in the Dash-1 (Tab V-12.13). MP1 directed SO to turn the sensor ball towards the aft portion of the aircraft to confirm the propeller had stopped (Tab V-13.9-10, V-15.1). The propeller was stopped between the 6 and 7 o'clock position (See photo below). The SO switched the sensor to the IR mode, which first indicated the existence of a fire in the aft section (Tab V-15.2).



Fire observed exiting engine area from top and bottom of aircraft.

MP1 called for the engine fire checklist which was read by the SO in the abbreviated emergency checklist and backed-up MP2 using the expanded checklist (Tab V-12.13, V-13.10, V-15.1). The aircraft data logger files show initial indications of a basic engine shutdown, except for the lack of wind milling RPM (Tab S-3, DD-2, DD-4). The sensor ball IR image showed the fire growing to other parts of the aft section to include the propeller and the right tailboard servo area. There were flames on the bottom of the aircraft and flames wrapping around from the top. MP1 continued to fly the aircraft towards the airbase. In testimony, MP1 stated the aircraft was becoming more difficult to control and made an un-commanded 180 degree heading change followed by a 270 degree heading change (Tab V-13.11). Approximately 6 minutes and 30 seconds after the initial warning sounds (approximately 0920L), the right tailboard came off. The aircraft departed controlled flight and crashed inverted in an isolated area northeast of deployed location (Tab N-10, H-3). Even in a best-case scenario, the time required to descend from 10,000ft to landing would be at least 15 minutes. This provides the basis for concluding no potential for safe recovery of the aircraft existed once the engine stopped and the fire had initiated. The aircraft burned after impact. The fire self-extinguished after all combustible material was consumed.

Fire observed exiting engine area through right tail connection point.

Right tailplane separating from aircraft. Seen here moving down.

### e. Impact.

Aircraft S/N 99-3062 impacted the terrain at approximately 0920L on 17 August 2004. No technical specialist analysis of the impact/wreckage and/or burn patterns at the crash site was performed IAW AFMAN 91-223, 20 May 04, Para 6.5.4.8.2. However, the ISIB Investigating Officer documented the crash scene through digital photographs and video (Tab H-3). The aircraft was inverted at the time of impact. The ISIB salvaged the aircraft engine, right tailboard, and several miscellaneous parts and shipped them back to Nellis AFB. The remaining wreckage was destroyed by explosives for security reasons (Tab H-3).

### f. Life Support Equipment, Egress, and Survival.

The Predator is an unmanned aerial vehicle. Therefore, sections f, g, and h are not applicable.

### g. Search and Rescue.

N/A

### h. Recovery of Remains.

N/A

## 5. MAINTENANCE

### a. Forms Documentation.

Every USAF aircraft has a dedicated set of both written and electronic maintenance records used to record all flight and maintenance activity. Air Force Technical Order (AFTO) 781 Forms collectively provide maintenance, inspection, servicing, configuration, status, and flight records for all USAF aircraft. When AFTO 781 Forms are removed from the aircraft's active forms binder, they are kept in a jacket file along with all other aircraft historical data. A thorough

review of the AFTO 781 Forms and jacket file from 90 days preceding the mishap revealed no evidence of pending mechanical, structural, or electrical failure (Tab EE-2).

The Core Automated Maintenance System (CAMS) is a computer system used for maintenance management and trend analysis. CAMS data was retrieved from 90 days preceding the mishap and was reviewed by the board. No overdue inspections, no overdue time-change items, or overdue Time Compliance Technical Orders (TCTO) were found. CAMS data verified that no negative maintenance trends existed and no could-not-duplicate or repeat discrepancies had been reported.

There were no open discrepancies in the 781A's at the time of the accident (Tab EE-2). Four delayed discrepancy write-ups, which were not relevant to the accident, existed on the AFTO 781K *Delayed Discrepancy Form* (Tab EE-13-14).

A review of the maintenance documentation for the aircraft showed that there was one pending TCTO. TCTOs are directions to perform specific maintenance actions, usually upgrades or modifications, within a specific time period. This pending TCTO was not relevant to the accident (Tab EE-13).

The 781s for the GCS systems were not reviewed. There was no evidence to suggest that any aspect of the ground control station operation was connected in any way with the mishap.

   **b.  Inspections.**

Phase inspections are regularly scheduled maintenance performed on USAF aircraft at specific flying hours (e.g., every 120 flying hours). The maintenance documentation confirmed that all inspections were satisfactorily accomplished in accordance with applicable maintenance directives. The last 120-hour phase inspection was completed on 11 August 2004 at 877.6 airframe hours. The next scheduled aircraft phase inspection (120-hour airframe) was due in 120-hours (Tab EE-13).

The engine was removed for a 360-hour time change on 16 July 2004. The replacement engine RT04418565 was installed in the aircraft on 17 July 2004 (Tab EE-4). The engine had 348.7 hours at the time of installation and 137 additional hours since installed for a total of 485.7 at the time of the mishap (Tab EE-12). The next scheduled maintenance for the engine was a 60-hour maintenance inspection.

   **c.  Maintenance Procedures.**

The MA was conducting its first sortie after a 120-hour airframe inspection and 60-hour engine inspection. The aircraft and engine inspections were completed simultaneously from 10 August 2004 through 12 August 2004 (Tab EE-10-11). The 120-hour airframe inspection consisted of a thorough inspection of all flight control surfaces, nose and main landing gear areas, main fuselage, ground power control box panel, engine bay and variable pitch propeller. The inspection is conducted in a three step process where a 5-level technician, 7-level technician and Quality Assurance inspector all comply with the inspection technical orders and checklists (Tab

V-7.1, V-21.1). There were no significant discrepancies found during the 120-hour inspection. The general procedures that are required to complete this inspection are found in technical order 1Q-1(M)B-6WC-2 card 2-001 through 2-019. The engine 60-hour inspection consists of a propeller gearbox backlash check; propeller gearbox clutch check; weep hole inspection; components, hoses and lines inspection; spark plug inspection; compression checks; oil filter change; oil change; magnetic plug inspection; and engine post test. There were no significant discrepancies found during the 60-hour engine inspection. The general procedures that are required to complete this inspection are found in technical order 1Q-1(M)B-6WC-2 card 5-001 through 5-003.

Time changing is the process whereby certain components are replaced periodically to ensure that the aircraft can continue to successfully perform the mission. The following engine components were time changed (TCI) during these inspections:

> Right Tail Plane Servo (TAB EE-7)
> Left Tail Plane Servo (TAB EE-7)
> Wastegate Servo (TAB EE-9)
> Throttle Servo (TAB EE-6)
> Variable Pitch Propeller (VPP) Assembly (TAB EE-8)
> Variable Pitch Propeller (VPP) Servo (TAB EE-5)

The SIB sent three items to be tested. The AIB spoke to the Wright-Patterson Structural Materials Evaluation team who conducted the lab testing. The first item tested was a cracked oil supply banjo fitting. The cracked oil supply banjo fitting and the surrounding components showed evidence of impact damage (Tab I-14). In conversation between the AIB, the Wright-Patterson evaluation team and Mr. Dextraze, the AIB concluded the damage to the banjo fitting was damaged upon impact, therefore not the initial cause of the fire (Tab I-14). The plenum chamber wrap was tested for evidence of fluids and cause of fire. The tests showed no evidence of fluid on the wrapping material. Experiments showed that the temperature of the fire would have removed all remnants of fluid from the wrap (Tab I-14). Also tested was an example of the rubber oil hoses, which showed the rubber oil hoses would ignite at 525° Celsius (C) after 45 seconds of exposure (Tab I-14). Because of the fire, the engine bay was exposed to temperatures high enough to destroy all fluid evidence and most physical evidence.

On 17 July 2004, engine RT04418565 was installed in the mishap aircraft (Tab EE-4). During the removal and installation process, several items not supplied with the replacement engine must be removed from the originally installed engine and installed on the new one. One of these items is the main engine oil supply hose. The main oil supply hose is connected from the upper right side of bulkhead 10 to the engine oil pump at the bottom aft side of the engine and supplies all oil from the oil cooler to the oil pump (Tab V-19.1, V-21.1). There is no specific T.O. guidance on the routing of the main oil supply hose during the engine installation (Tab FF-3, V-18.1, V-19.1, V-20.1, V-21.1). Both SSgt Devito and SSgt Holt accomplished the engine installation, to include the installation of the hoses. According to testimony, neither individual recalled routing this specific oil hose (Tab V-17.1, V-18.1). There is no record of the oil supply hose being removed at any time since the engine change. Standard routing of this hose would be from the upper right side of bulkhead 10, down the right side of the engine, across the bottom

forward side from right to left and back to the oil pump (Tab V-19.1, V-21.1). The following illustration shows the oil supply hose in its standard location.



Evidence shows this hose was routed in a non-standard procedure from the upper right side of bulkhead 10 over the engine block (right to left), down the left side around the engine #3 exhaust manifold and to the oil pump (Tab CC-8, CC-16, CC-37, DD-3). According to witness testimony, this non-standard format would not be possible, due to engine configuration and hose length (Tab V-9.22). According to other witnesses, this routing procedure has never been seen (Tab V-9.23, V-17.1, V-20.1, CC-38) and is not an accepted method (Tab V-9.23, V-21.1). The pictures below show the mishap engine with the non-standard routing of the oil supply hose.



To understand the procedures required to route this hose, the AIB spoke with Mr. Seth Dextraze, a General Atomics airframe and power plant specialist, who is the company's lead mechanic at Indian Springs AFAF. The AIB also visited Detachment 13, 372d Training Squadron, known as Field Training Detachment (FTD), an Air Education Training Command unit located at Nellis AFB, which provides formal technical training to Predator Maintenance technicians. Using photographs from the mishap engine and pieces from a training engine installed in a training

aircraft, Mr. Dextraze demonstrated the non-standard routing of the oil supply hose on the mishap aircraft. (Highlighted by yellow arrows pictured below) (TAB CC-38)



In this routing configuration, the oil hose is abnormally close to the #3 exhaust manifold and exhaust manifold mounting flange. At the time of the mishap, the #3 exhaust manifold was approximately 1500 °F which is within normal operating limits during aircraft climb (Tab CC-39, DD-2, FF-6). The heat generated from the manifold and manifold mounting flange caused the oil supply hose to weaken and fail. As a result, oil was able to leak and come in contact with possible ignition sources.

The engine uses TORCO synthetic motor oil which, according to the manufacturer's Material Safety Data Sheet (MSDS), has a flash point of 392 °F and will release vapors which can burn in open or be explosive in confined spaces if exposed to sources of ignition (Tab EE-15).

On 17 August 2004, the aircraft was launched without incident. Approximately 28 minutes into flight the engine experienced a catastrophic failure (Tab S-3, S-4). Post mishap analysis determined that the non-standard routing of the main oil supply hose allowed exposure to high temperatures, over time compromised the integrity of the inner hose that the fire sleeve (outer hose) was there to protect. The hose most likely ruptured and exposed the oil within it to temperatures well over the 392° F flash point of the oil, possibly to temperatures of 1500° F (Tab CC-38-39). Once the fire started it was fed by the airflow within the engine bay not only from the engine cooler fan but also the ram air from the scoops on the lower engine cowl that force airflow upward from the bottom of the engine to the top. Once this fire started it would have taken long to start burning lines or components that would contribute to the fire i.e., fuel lines, carburetors, and even coolant lines (Tab CC-38-39).

The fire originally concentrated in the engine bay's upper left side and migrated throughout the engine bay as fuel and oil hoses burned (Tab DD-3). The wires located on the forward portion of the alternator, closest to bulkhead #10, were not destroyed by the fire. The alternator mounting plate was thermally bent on the left hand side and the right hand side had snapped due to impact. This implies that the fire was most likely most intense on the left hand side aft of the alternator mounting plate (Tab DD-3). Another point that indicates that the fire was predominantly located in the upper portion of the engine was the observation that all of the rubber water lines located on

the bottom of the engine showed significantly less fire damage (Tab DD-3). The engine parameters downlinked from the aircraft provide a real-time read out of speeds and temperatures associated with the aircraft. To interpret the engine data logger files the AIB spoke to Mr. Eric Morse, a General Atomics/Airframe Systems Inc. avionics specialist, who is the company's lead avionics technician at Indian Springs AFAF. Mr. Morse concluded the interference in the downlink signal between the aircraft and the ground station unit caused a loss of accurate real time data. When the data link signal is lost, the cockpit will display parameters representing the last known good signal which may no longer be valid. Also, all engine parameters taken after engine shutdown are considered invalid due to the inability to validate the integrity of the engine bay cables, the vehicle by which this information is transmitted. If the cables were heated up to the intensity suspected, the projected values present at the Secondary Control Module may or may not be accurate voltage readings (Tab DD-2). Much like the gauges in a car, the voltage readings to the control modules are used to determine the values of things like temperature, speed, etc. Thus, inaccurate readings may have been indicated by the data logger files and represented on the monitors located in the LRGCS. In conclusion, all information after 9:08:45L, which is prior to first abnormal engine indications on the data logger files, may or may not represent real values (Tab DD-2).

Approximately 6 minutes 30 seconds after first indication of engine malfunction and fire, the weakening of bulkhead 10 caused the aircraft right tail plane to separate from the aircraft causing the aircraft to depart controlled flight and impact the ground. The following photographs show a predator in-flight with a yellow arrow pointing out the right tailboard. The other two photos illustrate the departed tail plane and servo area from the MA.



MQ-1L, S/N 99-3062  17 August 2004

A comprehensive review of all maintenance documentation showed that all maintenance practices of the maintenance personnel were in compliance with technical orders, safety operating instructions, and local operating instructions.

### d. Maintenance Personnel and Supervision.

A thorough review of the AF Form 623s, *Individual Training Record*, AF Form 797s, *Job Qualification Standard Continuation/Command*, CAMS Special Certification Roster, and all associated maintenance forms was accomplished with no relevant discrepancies in the training, qualifications, and documentation of maintenance practices. Records indicate maintenance personnel assigned to maintain the mishap aircraft were properly trained in their primary AFSC. Data retrieved from CAMS revealed unit ancillary training was effectively utilized and no overdue training tasks were identified. Records revealed maintenance leadership provided adequate supervision and was effectively organized IAW AFI 21-101, *Aerospace Equipment Maintenance Management*. The AIB discovered some maintenance sign off procedures that were inconsistent with the maintenance directives but they were unrelated to the engine installation and were not contributing factors to the mishap.

Maintenance supervision at the deployed location was heavily tasked. They are responsible to supply mission ready aircraft to Operations on a very precise timeline. The high amount of flying hours multiplies the scheduled workload and creates numerous conditions not experienced at home station. All indications confirm adequate and effective maintenance supervision was provided for all assigned to the unit (Tab V-5.2, V-9.5, V-19.2).

### e. Fuel, Hydraulic and Oil Inspection Analysis.

Fuel samples were taken from the fuel servicing carts and tested at the deployed location's fuel laboratory. The results showed no defects in the samples (Tab EE-19-22).

### f. Unscheduled Maintenance.

According to the AFTO Form 781s, there was no history of repeated or recurring maintenance items for the mishap aircraft (Tab EE-2).

## 6. AIRCRAFT AND AIRFRAME, MISSILE, OR SPACE VEHICLE SYSTEMS

### a. Condition of Systems.

There was no damage to the LRGCS system. The aircraft was destroyed. Most of the parts and pieces of the aircraft were located in a small area in which had sustained significant fire damaged. Prior to the weakening and the departure of the right tail plane, there was no evidence to indicate a flight control or line-of-sight malfunction occurred. There was heavy interference from another Predator that landed and was taxing in during the flight of BUGSY 24. The mishap

aircraft was being flown with the LOS command system. The mishap engine was analyzed at Nellis AFB during engine breakdown.



MQ-1L S/N 99-3062

**b. Testing.**

No post accident maintenance actions were performed on the aircraft (Tab D-5).

The LRGCS was impounded immediately after the accident. Post accident actions performed were securing of the LRGCS 8mm tapes and downloading of the data logger files (Tab D-5, V-13.11).

The consolidated Tool Kit was inspected and all tools were accounted for (Tab D-5).

All Technical Orders were inspected for missing pages and correct updates with no discrepancies noted (Tab D-5).

The aircraft battery charger was tested for correct output; the charger output was within limits (Tab D-5).

## 7. WEATHER

**a. Forecast Weather.**

The flight weather briefing forecasted light and variable winds at takeoff with visibility forecast to be 7 miles with scattered clouds (Tab F-3).

**b. Observed Weather.**

The crew noted the observed weather was as forecast with no significant weather to report (Tab V-12.10, V-13.12).

c. **Space Environment.**

The KU link was not used on this mission, therefore, space environment was not a factor.

d. **Conclusions.**

Weather was not a factor.

## 8. CREW QUALIFICATIONS

a. **Mishap Pilot One.**

MP1 is a qualified mission pilot for Predator R/MQ-1 aircraft with a check ride completion date of 18 February 2004 (Tab G-12). At the time of the accident, he was certified combat mission ready for the R/MQ-1B and was current and qualified in all flying events required for the mission (Tab G-4, G-12, K-3). His total flying hours are 4264.8 with majority of time (2515.3 hours) are in C-130E aircraft (Tab T-2). His experience in the R/MQ-1B is 234.5 hours to include 132.5 combat hours and 54.9 combat support hours (Tab G-4).

A summary of MP1 flight time as of the mishap date is as follows (Tab G-5):

|         | Hours | Sorties |
|---------|-------|---------|
| 30 days | 13.5  | 13      |
| 60 days | 40.3  | 29      |
| 90 days | 68.9  | 39      |

b. **Mishap Pilot Two.**

MP2 is a qualified mission pilot for Predator R/MQ-1 aircraft with a check ride completion date of 20 October 2003 (Tab G-13). At the time of the accident, the he was current and qualified in all flying events required for the mission (Tab G-7, G-13, K-3). The majority of his 1881.7 total flying hours is in KC-135R aircraft (Tab G-6). His Predator experience includes 493.5 primary hours including 197.1 combat hours and 252.1 combat support hours (Tab G-7).

A summary of the MP2 flight time as of the mishap date is as follows (Tab G-8):

|         | Hours | Sorties |
|---------|-------|---------|
| 30 days | 48.8  | 27      |
| 60 days | 156.7 | 57      |
| 90 days | 190.8 | 67      |

c. **Sensor Operator.**

SO is a qualified mission sensor operator for Predator R/MQ-1 aircraft with a check ride completion date of 13 May 2004 (Tab G-14). She has a total of 185.6 hours in Predator (Tab G-9). At the time of the accident, the SO was current and qualified in all flying events required for

the mission (Tab G-9, G-14, K-3). Her Predator flight hours include 88.7 combat hours and 47.4 combat support hours (Tab G-9).

A summary of the SO's flight time is as follows (Tab G-11):

|          | Hours | Sorties |
|----------|-------|---------|
| 30 days  | 39    | 27      |
| 60 days  | 136.1 | 55      |
| 90 days  | 136.1 | 55      |

### d.  Supervisor of Flying.

The Supervisor of Flying (SOF) for the deployed location at the time of the mishap, assigned to the 332nd Air Expeditionary Wing as the Deputy Operations Group Commander, and a qualified F-16 pilot. On the day of the mishap, the SOF began his SOF tour at 0430L and completed his tour at 1000L. His experience with Predator is limited to the time of the deployment and he maintains no qualifications or association with Predator beyond a cursory knowledge of its operations at the deployed location. As a result of the mishap aircraft's uneventful takeoff and inability to reach the base following engine loss and ensuing fire, the SOF's involvement in the resolution of the mishap was negligible (Tab V-12.15, V-16).

## 9.  MEDICAL

### a.  Qualifications.

Physical exams as documented on the Air Force Forms 1042, *Medical Recommendations for Flying or Special Operational Duty Forms*, for MP1, MP2 and the SO were current. All were fully medically qualified to perform Predator crew duties.

### b.  Health.

Medical records review for MP1, MP2, and the SO revealed no medical or dental conditions, medications, or acute illnesses that influenced the mishap. During their annual physical examinations, the pilots and sensor operator were found to be healthy and qualified for worldwide duty. There were no medical issues involving any of the crewmembers that were factors in this mishap.

### c.  Toxicology.

Blood and urine samples were obtained from MP1, MP2, SO, and maintenance personnel directly involved with the aircraft. These samples were obtained at the deployed location's medical facility immediately following the crash of the mishap aircraft and the resulting reports were generated on the 26th and 31st of August, 2004. The samples were examined for carbon monoxide, ethanol, and drugs (screening was accomplished for the following drugs: amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, opiates and phencyclidine).

MQ-1L, S/N 99-3062  17 August 2004

No ethanol or drugs were found in any of the samples and the carbon monoxide levels were normal in all cases.

Substance abuse was not a factor in this accident.

### d. Lifestyle.

There is no evidence that unusual habits, behavior, or stress on the part of the crew contributed to the accident.

### e. Crew Rest and Crew Duty Time.

Air Force policy dictates aircrew members must receive adequate rest to insure safety and mission effectiveness. Air Force regulations outline maximum allowable flight duty periods, maximum monthly and quarterly total flying hours, and minimum crew rest periods to ensure adequate time for meals, transportation, and sleep.

Crew rest is defined in AFI 11-202, Vol 3, *General Flight Rules*, Para 9.7.1 as the non-duty period before the flight duty period begins. Air Force crews require at least 8 hours of continuous, uninterrupted rest during the 12 hours immediately prior to the beginning of the flight duty period. All crew members had adequate crew rest. Crew rest and duration of duty day were not factors in the accident (Tab BB-7, V-12.6, V-13.5, V-15.1).

## 10. OPERATIONS AND SUPERVISION

### a. Operations.

Operations tempo for the deployed location is very high. The squadron is responsible for Predator RPA operations, in support of CENTCOM, for Operations ENDURING FREEDOM and IRAQI FREEDOM. Operations at the LRE location have been steadily increasing since the inception of the remote-spit operations concept. At the time of the mishap, the LRE was responsible for providing aircraft to POC-N as well as maintaining a local orbit around the deployed location for base defense. This volume of production requires tremendous efforts from both aircrews and maintenance personnel. The mishap crew (MC) and maintenance personnel interviewed by the AIB agreed that the operations tempo, at the time of the mishap, was very high, but not beyond the capabilities of the individuals deployed to complete the task (Tab V-1.1, V-2.2, V-3.2, V-4.5, V-5.2, V-7.2, V-8.5, V-9.4, V-10.2, V-11.1, V-12.4, V-13.4, V-14.1, V-15.2, V-17.1, V-18.1, V-19.2, V-21.1).

### b. Supervision.

Supervision at the deployed location was heavily tasked. MP1 was the commander of the 46 ERS at the time of the accident. MP1 ensured all aircrew members had the required information to complete the ATO tasked missions, maintained close communications with command and control elements at the deployed location, the CAOC, and at the POC-N and performed pilot

duties. All indications confirm adequate and effective supervision provided for all personnel assigned to the unit (Tab V-13.20-22, V-15.1).

## 11. HUMAN FACTORS ANALYSIS

Human factors analysis consists of two categories: environmental and individual. The mishap crew members and maintenance personnel react to the environment to which they are exposed. The environmental factors cover not only the physical environment but also the organizational and personal environments. The individual factors cover physiological through psychosocial factors. Human factors listed in Air Force Pamphlet (AFPAM) 91-211, attachment 8, *Human Factors Terms* were considered by the AIB, but no single factor was found to be a significant issue in this accident (Tab BB-2). The following discussion provides some background concerning the Predator weapons system as a whole and the human factors associated with operating this system in a combat environment.

### a. Environmental.

Environmental factors pertaining to this mishap are related to the physical environment of combat operations at a deployed location and cockpit design factors, unique to Predator, which have an impact on the analysis and reaction to an emergency situation.

#### (1) Operations

The pace of operations at the deployed location was very high. Operations personnel are performing launch and recovering missions in support of POC-N, FCF's, and flying the local mission supporting the base defense of the deployed airfield. Maintenance personnel are constantly performing phase inspections (either 60-hour or 120-hour) or the 360-hour inspections which requires complete engine removal/installation. According to testimony over a 3 month period ~30-35 engine removals/installations occurred (Tab V-21.1). Phase inspections are a daily occurrence along with the normal pre and post flight operations which maintenance must perform.

#### (2) Institutional / Management

All crews and maintenance personnel at the deployed location had received the appropriate level of training prior to deployment and were adequately supervised. The workload was very demanding and all personnel interviewed expressed their view that although very busy, they were able to accomplish what was required and were afforded the time required to do the job correctly. Supervisory personnel were available and closely involved with the operation of the unit.

#### (3) Logistics / Maintenance

Personnel assigned to accomplish the deployed operation represented an appropriate mix of experienced and relatively inexperienced skill levels. Supervision and Quality Assurance personnel were available at the required times to ensure the success of the mission.

**(4)** Facilities Services

Primary squadron functions to include both operations and maintenance were conducted within the relative protection of a hardened aircraft shelter. Personal living quarters were located within a "tent city" established for the Air Force personnel assigned to the base. Facilities for dining, recreation, exercise, and spiritual growth were also available to all personnel.

**(5)** Egress / Survival

N/A

### b. Individual

**(1)** Physiological / Biodynamic

The only factors applicable to this mishap are those affecting the aircrew and are inherent to Predator operations.

**(2)** Psychological

Both aircrew and maintenance personnel were exposed to the stressors associated with operations in a combat environment. Mental fatigue resulting from the ops temp and the threat of attack were certainly present in all personnel, yet not expressed by anyone interviewed as being a significant detriment to the effective operation of the unit. Attention management is a factor for the aircrew as it pertains to the complex nature of conducting simultaneous operations involving multiple aircraft.

**(3)** Psychosocial

According to testimony, morale amongst both maintenance and operations personnel was very good, interpersonal relationships between members of the squadron were effective and did not have a detrimental impact on the operation as a whole or on this mission in particular.

## 12. GOVERNING DIRECTIVES AND PUBLICATIONS

### a. Primary Operations Directives and Publications.

1. AFI 11-2RQ-1, Volume 3, 28 February 2002, *RQ-1-Operations Procedures*
2. AFI 11-202, Volume 3, 6 June 2003, *General Flight Rules*
3. AFI 11-202, Volume 3, ACC Supplement 1, 30 December 2003, *General Flight Rules*
4. 57th Wing PREDATOR GCS In-Flight Guide, 1 April 2003
5. Technical Order 1Q-1(M) B-1, 1 November 2003, USAF Series MQ-1B and RQ-1B Systems Flight Manual, with Change 1, 31 March 2004, with Interim Operational Supplement 3, 3 May 2004
6. AFMAN 11-217, Volume 1, 29 December 2000, *Instrument Flight Procedures*
7. AFPAM 91-211, 23 July 2001, *Human Factors Terms*

**b. Maintenance Directive and Publications.**

1. AFI 21-101, 1 June 2004, *Aerospace Equipment Maintenance Management*
2. Technical Manual 1Q-1(M) B-2-3-12-1, 31 Mar 2004, *MQ-1L and RQ-1L Unmanned Aerial Vehicle Maintenance Procedures.*
3. Technical Manual 1Q-1(M) B-2-3-12-3, 31 Mar 2004, *MQ-1L and RQ-1L Unmanned Aerial Vehicle Maintenance Procedures.*
4. Technical Manual 1Q-1(M) B-6WC-2, 31 Mar 2004, *Aircraft Periodic Inspections and Maintenance Requirements*
5. Technical Manual 1Q-1(M) B-2-72JG-10-1, 31 Mar 2004, *Engine Reciprocating-Engine Fuel and Intake System*
6. Technical Manual 1Q-1(M) B-2-72JG-40-1, 31 Mar 2004, *Engine Reciprocating-Exhaust and Turbocharger System*

**c. Known or Suspected Deviations from Directives or Publications.**

(1) Mishap Crew.

AFI 11-2RQ-1 Vol. 3 states that "for all ground and flight operations, the pilot flying the aircraft will occupy the left seat unless equipment malfunctions dictate use of the right seat (exception: For relief-on-station (ROS) flights the pilot flying the relieving/relieved aircraft will occupy the right seat)" (Tab BB-6). At the time when initial indications of the aircraft malfunction appeared, no one was at the controls of the MA. From review of the 8-mm tapes and the dataloggers, approximately 30 seconds elapsed before any pilot actions were taken, by MP2, to deal with the situation. It is clear, from the evidence provided; this deviation had neither a causal role nor any effect on the final outcome of the mishap. The aircraft was un-recoverable by the time any signs of fire could have been noticed by the MC, even if there had been no datalink interference and MP1 was at the controls the moment the engine stopped. Other than this one deviation, the crew complied with all checklists, AFIs, and regulations pertaining to the execution of this mission.

(2) Maintenance.

Maintenance complied with all Tech Orders, AFIs, and regulations pertaining to the maintenance on this aircraft.

# 13. NEWS MEDIA INVOLVEMENT

A news bulletin was put out by the deployed location. Beyond this there has been no apparent media interest regarding this accident (Tab HH-2).

# STATEMENT OF OPINION
## MQ-1L PREDATOR S/N 99-3062 ACCIDENT
## 17 AUGUST 2004

Under 10 United States Code 2254(d) any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability of the United States or by any person referred to in those conclusions or statements.

## 1. OPINION SUMMARY:

**There is clear and convincing evidence that this mishap was caused by a fire in the engine compartment.** There is substantial evidence the fire was caused by the non-standard routing of the oil pump supply line bringing oil from the oil cooler to the oil pump. The line was routed over the engine block around #3 cylinder head and then to the oil pump. The location of the fire, routing of the oil line, condition of the oil line, flammability characteristics of the oil, and condition of the engine components tend to indicate that the oil supply line failed and the subsequent oil leak was the ignition point of the fire. The hose is made of a material that when exposed to the normal heat from the turbocharger or contact of the oil line to cylinder #3 exhaust would fail over time and expose oil to very hot surfaces, thus starting a fire. The fire, fed by airflow from the air scoops and fuel or coolant lines that were burned, grew to encompass the propeller area, and affected the structural integrity of bulkhead 10 causing the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact.

There is substantial evidence that two additional factors contributed to this mishap: (1) the maintenance T.O.s do not give clear guidance on how to route the hoses; and (2) the very high Ops TEMPO for both the operations and maintenance crews.

## 2. DISCUSSION OF OPINION:

In my opinion, the primary cause of this mishap, based on physical evidence and expert analysis, is the non-standard routing of the oil pump supply line bringing oil from the oil cooler to the oil pump. As seen in the pictures of the mishap engine and proven at the FTD, the routing of the oil pump supply line brought it near or in contact with the #3 exhaust manifold and the engine turbo. The oil supply line hose was exposed to high temperatures which over time compromised the integrity of the inner hose that the fire sleeve (outer hose) was there to protect. The oil supply line failed and exposed the oil within it to temperatures well over the 392° F (flash point of the oil) and to temperatures of 1500° F from the cylinder head. Once the fire started, airflow from the engine cooling fan along with ram air from the scoops on the lower engine cowl forced airflow upward from the bottom of the engine to the top bringing the fire to rear of the engine. As the fire progressed, it burned lines or components that would also contribute to the fire i.e., fuel lines, carburetors, and even coolant lines. The fire eventually affected the structural integrity of bulkhead 10 causing the right tailboard to depart the aircraft. The aircraft departed controlled flight and was destroyed upon impact. The engine parameters downlinked from the

aircraft provide a real time read out of speeds and temperatures associated with the aircraft. However, expert analysis determined the validity of these parameters past 0908:45L are suspect due to the cables that were either burned, destroyed or heated up to the intensity suspected thus giving inaccurate readings as indicated by the data logger files and represented on the monitors located in the pilot cockpit.

After the second Predator was shut down, downlink was re-established with the GCS and the MC became aware that there was a problem with the MA. The MC properly performed all actions to attempt to recover the aircraft, but the engine fire and subsequent loss of control was beyond the MP's ability to overcome. Both MPs and the SO are combat mission ready and qualified to do their job.

There is substantial evidence that two additional factors contributed to this mishap: (1) the maintenance T.O.s do not give clear guidance on how to route the hoses; and (2) the very high Ops TEMPO for both the operations and maintenance crews. The T.O. does not specify a route for the oil supply hose and the checklist only directs the maintenance personnel to connect the three engine oil lines to the bulkhead and radiator. As shown in this mishap, there are routes that meet these requirements while endangering the aircraft. Second, the pace of operations at the deployed location required ~30-35 engine replacements during a 3 month period. With each aircraft flying 20-hour sorties, a 60-hour inspection is accomplished after every 3rd flight and 120-hour inspections after every 6th flight. This high operations tempo is bound to take its toll, even on the most dedicated and capable personnel.

15 October 2004

MICHAEL L. ROLLISON, Col, USAF
President, Accident Investigation Board

 

# EXECUTIVE SUMMARY
## AIRCRAFT ACCIDENT INVESTIGATION
## MQ-1L "PREDATOR," S/N 99-003056
## AT A DEPLOYED LOCATION ON 27 MARCH 2005

On 27 March 2005, at approximately 0240Z, an MQ-1L Predator, Remotely Piloted Aircraft (RPA), S/N 99-003056, crashed 10 miles north of a forward operating location (FOL) in the USCENTCOM theater. The aircraft departed controlled flight approximately eight minutes after an engine fire was detected. The mishap RPA (MRPA) was deployed from the 15th Reconnaissance Squadron, 57th Wing, Nellis AFB, Nevada. The fire was catastrophic, quickly burning through fuel and oil lines on the engine and other components in the engine bay. During the course of the fire, the engine failed. Seven minutes later, the aircraft experienced uncommanded pitch and roll changes as the structural integrity of the left tail plane servomotor weakened. One minute later, the left tail plane departed the aircraft and it departed controlled flight. The left tail plane was not at the impact site and was never recovered. There were no injuries or fatalities from the accident. Upon impact, the MRPA was damaged beyond economical repair. Other than the damage to the aircraft, valued at $3,792,200, there was no damage to government or private property.

The primary cause of this accident, supported by clear and convincing evidence, was a catastrophic engine fire that spread through the engine bay and tail section of the aircraft. As the fire continued to grow fed by fuel, oil, and airflow from the air scoops, the ignition module was disabled causing the engine to fail, the left tail plane servomotor weakened causing the left tail plane to separate from the aircraft and the aircraft departed controlled flight. There is substantial evidence that the cause of the engine fire was a fuel leak on the left forward part of the engine that found an ignition source, most likely the turbocharger, alternator, or a cylinder head. The location of the fire as well as critical components on the left bulkhead, flammability of the fuel, materials used for fuel and oil lines, and routing of fuel, oil, and cooling air lines tend to indicate that the fuel priming solenoid feed line failed and the subsequent fuel leak was the ignition point of the fire. There is substantial evidence six additional factors substantially contributed to the mishap: (1) an O-ring seal on the #3 cylinder valve cover was pinched or cut during installation. After holding a seal for three previous flights, it may have failed and leaked oil that collected in the lower engine bay cowl and provided combustible material to feed the fire. While it is possible this could have been the ignition source, it is unlikely due to the high flashpoint of the oil; (2) the aircraft design uses rubber fuel and oil lines susceptible to fire and damage from exposure to extreme heat; (3) there is no dedicated fire-detection or fire-suppression system; (4) cockpit controls/switches/displays detract from safe mission completion; (5) inadequate procedural guidance for engine fires; (6) inadequate technical data on the proper routing of fuel, oil, and cooling lines; and (7) inadequate technical data on proper post flight inspection procedures resulting in a failure to detect fuel line chafing.

*Under 10 U.S.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.*

# UNITED STATES AIR FORCE
# AIRCRAFT ACCIDENT INVESTIGATION BOARD
# REPORT



**MQ-1L "Predator," S/N 99-003056**
**15th Reconnaissance Squadron**
**57th Operations Group**
**57th Wing**
**Nellis Air Force Base, Nevada**



**DATE OF ACCIDENT:  27 March 2005**
**BOARD PRESIDENT:  Lieutenant Colonel Harry J. Bender**

**Abbreviated Accident Investigation, conducted pursuant to**
**Chapter 11 of Air Force Instruction 51-503**



DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR COMBAT COMMAND
LANGLEY AIR FORCE BASE, VIRGINIA

AUG 1 2 2005

MEMORANDUM FOR ACC/JA

SUBJECT: AFI 51-503, Aerospace Accident Investigation Report – MQ-1L,
S/N 99-003056, 15th Reconnaissance Squadron, 57th Wing, Nellis Air Force
Base, Nevada, 27 March 2005

I have reviewed the Accident Investigation Board Report regarding the MQ-1L that

experienced an engine fire which led to its departure from controlled flight and its

eventual crash at a forward location on 27 March 2005. The report prepared by

Lieutenant Colonel Harry J. Bender, complies with the requirements of AFI 51-503. This

report is approved.

RONALD E. KEYS
General, USAF
Commander

Attachment:
Accident Investigation Board Report

*Global Power For America*

# EXECUTIVE SUMMARY
# AIRCRAFT ACCIDENT INVESTIGATION
# MQ-1L "PREDATOR," S/N 99-003056
# AT A DEPLOYED LOCATION ON 27 MARCH 2005

On 27 March 2005, at approximately 0240Z, an MQ-1L Predator, Remotely Piloted Aircraft (RPA), S/N 99-003056, crashed 10 miles north of a forward operating location (FOL) in the USCENTCOM theater. The aircraft departed controlled flight approximately eight minutes after an engine fire was detected. The mishap RPA (MRPA) was deployed from the 15th Reconnaissance Squadron, 57th Wing, Nellis AFB, Nevada. The fire was catastrophic, quickly burning through fuel and oil lines on the engine and other components in the engine bay. During the course of the fire, the engine failed. Seven minutes later, the aircraft experienced uncommanded pitch and roll changes as the structural integrity of the left tail plane servomotor weakened. One minute later, the left tail plane departed the aircraft and it departed controlled flight. The left tail plane was not at the impact site and was never recovered. There were no injuries or fatalities from the accident. Upon impact, the MRPA was damaged beyond economical repair. Other than the damage to the aircraft, valued at $3,792,200, there was no damage to government or private property.

The primary cause of this accident, supported by clear and convincing evidence, was a catastrophic engine fire that spread through the engine bay and tail section of the aircraft. As the fire continued to grow fed by fuel, oil, and airflow from the air scoops, the ignition module was disabled causing the engine to fail, the left tail plane servomotor weakened causing the left tail plane to separate from the aircraft and the aircraft departed controlled flight. There is substantial evidence that the cause of the engine fire was a fuel leak on the left forward part of the engine that found an ignition source, most likely the turbocharger, alternator, or a cylinder head. The location of the fire as well as critical components on the left bulkhead, flammability of the fuel, materials used for fuel and oil lines, and routing of fuel, oil, and cooling air lines tend to indicate that the fuel priming solenoid feed line failed and the subsequent fuel leak was the ignition point of the fire. There is substantial evidence six additional factors substantially contributed to the mishap: (1) an O-ring seal on the #3 cylinder valve cover was pinched or cut during installation. After holding a seal for three previous flights, it may have failed and leaked oil that collected in the lower engine bay cowl and provided combustible material to feed the fire. While it is possible this could have been the ignition source, it is unlikely due to the high flashpoint of the oil; (2) the aircraft design uses rubber fuel and oil lines susceptible to fire and damage from exposure to extreme heat; (3) there is no dedicated fire-detection or fire-suppression system; (4) cockpit controls/switches/displays detract from safe mission completion; (5) inadequate procedural guidance for engine fires; (6) inadequate technical data on the proper routing of fuel, oil, and cooling lines; and (7) inadequate technical data on proper post flight inspection procedures resulting in a failure to detect fuel line chafing.

*Under 10 U.S.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.*

# SUMMARY OF FACTS AND STATEMENT OF OPINION
## MQ-1L 99-003056 Accident
## 27 March 2005

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i
COMMONLY USED ACRONYMS & ABBREVIATIONS ............................................... iii
SUMMARY OF FACTS ...................................................................................................... 1
1.  AUTHORITY, PURPOSE, AND CIRCUMSTANCES ............................................. 1
    a.  Authority ......................................................................................................... 1
    b.  Purpose ........................................................................................................... 1
    c.  Circumstances ................................................................................................ 1
2.  ACCIDENT SUMMARY ............................................................................................ 1
3.  BACKGROUND ......................................................................................................... 2
4.  SEQUENCE OF EVENTS ......................................................................................... 4
    a.  Mission ............................................................................................................ 4
    b.  Planning ........................................................................................................... 4
    c.  Preflight ........................................................................................................... 4
    d.  Changeover ...................................................................................................... 4
    e.  Flight ................................................................................................................ 4
    f.  Impact ............................................................................................................... 7
    g.  Life Support Equipment, Egress and Survival ............................................. 7
    h.  Search and Rescue ......................................................................................... 8
    i.  Recovery of Remains ...................................................................................... 8
5.  MAINTENANCE ........................................................................................................ 8
    a.  Forms Documentation ..................................................................................... 8
    b.  Inspections ...................................................................................................... 8
    c.  Maintenance Procedures ............................................................................... 11
    d.  Maintenance Personnel and Supervision ..................................................... 12
    e.  Fuel, Hydraulic and Oil Inspection Analysis ................................................ 12
    f.  Unscheduled Maintenance ............................................................................ 13
6.  AIRCRAFT AND AIRFRAME, MISSILE, OR SPACE VEHICLE SYSTEMS ...... 13
    a.  Condition of Systems .................................................................................... 13
    b.  Testing ........................................................................................................... 13
7.  WEATHER ................................................................................................................ 14
    a.  Forecast Weather ........................................................................................... 14
    b.  Observed Weather .......................................................................................... 14
    c.  Space Environment ........................................................................................ 14
    d.  Conclusions .................................................................................................... 14
8.  CREW QUALIFICATIONS ...................................................................................... 15
    a.  Mishap Pilot ................................................................................................... 15
    b.  Mishap Sensor Operator ................................................................................ 15
    c.  Supervisor of Flying ...................................................................................... 15

9.  MEDICAL ................................................................................................................16
    a.   Qualifications .................................................................................................. 16
    b.   Health .............................................................................................................. 16
    c.   Toxicology ....................................................................................................... 16
    d.   Lifestyle .......................................................................................................... 16
    e.   Crew Rest and Crew Duty Time ..................................................................... 16
10. OPERATIONS AND SUPERVISION ...................................................................... 16
    a.   Operations ........................................................................................................ 16
    b.   Supervision ...................................................................................................... 17
11. HUMAN FACTORS ANALYSIS .............................................................................. 17
    a.   Enviromental .................................................................................................... 18
    a.   Individual ......................................................................................................... 20
12. GOVERNING DIRECTIVES AND PUBLICATIONS ............................................. 21
    a.   Primary Operations Directives and Publications ............................................ 21
    b.   Maintenance Directives and Publications ....................................................... 21
    c.   Known or Suspected Deviations from Directives or Publications ................... 22
         (1)   Crew ........................................................................................................ 22
         (2)   Maintenance ............................................................................................ 22
13. NEWS MEDIA INVOLVEMENT ............................................................................. 23
    STATEMENT OF OPINION ......................................................................................... 24

# COMMONLY USED ACRONYMS & ABBREVIATIONS

| | | | | |
|---|---|---|---|---|
| AB | Air Base | | GMT | Greenwich Mean Time |
| ACC | Air Combat Command | | GPS | Global Positioning System |
| AF | Air Force | | HDD | Heads Down Display |
| AFAF | Air Force Auxiliary Field | | Hr | Hour |
| AFB | Air Force Base | | HUD | Heads Up Display |
| AFI | Air Force Instruction | | IAW | In Accordance With |
| AFMAN | Air Force Manual | | INS | Inertial Navigation System |
| AFTO | Air Force Technical Order | | ISIB | Interim Safety Investigation Board |
| AGL | Above Ground Level | | Ku | Satellite Link Frequency Band |
| AIB | Accident Investigation Board | | L | Local Time |
| Alt | Altitude | | LL | Low Lead |
| AO | Area of Operation | | LOS | Line of Sight |
| AOA | Angle of Attack | | LRE | Launch and Recovery Element |
| AOR | Area of Responsibility | | MC | Mishap Crew |
| ATC | Air Traffic Control | | MCE | Mission Control Element |
| ATO | Air Tasking Order | | MCT | Manifold Charge Temperature |
| AVGAS | Aviation Gasoline | | MOC | Maintenance Operations Center |
| BOLDFACE | Steps a pilot must take immediately without reference to written checklist | | MP | Mishap Pilot |
| | | | MRPA | Mishap Remotely Piloted Aircraft |
| BPO/Pre | Basic Post Flight/Preflight | | MSL | (above) Mean Sea Level |
| C | Celsius | | MSN | Mission |
| CAMS | Core Automated Maintenance System | | MSO | Mishap Sensor Operator |
| CAOC | Combined Air Operations Center | | MTS | Multi-spectral Targeting System |
| CAPs | Critical Action Procedures | | N/A | Not Applicable |
| CHT | Cylinder Head Temperature | | NDN | No Defects Noted |
| CND | Could Not Duplicate | | NM | Nautical Miles |
| CL | Command Link | | NRTS | Not Repairable This Station |
| DEMPC | Data Exploitation, Mission Planning, and Communications | | OAT | Outside Air Temperature |
| | | | OCG | Operations Check Good |
| DL | Data Link | | OIF | Operation Iraqi Freedom |
| DLOS | Digital Line of Sight | | OG | Operations Group |
| DNIF | Duties Not to Include Flying | | OPS Cell | Operations Room |
| DoD | Department of Defense | | OPTEMPO | Operations Tempo |
| EGT | Exhaust Gas Temperature | | ORM | Operational Risk Management |
| ERS | Expeditionary Reconnaissance Squadron | | OTI | One Time Inspection |
| | | | P | Pilot |
| F | Fahrenheit | | PCM | Primary Control Module |
| Ft | Feet | | PMEL | Precision Measurement Equipment Laboratory |
| Ft/sec | Feet per second | | | |
| FCIF | Flight Crew Information File | | POC | Predator Operations Center |
| FCF | Functional Check Flight | | PPSL | Primary Predator Satellite Link |
| FDP | Flight Duty Period | | PSI | Pounds per square inch |
| FOL | Forward Operating Location | | RPA | Remotely Piloted Aircraft |
| FPS | Fuel Priming Solenoid | | RPM | Revolutions Per Minute |
| FTU | Formal Training Unit | | RS | Reconnaissance Squadron |
| GA or GAAS | General Atomics Aeronautical Systems Inc | | RTB | Return to Base |
| | | | SA | Situational Awareness |
| GCS | Ground Control Station | | SAR | Synthetic Aperture Radar |
| GDT | Ground Data Terminal | | SCAT | Servo Cooling Air Hose |

| SEPT | Situational Emergency Procedure Training |
| --- | --- |
| SFO | Simulated Flameout |
| SIB | Safety Investigation Board |
| S/N | Serial Number |
| SO | Sensor Operator |
| SOF | Supervisor of Flying |
| TCTO | Time Compliant Technical Order |
| TO | Technical Order |
| Turbo | Turbocharger |
| UAV | Unmanned Aerial Vehicle |
| USAF | United States Air Force |
| USCENTCOM | United States Central Command |
| VIT | Variable Information Table |
| VPP | Variable Pitch Propeller |
| Z | Zulu time |

# SUMMARY OF FACTS

## 1. AUTHORITY, PURPOSE, AND CIRCUMSTANCES

### a. Authority.

On 3 May 2005, Lieutenant General William M. Fraser III, Vice Commander Air Combat Command, appointed Lieutenant Colonel Harry J. Bender to conduct an aircraft accident investigation of the 27 March 2005 crash of an MQ-1L Predator aircraft, serial number (S/N) 99-003056, near a forward operating location (FOL) within the USCENTCOM area of responsibility (AOR). Although operating in support of Operation Iraqi Freedom (OIF), the aircraft was not a combat loss resulting from hostile fire. The Abbreviated Accident Investigation was conducted pursuant to Chapter 11 of Air Force Instruction (AFI) 51-503, *Aerospace Accident Investigations,* at Nellis Air Force Base (AFB), NV, from 7 May 2005 to 28 May 2005. The legal advisor was Captain Ron M. Blaze. The Board Pilot Member was Captain Troy A. Dupont. The Board Maintenance Member was Staff Sergeant Kevin Strickland. Staff Sergeant Teresa Ulring was appointed to serve as the Board Recorder (Tab Y).

### b. Purpose.

This aircraft accident investigation was convened under Chapter 11 of AFI 51-503, *Aerospace Accident Investigations.* The purpose of this investigation is to provide a publicly releasable report of the facts and circumstances surrounding the accident, to include a statement of opinion on the cause or causes of the accident; to gather and preserve evidence for claims, litigation, disciplinary, and adverse administrative actions; and for all other purposes. In addition to documenting factual information concerning the accident, the Board President is also required to state his opinion as to the cause of the accident or the existence of factors, if any, which substantially contributed to the accident. This investigation is separate and apart from the Safety Investigation Board, convened in accordance with (IAW) AFI 91-204, *Safety Investigations and Reports.* This report is available for public dissemination under the Freedom of Information Act (5 United States Code §552) and the Air Force Supplement to Department of Defense Regulation 5400.7, *Department of Defense Freedom of Information Act Program.*

### c. Circumstances.

The Accident Investigation Board convened to investigate the 27 March 2005 Class A accident involving MQ-1L Predator aircraft, S/N 99-003056, assigned to the 15th Reconnaissance Squadron (RS), 57th Operations Group, 57th Wing, Nellis AFB, Nevada and forward deployed in support of USCENTCOM Operation Iraqi Freedom.

## 2. ACCIDENT SUMMARY

On 27 March 2005, MQ-1L Predator, S/N 99-003056, was flying a combat support mission and had completed over 22 hours of the mission when it crashed ten miles north of the FOL following a catastrophic engine fire and departure from controlled flight. Within nine

minutes of detecting the aircraft fire, the left tail plane separated from the mishap remotely piloted aircraft (MRPA) and the MRPA experienced total loss of control. There were no injuries or fatalities. Upon impact, the MRPA was damaged beyond economical repair. The estimated cost is $3,792,200 (Tab P-4). There was no damage to government or private property (Tab P-5). There was no apparent media interest regarding the accident.

## 3. BACKGROUND

The 57th Wing, stationed at Nellis AFB, NV, oversees the dynamic and challenging missions for all the flying operations at Nellis AFB and Indian Springs Air Force Auxiliary Field (ISAFAF), including remotely piloted aircraft (RPA) operations. The 57th Operations Group under the 57th Wing is composed of eight squadrons whose missions run the gamut from operations and intelligence support to combat training, reconnaissance, and counter-land. The 11th, 15th and 17th Reconnaissance Squadrons are components of the 57th Operations Group. Their primary mission is to provide combatant commanders with deployable, long endurance, near real-time aerial reconnaissance, surveillance, target acquisition, precision munitions delivery, and special capabilities and tactics. The squadrons fly the RQ/MQ-1L Predator in performance of this mission. Operating from medium altitudes, they find, fix, track, target, engage and evaluate targets for combatant commanders and national level leadership. The wing and its subordinate units are all components of the Air Force's Air Combat Command.

The RQ-1B Predator is a medium-altitude, long-endurance RPA. The MQ-1L's primary mission is interdiction and conducting armed reconnaissance against critical, perishable targets. When the MQ-1L is not actively pursuing its primary mission, it augments the RQ-1 as a Joint Forces Air Component Commander-owned theater asset for reconnaissance, surveillance and target acquisition in support of the Joint Force Commander. The Predator can be employed in areas with moderate risk from hostile forces, minimizing the risk to aircrews from manned aircraft. The RQ/MQ-1 Predator is a system, not just one aircraft. The fully operational system consists of four aircraft (with sensors), a ground control station (GCS), a Predator primary satellite link (PPSL) communication suite, and 55 people.



The MQ-1 Predator carries the Multi-spectral Targeting System (MTS) with inherent Hellfire missile targeting capability and integrates electro-optical, infrared (IR), laser designator and laser illuminator into a single sensor package. The aircraft can employ two laser-guided Hellfire anti-tank missiles with the MTS ball.

Because the Predator aircraft is unmanned, the crew remotely controls the aircraft from the Ground Control Station (GCS) via a sophisticated communications system, including a "C-band" line-of-sight (LOS) microwave data link and a "Ku-band" satellite data link (Ku) for beyond-LOS operations. When an aircraft is more than approximately 130 miles from the GCS, the curve of the Earth's surface blocks a direct line and transmissions must be "bounced" via satellite relay from the GCS to the aircraft and vice versa. The data link that provides pilot commands to the RPA from the GCS are the command link (CL) or uplink to the RPA. The RPA reports status and supplies video via a return link (RL) or downlink to the GCS. Datalink status and video are displayed on head up displays (HUDs) at the pilot and sensor operator (SO) positions.

Because of the critical nature of datalinks to the Predator system, emergency mission profiles are preprogrammed into the primary control module (PCM) computer on the aircraft. If the uplink is lost while the RPA is on the ground, the PCM will stop the aircraft and kill the engine. If the RPA is airborne and the PCM detects a complete loss of uplink, it will command the aircraft autopilot to perform an emergency lost link profile consisting, among other things, of a preset altitude and heading.

The Predator can forward deploy as a system. The crew in the GCS when deployed in this manner consists of a pilot, a sensor operator, and a Data Exploitation, Mission Planning, and Communications (DEMPC) operator. The Predator can be fitted with a variety of sensors, including video, IR video, and specialized radar systems. The PPSL consists of a satellite dish and associated support equipment. The Ku-band satellite link provides communications between the GCS and the RPA when it is beyond line-of-sight.

The Predator can also be flown utilizing remote split operations and is now the normal mode of operation. When employed in this manner a smaller Launch and Recovery Element (LRE) will be deployed to a FOL and utilize the C-band LOS data link for take-offs and landings due to the requirement during this flight regime for high-speed connectivity. Once airborne, the aircraft can be handed over to the Mission Control Element (MCE). The CONUS MCE is connected to the PPSL located at a FOL through fiber optics. The transmissions now run through the fiber cable to the PPSL and once again "bounced" by satellite relay from the GCS to the aircraft and vice versa. This type of operation greatly reduces the amount of time squadron members spend deployed and significantly enhances the pilot's capabilities through a variety of support functions provided by the Predator Operations Center (POC). This operation has an approximate 1.5 second time delay versus the near real time of C-band or an approximate one-second delay of the conventional full system deployment Ku-band satellite link. The Predator system needs 5,000 feet by 125 feet of hard surface runway with clear LOS to each end from the GCS to the air vehicles.

The MQ-1 Predator uses a modified version of the ROTAX 914F, four-stroke, turbo-charged engine that uses 100 Low Lead (LL) fuel, commonly called Aviation Gas (AVGAS) and a synthetic racing engine oil. A major difference between the MQ-1 Predator engine and the commercially available engine is the location of the turbo charger, although many modifications have been made to strengthen and improve the stamina of the engine needed for long duration missions.

## 4. SEQUENCE OF EVENTS

### a. Mission.

The mishap pilot (MP) was Flight Lieutenant Simon R. Dachtler and the mishap sensor operator (MSO) was Senior Airman Juan Paolo R. Abado. They controlled the MRPA from the LRE. The mishap crew (MC) assumed control of the MRPA from the MCE two minutes prior to the first indication of the engine fire (Tab CC-2). Both crew members were current in their respective duty assignments. The MP and MSO were both considered experienced according to AFI 11-2RQ-1v1, as the MP had more than 344 hours in the Predator, and the MSO had more than 973 hours in the Predator (Tab G-4 & G-7). This mission was an Air Tasking Order combat support mission. The MRPA was launched at 0408Z, 26 March 2005 from the forward operating location.

### b. Planning / Briefing.

The MC planned the sortie to begin north of the FOL for hand-off from the MCE and planned recovery at the FOL. The MC completed required briefing items and was ready to assume control of the MRPA from the MCE (Tab V-9.3, CC-14-15). The MC received a thorough weather brief (Tab F-1.1).

### c. Preflight.

The aircraft was inspected prior to launch with no discrepancies noted. (Tab R-6). The MRPA launched without incident (Tab R-6). Eight different flight crews controlled the aircraft for over twenty two hours without incident (Tab AA-2). The MC did not perform the preflight. They assumed responsibility of the MRPA while it was airborne.

### d. Changeover.

The crew changeover occurred without incident 22 hours and 20 minutes into the MRPA's flight, at 0228Z, 27 Mar 05. No anomalies or discrepancies were passed from the MCE crew to the MC during the changeover brief (Tab R-15).

### e. Flight.

The first 22 hours and 20 minutes of the flight were uneventful. The MC assumed control of the MRPA in the following crew configuration: the MP at the flight controls, the MSO at the SO station. The MC began their sortie approximately 27 miles north of the FO at 10,000 ft MSL (Tab CC-2), planning for a straight-in approach to a full stop landing at the FOL.

Data from on-board sensors from 0150Z up until data collection was lost at 0239:49Z is located at Tab CC-2. This data was used in developing a chronological sequence of events from MCE hand-off through aircraft impact (0228Z - 0240Z). The MRPA initially launched at 26/0408Z and had been airborne for 22 hours and 20 minutes prior to hand-off.

1. 0227:54 – LOS Uplink established my MC. The MC now has control of the MRPA. All engine instruments normal and there were no indications of an engine fire.

2. 0228:00 – To verify hand-off was complete, the MSO commanded the MTS to slew left 135° and the MC received video of the left wing. The MP directed the aircraft to turn right. These actions verified that the LRE had control of the MRPA to the MCE. The only discrepancy noted during the hand-off from the MCE to the LRE was failure by the MC to accomplish a 360° inspection of the underside of the aircraft using the MTS sensor. This practice, although not formally captured in written operating procedures, provides the crew an opportunity to visually inspect the aircraft for damaged, missing, or loose aircraft components. It can also be an inspection for leaking fluids such as fuel or oil, aircraft icing, or other aircraft problems.

3. 0230:05 – Oil pressure dropped from ~55 to 20 psi over the next 38 seconds. This was a result of either the main oil supply line or the turbo oil feed line being burned through by fire. Forward fuel tank level is ~44 pounds, aft tank had 17 pounds.

4. 0230:15 – Turbo Oil Temperature spiked from approximately 235° F to 302° F.

5. 0230:19 – A descent was initiated for arrival at the FOL. Range from the FOL was 23.42 nm. Engine out glide range from this point was 22 nm with gear down, 31 nm gear up. Estimated time to landing at current speed of 74 knots was roughly 20 minutes to touchdown. The gear was commanded down five seconds later. As the gear was commanded down, both fuel pumps automatically turned on. The fuel pumps remained on for the remainder of the flight as part of the normal fuel schedule.

6. 0230:21 – Prior to commanding gear down, but after descent was initiated, the first indication of a possible engine overheat or fire appeared on Variable Information Table (VIT) 1 in the HDD as the Turbo Oil Temperature entered the red zone with a temperature reading of 302° F.

7. 0230:27 – While the MC was observing the gear extension as part of the DESCENT checklist, they visually saw the engine fire via the MTS video. This was the first indication of an engine fire that the MC recognized (Tab S-10). The MC needs 20 minutes of flight to get to the runway based on current speed and range from the field.



(Tab S-10)

8. <u>0230:34</u> – The engine failed 23 nm from the field. The fire had disabled the ignition module on the lower left side of the bulkhead near the left tail servomotor. Post engine failure, MC initiated Critical Action Procedures for ENGINE FAILURE checklist. Engine out glide range at this point was ~ 22 nm with gear down. Aft fuel tank quantity is 14 pounds, a loss of 3 pounds in 30 seconds.

9. <u>0230:55</u> – The landing gear reached the full down and locked position. MP commanded a gear retraction 11 seconds later in an attempt to increase glide range. Engine out glide range was 29 nm with gear up, 21 nm with gear down. Range from the field was 22.35 nm.



(Tab S-13)

10. <u>0231:27</u> – Engine RPM stopped.

11. <u>0231:31</u> – MP commanded GCS Ignition – Cold. Engine was windmilling and RPM increases to 1557. Windmilling RPM is where the engine is no longer producing power but the airflow is pushing the propeller which turns the engine at this point. Fuel pumps are automatically turned off when GCS Ignition is commanded to "Cold" To save battery power per T.O. 1Q-1(R)B-1.

12. <u>0231:37</u> – MP again commanded GCS Ignition – Cold. Engine RPM stopped again. Due to confusion by the pilot when RPM started again, a second activation of the ignition was made in an attempt to kill the ignition. This activation of the GCS Ignition button turned the GCS Ignition to "Hot," and the fuel pumps were turned back on, feeding the fire. The MRPA continued the descent, now ~9000 ft. Range from the field was 21.3 nm.

13. <u>0232:33</u> – Throttle was retarded indicating accomplishment of third step of the Engine Failure critical action procedure checklist. Angle of Attack was a negative 0.8 and was never set to the positive 2.0 degree angle of attack recommended by the technical order. Aft fuel tank quantity is now ~ 10 pounds, a loss of 7 pounds in two

and a half minutes. Per T.O. 1Q-1(M)B-1, fuel flow at best endurance speed with weapon pylons is ~15 pounds per hour at 10,000 ft. The MRPA has used 7 pounds in a little over two minutes with a failed engine. 6 pounds of 100 LL fuel equates to 1 gallon of fuel.

14. 0237:50 – Pitch oscillations developed and left tailboard servomotor amps fluctuated. The MP attempted to regain aircraft control by increasing airspeed. Altitude was now 5154 ft. Engine out glide range was roughly 16 nm. Range to the field - 11.96 nm.

15. 0239:00 – The left tailboard departed the MRPA and the MRPA departed controlled flight. Altitude was 4,080 ft and range to the field was 10.5 nm. Engine out glide range was 12.5 nm. Had the tail plane not separated, the MRPA could have landed.

16. 0239:49 – Prior to the crash, the MC lost downlink with the MRPA at 10.38 nm from the field. The MRPA was at 482 feet AGL with a descent rate greater than 70 ft/sec.

### f.  Impact.

After departing controlled flight, the MRPA impacted the ground ten miles north of the FOL in an unpopulated area at approximately 27/0240Z and was totally destroyed.


Tab S–5


Tab S–5

No technical analysis of the impact/wreckage and/or burn patterns at the crash site was performed IAW AFMAN 91-223, 20 May 04. However, the Interim Safety Investigation Board (ISIB) Investigating Officer documented the crash site through digital photographs and video. The MRPA crashed upright. The ISIB salvaged the aircraft engine and several miscellaneous parts and shipped them back to Nellis AFB. The remaining wreckage was destroyed by explosives for security reasons (Tab H-4). The left tail plane separated from the aircraft prior to impact and was never recovered.

### g.  Life Support Equipment, Egress and Survival.

Not applicable.

### h. Search and Rescue.

Not applicable.

### i. Recovery of Remains.

Not applicable.

## 5. MAINTENANCE

### a. Forms Documentation.

Every Air Force aircraft has a dedicated set of both written and electronic maintenance records used to record all flight and maintenance activity. These records are called the AFTO Form 781 and Core Automated Maintenance System (CAMS). The AFTO Forms 781 and CAMS data were thoroughly reviewed. The review revealed no evidence of pending mechanical, structural, or electrical failure for aircraft 99-3056 or engine #4418803. No over due inspections, no overdue time-change items, or overdue Time Compliance Technical Orders (TCTO) were found. TCTOs are directions to perform specific maintenance actions, usually upgrades or modifications, within a specific time period. There were eight pending TCTOs but they were no relevant to the accident. CAMS data verified that no negative maintenance trends existed and no could not duplicate (CND) or repeat discrepancies had been reported. There were two discrepancies in the 781A's at the time of the accident. Four delayed discrepancy write-ups, not relevant to the accident, existed on seven of the AFTO 781K Delayed Discrepancy Form. Previous maintenance discrepancies and corrective actions existed in the forms (Tab D-5).

The AFTO Forms 781 for the GCS was also reviewed and no discrepancies relevant to the accident were noted.

Maintenance on the satellite link system is documented in AFTO Form 244 and tracked through CAMS (Tab D-5). No discrepancies relevant to the accident were noted in these forms.

### b. Inspections.

Phased inspections are regularly scheduled maintenance practices performed on USAF aircraft at specific flying hours (e.g., every 150 flying hours). The maintenance documentation confirmed all inspections were satisfactorily accomplished IAW applicable maintenance directives. The last 150-hr aircraft phase inspection was completed at 1442.5 airframe hours (Tab D-4). The next scheduled aircraft phase inspection (150-hr airframe) was due in 73.2 hours. The engine on the MRPA was recently overhauled and installed on 1 March 2005. Engine #04418803 had completed a 360-hr inspection/overhauled between 1 February 2005 and 7 February 2005. It had 25.9 hours on it before the mishap flight and the next scheduled inspection was due in 34.1 hours (Tab D-11).

Post-flight Inspections are accomplished IAW T.O. 1Q-1(M)B-6WC-1 (Tab BB-10). The upper cowl is removed and the engine bay area is inspected. Usually, the engine area is still very warm to very hot in some areas, especially around the turbocharger area. Also, due to the very confined space of the engine bay, the lower and side portions of the engine are difficult to inspect as depicted in photo at Tab Z-5. These areas must be inspected with a mirror and flashlight. The ability to inspect fuel and oil lines is limited due to the outer heat shield tubing on many of the lines and the fact that some lines are not visible (Tab V-13.1). If some lines are routed in such a manner that causes them to lie against other lines, they must be moved away to see signs of chafing on fuel lines. Furthermore, personnel need to be aware of which trouble areas or high probability of chafing areas to look for (Tab V-13.1). One technique of protecting against chafing is depicted in photo at Tab Z-9. Tape is wrapped around the right carburetor line and engine coolant line to prevent chafing of either line. The photo is of an engine from Detachment 13 of the 372d Training Squadron at Nellis AFB, Nevada. They provide formal classroom and hands-on instruction to Predator maintenance personnel.

During a 360-hr engine overhaul/inspection on another Predator aircraft at the FOL three days after the mishap, chafing of the fuel priming solenoid (FPS) feed line was detected (Tab CC-11). A one time inspection (OTI) (Tab CC-12) of the remaining Predators at the FOL revealed four instances of excessive chafing on the FPS feed line caused by the Variable Pitch Propeller (VPP) servo cooling air hose (SCAT hose), a rubber hose with wire braiding for support, rubbing against the FPS feed line due to engine vibration. A chafed fuel line can lead to fuel leaks.



The fact that 4 of 13 aircraft had chafed fuel lines that were not detected during postflight inspections indicates three possible causes: (1) the current procedures (Tab BB-10, BB-12) do not adequately describe the required work or high probability areas for chafing; (2) personnel are not properly trained to locate chafed fuel lines; and (3) some fuel line chafing cannot be detected during a postflight inspection due to visibility restrictions, confined spaces, and routing of lines (Tab Z-4, V-13.1). The chafed fuel lines also indicate a need to re-route lines to prevent chafing with other engine lines/components.

The SCAT hose was routed in such a manner as to cause chafing on the FPS feed line. It should be routed so that it doesn't rub against the FPS feed line. Witness testimony stated procedures in the job guides directing routing of lines are inadequate. (Tab V-12.1, 13.1). Upon reviewing the job guide for this procedure, the procedure states only to connect the line to the bulkhead (Tab BB-31). Furthermore, during a postflight inspection, it is possible to not see any chafing unless the SCAT hose is moved away from the FPS feed line (Tab Z-3, Z-11, Z-12). The FPS feed line is easier to see during a 360-hr engine overhaul/inspection because the fuel backflow line and oil sump line are disconnected from the bulkhead (Tab Z-7). The temporary fix in theater was to zip tie the SCAT hose away from the FPS feed line to prevent further chafing (Tab CC-7).

The FPS feed line is on the forward left part of the engine on top of the plenum and receives fuel from the fuel pressure regulator (Tab Z-4). The SCAT hose can be routed using several different routes to include one route that places the SCAT hose next to the FPS feed line and another route away from the line. There is no guidance on how best to properly route the hose when installing the engine. At one time, the SCAT hose was routed over the metal fuel line to the left carburetor but that practice was stopped once carburetor fuel lines began to chafe (Tab V-12.1). In the photo below (Tab Z-4), it is routed under the left carburetor line.



The conditions at 10,000 ft were conducive for a fire ignited by fuel vapors. The flashpoint of fuel is defined as the lowest temperature at which it can form an ignitable mix with air. The flashpoint for 100 LL Avgas is as low as -45° C for most manufacturers of 100LL fuel per Material Safety Data sheets. The synthetic engine oil used by the Predator has a flashpoint of approximately 500° F. With the cool ram air entering the engine compartment, the ambient temperature would be lower than the flashpoint of the oil but well in the range conducive for fuel vapors. Once the fuel vapor ignited, it quickly burned through other lines nearby. Located directly next to the FPS feed line is the fuel backflow line that takes unused fuel from the fuel pressure regulator and routes it back to the fuel tanks (Tab Z-4). Next to the backflow line and FPS line is the oil sump line that returns oil to the oil reservoir (Tab Z-4). Close by is the main fuel supply line into the fuel pressure regulator (Tab Z-4). As these lines burned and failed, they leaked more fuel into the engine bay. Directly below the FPS feed line and fuel backflow line is the engine ignition module and left tail plane servomotor that also holds the left tail plane onto the aircraft (Tab Z-8, BB-37). With these items burning, the ignition module was disabled first followed by the weakening of the left tail plane servomotor which caused uncommanded pitch and roll changes. As the left tail plane servomotor finally failed entirely, the left tail plane separated from the aircraft and the MRPA departed controlled flight, impacting the ground one minute later. Within 8.5 minutes of confirming the engine fire, the left tail plane separated from the MRPA.

Post-mishap engine teardown analysis revealed that the O-ring seal on cylinder #3 was pinched or cut during installation (Tab J-24). A pinched/cut O-ring can lead to leaky valve covers (Tab J-24). According to the AFTO Form 781, the removal and replacement of #1 and #3 cylinder valve covers was corrected by SSgt Daniel Gurganious and inspected by SSgt Daniel Miranda IAW with T.O. 1Q-1(M)3-2-72G-30-1 (Tab D-5). It is likely the O-ring seal was pinched or cut during installation due to distraction or inattention to detail. Once the valve cover is installed, it is impossible to visually detect a pinched/cut O-ring unless it is protruding out from under the valve cover. Furthermore, if the O-ring seal maintains a good seal during the engine ground run and no oil leaks are detected, personnel will not detect this defect (Tab V-13.1).

### c. Maintenance Procedures.

Only minor documentation discrepancies were noted. Recent maintenance procedures of note include post-flight inspections, engine overhaul, replacement of cylinder head O-rings, carburetor inspections, power supply removal and replacement, and turbo charger serial number (S/N) DCL 43814 was removed and replaced with S/N GCL00012.

Engine #04418803 was installed on aircraft 99-3056 on 1 March 2005. The engine was removed from Aircraft 99-3047 on 30 January 2005 for a 360-hr inspection/overhaul. Moving engines between aircraft is common in the military. The mishap engine (ME) 360-hr inspection/overhaul was conducted between 1 February 2005 and 7 February 2005 at the FOL (Tab D-11). Tech data for the installing engine and fuel, oil, and coolant lines does not clearly show or describe the proper routing of lines. Witness testimony stated drawings are inadequate on how to properly and safely route fuel, oil, and coolant lines (Tab V-12.1),

13.1). Procedures are generally described with little guidance; e.g., "Connect lines to the bulkhead." (Tab BB-31).

The engine was installed on 1 March 2005 (Tab U-18). On 2 March 2005, an engine run ground operations check was completed. During the ground operations check, all four valve covers were noted leaking along with the #1 cylinder head pushrod seal (Tab U-21). Leaky valve covers can result from bad seals, pinched/cut seals, warped valve covers, or by not applying the proper torque on the valve cover retaining bolt. All of the valve covers were replaced IAW with the job guide, the work was inspected and properly signed off, and the valve covers checked good on the subsequent engine ground run (Tab D-5). The inspection process for replacement of valve covers is a visual check and engine ground run. Unless O-rings are protruding externally or the valve cover is misaligned, there is no means to visually verify that O-rings are not pinched or cut (Tab V-13.1). The engine ground run verifies that the O-ring seals are maintaining a good seal. A pinched/cut O-ring seal can maintain a seal as well. The pressure in the valve cover area is usually less than 8 pounds per square inch (psi).

During the same engine run, Cylinders #1 and #3 were not firing properly. The spark plugs were replaced and cylinders #1 and #3 fired properly (Tab U-26). The aircraft completed a Functional Check Flight (FCF) on 7 March 2005 with a duration of .7 hours and a 1-hr engine run (Tab U-15). An FCF is a short duration flight intended to ensure that all of the aircraft components are operating properly and is required after engine overhaul and installation. The aircraft completed its FCF and landed with no maintenance discrepancies and postflight inspections revealed no oil leaks or other discrepancies (Tab U-15, U-28). The aircraft flew again on 22 March 2005 for 2.5 hours. This mission was cut short due to the power supply overheating (Tab U-31). The power supply was removed and replaced and the aircraft flew again on the same day for 20.1 hours (Tab U-33). Both postflight inspections revealed no discrepancies such as oil leaks on the valve covers. Postflight inspections were completed IAW the tech order job guides (Tab BB-10). The job guide is very general in nature but a very detailed inspection must occur due to the number of lines and confined space within the engine bay. It is very easy to overlook an area and the inspector must be familiar with trouble or high probability areas where chafing could occur (Tab V-13.1).

### d. Maintenance Personnel and Supervision.

A thorough review of AF Forms 623, *Individual Training Record*, AF Forms 797, *Job Qualification Standard Continuation (JQS)/Command JQS* and all associated maintenance training forms was accomplished and revealed no maintenance personnel or activities discrepancies. All maintenance personnel assigned to the MRPA were properly trained and had the necessary skill level to perform their assigned duties. Only minor documentation errors were noted.

### e. Fuel, Hydraulic and Oil Inspection Analysis.

Fuel was analyzed; no discrepancies were noted (Tab D-8). Oil samples were not tested.

## f. Unscheduled Maintenance.

A comprehensive review of all unscheduled maintenance actions documented in the AFTO Forms 781 during the previous 90 days was accomplished. According to the AFTO forms 781 there were no repeating or recurring write-ups related to the MRPA (Tab D-10). Unscheduled maintenance actions that occurred on this aircraft were the replacement of the power supply and turbocharger. There is no evidence these actions contributed to the mishap.

# 6. AIRCRAFT AND AIRFRAME, MISSILE, OR SPACE VEHICL SYSTEMS

## a. Condition of Systems.

There was no damage to the GCS or the PPSL system. The MRPA, however, sustained substantial damage. The engine and its surrounding components sustained significant damage in the post-impact fire. The aircraft was damaged beyond economical repair. The certificate of damage did not include the cost of two AGM-114 Hellfire missiles which is $88,900 per missile (Tab CC-22). Total cost of the mishap is estimated at $3,792,200 (Tab P-4, CC-22). Photographs of the crash site are located at Tab S.

## b. Testing.

Lab tests (Tab J-7) were accomplished on the banjo fitting of the oil supply return line to determine the type and method of failure in order to determine whether the fitting failure was a result of fatigue or high stress, such as from impact with the ground. Visual examination, chemical analysis, hardness testing, and fracture surface examination were accomplished on the fitting. The results of the test indicated the banjo fitting fractured suddenly to applied forces which exceeded its tensile strength, most likely when the aircraft impacted the ground. There was no evidence of preexisting fatigue crack in the banjo fitting (Tab J-4).

General Atomics Aeronautical Systems Inc. (GAAS) reviewed operator reports and assisted with the inspection of the engine and aircraft to determine the cause of the mishap (Tab J-18). They suspected the fire was caused by the incorrect installation of the O-ring on the #3 cylinder valve cover, which eventually failed, leaking oil onto the exhaust manifold and into the engine bay lower cowl. In their opinion, the sequence of events could have been as follows:

"After some period of time, the leaky valve cover (#3 cylinder valve cover) dripped enough oil to saturate the exhaust heat shield wrapping. The oil likely did not ignite on the wrapping directly and leaded down and pooled in the lower cowl. Near the time that the aircraft started its descent, the oil found an ignition source such as the exhaust pipe. The fire initially was local under the #3 cylinder and proceeded to burn through the oil supply line. As the oil line burned, it collapsed or exposed openings in the hose that allowed the oil pump to pull air and decrease its pumping ability. The reduced oil pump efficiency resulted in the first logger indication of the oil pump pressure dropping. The fire intensity grew as indicated by Manifold Charge Temperature (MCT), Cylinder Head temperature (CHT, and turbo sump

temperatures. Additional oil fueled the fire from the fire damaged oil supply line and disabled the ignition module. At the time, the module failed, the engine stopped producing power. The oil residue evidence is consistent with the finding of an oil leak on the left side of the engine. It is also possible that a fuel line burned prior to impact and caused a higher intensity fire that burned the tail off" (Tab J-29).

Interviews with maintenance personnel (Tab V-10.5, 10.6 11.4, 13.2) did not support the theory that oil leaking from the valve cover could have started the fire. All agreed that oil coming off the valve cover would immediately dissipate on the heat shield of the exhaust manifold and not pool in the lower bay. Furthermore, the flashpoint for the oil used in the Predator engine is above 500° F (Tab O-10).

GAAS also stated the oil pressure dropped at the rate of 2.5 psi per minute (Tab J-26). However, the data logger files showed an oil pressure drop from ~60 psi to less than 40 psi within 30 seconds and to less than 20 psi with one minute, a drop of 40 psi in one minute (Tab CC-2). The sharp drop in oil pressure was followed by an immediate spike in turbocharger oil temperature and cylinder head temperatures.

# 7. WEATHER

### a. Forecast Weather
The flight weather briefing forecasted clear skies, visibility of 6 statute miles and wind 300° at 6 knots for takeoff. Landing weather for a scheduled landing time of 27/0100Z was forecasted as clear skies, visibility of 5 statute miles, and winds 320° at 10 knots gusting to 18 knots (Tab F-7).

### b. Observed Weather.
The observed weather at 0155 was few clouds at 1000 feet, visibility of 9000 meters (5.6 statute miles), winds 020° at 4 knots. Observed weather at 27/0246Z was few clouds at 100 ft MSL, few clouds at 20,000 ft MSL, winds 260° at 4 knots (Tab F-13). Weather observed in the MTS sensor of the airfield indicated clear skies.

### c. Space Environment
The Ku link was not in use at the time of the mishap; therefore, space environment was not a factor.

### d. Conclusions.

The mission was flown within the operational weather limitations of the system. Weather was not a factor.

## 8. CREW QUALIFICATIONS

### a. Mishap Pilot (MP)

The MP is a qualified Predator pilot (Tab G-4, G-10). At the time of the accident, the MP was certified combat mission ready as an MQ-1L pilot, was rated experienced, and was current and qualified in all flying events required for the mission. The MP is an exchange officer from the British Royal Air Force and had extensive flying experience in fighter-type aircraft. The MP's Predator flight hours include 344.5 total hours in the RQ-1 and MQ-1 (Tab G-4). The MP completed initial MQ-1 Predator qualification and mission upgrade on 9 August 2004 (Tab G-10).

A summary of the MP's flight time is depicted as shown (Tab G-6):

|         | Hours | Days Flown |
|---------|-------|------------|
| 30 days | 28.7  | 22         |
| 60 days | 51.3  | 29         |
| 90 days | 86.5  | 43         |

### b. Mishap Sensor Operator (MSO)

The MSO was an MQ-1L qualified Instructor Sensor Operator (Tab G-11). The MSO completed initial RQ-1/MQ-1 Predator mission/qualification training on 17 Oct 2002 and received his initial RQ/MQ-1 Instructor Sensor Operator evaluation on 21 July 2004 (Tab G-11). At the time of the mishap, the MSO was current and qualified in all flying events for the mission. The MSO had 967.4 total hours in the RQ-1 and MQ-1 (Tab G-8). A summary of the MSO's flight time is depicted as shown (Tab G-9):

|         | Hours | Days Flown |
|---------|-------|------------|
| 30 days | 28.2  | 22         |
| 60 days | 66.3  | 33         |
| 90 days | 66.8  | 34         |

### c. Supervisor of Flying (SOF)

The SOF was assigned to a flying squadron in the Air Expeditionary Wing at the FOL. His experience with Predator is limited to the time of the deployment and he maintains no qualification or association with Predator beyond a cursory knowledge of its operation at the FOL. Since the mishap aircraft never returned to the FOL, the SOF's involvement in the resolution of the mishap was negligible (Tab R-9).

## 9. MEDICAL

There is no evidence to suggest medical factors contributed to the accident.

### a. Qualifications.

Physical exams as documented on the Air Force Forms 1042, *Medical Recommendation for Flying or Special Operational Duty,* for the MP and MSO were current. Both were medically qualified to perform Predator crew duties.

### b. Health

There is no evidence to suggest medical issues involving any of the crewmembers nor maintenance personnel were factors in this accident.

### c. Toxicology.

Toxicology screens were run on the MP, MSO, and maintenance personnel directly involved with the aircraft following the mishap. Blood and urine were tested for carbon monoxide levels, ethanol, amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, opiates, and phencyclidine. All tests produced negative results.

### d. Lifestyle.

The MC was performing their mission from a forward operating location in a combat zone. Other than the normal stresses of combat operations, there is no evidence that unusual habits, behavior, or stress on the part of the crew and maintenance personnel contributed to the accident. One person, who had been deployed to the FOL previously, said the environment had improved 200% since he was last there. (Tab V-10.2)

### e. Crew Rest and Crew Duty Time.

Crew rest is defined in AFI 11-202, volume 3 as at least 10 hours of continuous restful activities including an opportunity for at least 8 hours of uninterrupted sleep during the 12 hours immediately prior to the flight duty period. There is no evidence to suggest crew rest and crew duty times were violated.

## 10. OPERATIONS AND SUPERVISION

### a. Operations.

Operations tempo for the deployed location is very high. The squadron is responsible for Predator operations in support of USCENTCOM Operation Iraqi Freedom. Operations are conducted 24/7 and at the time, 4 Predator missions per 24-hr period were generated.

Maintenance supervision stated that although the operations tempo was high, it was not beyond the capabilities of the individuals deployed to complete their tasks (Tab V-10.2).

The accident occurred during a combat support ATO-directed mission. However, no combat-related time sensitive taskings or high-pressure objectives existed during this phase of the Predator mission since it was returning to base for recovery and landing. There is no evidence to support damage from hostile fire.

The MP stated they had the usual stresses involved in being deployed to a combat environment and away from family (Tab V-9.8). At the time of the accident, Operational Risk Management (ORM) was a self-evaluation and crewmembers were expected to self-identify personal issues to the Mission Commander. The MP could not remember his self-evaluation ORM number other than it was normal. The MSO stated his ORM number was a "seven," indicating low risk (Tab V-8.8).

### b. Supervision.

Prior to stepping to the GCS, both members of the MC initialed cards indicating they had received their basic publications, and that they had reviewed the aircrew information file, operational read file, flight crew information file and sensor read file (Tab AA-3, AA-4, CC-13, CC-15). These information files are used to pass critical information to aircrew members before they fly such as changes to local operating procedures, the release of new technical orders, revisions to official procedures, etc. These cards also indicated all crewmembers had completed a critical action procedures (CAPs) test, and that the MP and MSO had passed the semi-annual 57th Operations Group (OG) standardization and evaluation test. CAPs testing requires aircrew members to write down all critical action procedures used during emergencies on their respective aircraft such as Engine Failure, Abort, Ejection, etc. The 57 OG standardization and evaluation test is a collection of questions on aircraft warnings, cautions, and performance limitations. The MP and MSO were also current on the monthly situational emergency procedures training (SEPT) (Tab AA-4). SEPT is a review of abnormal and emergency procedures and aircraft systems operations/limitations during realistic scenarios. This training presents a situation, and the crew discusses actions necessary to cope with the malfunction and carry it to a logical conclusion. All indications confirm adequate and effective supervision provided for all personnel assigned to the unit.

## 11. HUMAN FACTORS ANALYSIS

Numerous studies have validated the belief that 60 to 80 percent of Class A mishaps involve human factors, and that more than 90 percent of fatal Class A mishaps are directly related to human factors. Human factors are divided into two categories: environmental and individual. Environmental factors include operational issues, logistic or maintenance factors, matters pertaining to egress and survival, and issues associated with facilities and services essential to mission accomplishment. Individual factors run the gamut from physiological/biodynamic issues to psychological and psychosocial concerns. Human factors listed in Air Force

Pamphlet 91-211, Attachment 8 were considered by the board and several factors may have contributed to this accident.

**a. Environmental**

    1. Aircraft/Cockpit Design Factors – Automation

        a. Symbology is a factor when the system generated Symbology is not adequate for mission requirements. While performing emergency procedures, the MP inadvertently actuated the GCS-Ignition button twice since he thought the command had failed to execute (Tab CC-2, V-9.4). It is important to note the process of enabling or disabling the GCS ignition. The pilot must depress one of two identical unguarded buttons on the left throttle lever (the other button is used to launch the AGM-114 Hellfire missile). Then a preparatory message will appear on the HUD saying the GCS Ignition is prepared to be turned "Hot" or "Cold". For the command to take effect, the trigger on the right control stick must be pulled and the message on the HUD disappears indicating command executed (Tab BB-8). The only other feedback that the command actually took effect is to look down on the HDD Command Display on the Aircraft Status Area of the Status Display for the GCS Ignition status to change from "HOT" to "COLD". This is displayed in a white font for "HOT" and gray font for "COLD" on a blue background per TO 1Q-1(R)B-1. The MP observed other HDD data suggesting the engine had started up again so he commanded the GCS Ignition switch to "Cold" one more time thus turning the fuel pumps back on to feed the fire again (Tab CC-2). There is no switch that provides a mechanical/visual indication of activation other than trying to find it on a heads down display with many other indications of aircraft status.

        b. Design Deficiency is a factor when the design of the equipment being used does not adequately support mission requirements. There is no onboard dedicated fire-detection system or fire-suppression system to combat or suppress engine fires. The MC inadvertently detected the fire during a landing gear position check using the MTS sensor. When the MSO rotated the MTS to the rear view, the MP initially thought the bright spot on the tail was the sun (Tab V-9.3). The MSO recognized it as fire immediately based on his previous experience with a Predator engine fire. At this time, there was no engine sensor indication of an engine fire (Tab CC-2). The GCS has two video monitors, a keyboard, a joystick, a throttle control lever, and a flap lever for each workstation (Tab BB-7). Additionally, three other video monitors have been added on swing arms between the pilot and sensor operator along with another keyboard and mouse control to provide even more information. In a situation where split second decisions must be made, the likelihood of information overload, tunnel vision, or task saturation is very high. The MP had to sort through a multitude of data inputs, color warning labels, and audible warning tones, to even determine or confirm that an engine fire was in progress (Tab V-9.3 – 9.5). During an engine fire, it is critical to isolate fuel from the fire as soon as possible. The MTS video was the only positive and direct indication of an engine fire.

2. Operations Factors – Procedural Guidance/Publications

    a. Written Procedures are inadequate when the procedural guidance or publications have written procedures that contributed to an unsafe situation. The Engine Fire checklist (non-critical action) does not provide adequate guidance (Tab BB-6). Crew members are not provided with data to determine when they have an engine fire since it must be culled from the engine sensors. For example, high cylinder head temperature or high turbo oil temperature are not necessarily indications of an engine fire but may be symptoms of an engine fire. There are no cautions or notes that would provide the crew with additional information to base their decisions on such as: (1) how quickly fuel and oil lines fail when exposed to fire, (2) results of previous engine fire mishaps when total loss of control was experienced in less than 9 minutes, (3) the left or right tail plane may separate from the aircraft within 8 minutes of an engine fire, and (4) a caution or note reminding the aircrew to avoid populated areas or what to do when in hostile territory. Additionally, the Engine Fire checklist refers to the Engine Failure checklist (Tab BB-2) which may cause confusion during engine fire.

3. Logistics/Maintenance Personnel – Design

    a. Design is a factor when logistics and maintenance personnel inadequately support the mission due to equipment design. The majority of the fuel, oil and coolant lines are made of rubber with an added rubber heat shield to protect the lines from the high temperatures that exist on, in, and around the engine. In three other Predator engine fire mishaps, fuel, coolant, and oil lines were quickly consumed by fire. Due to the confine space of the engine bay, several lines are very close to each other, which often leads to chafing due to the vibration of the ROTAX 914F engine. Lines need to be moved or routed in another manner to prevent chafing. The use of tape to minimize chafing is not a long term solution.

4. Logistics/Maintenance Personnel – Procedures and Technical Data.

    a. Procedures is a factor when logistics and maintenance personnel are following inadequate procedures causing an unsafe situation. Technical Data is a factor when maintenance or design technical data are clearly deficient resulting in a reduction of performance. Current technical data is deficient in that there are no drawings depicting the proper routing of fuel, oil, and coolant lines. Procedures are general in nature and do not clearly indicate where those lines are intended to go (Tab BB-31). As a result, personnel run the lines wherever they will fit and through whatever parts of the engine that seem to work. One witness said he routes lines in the most logical way that he can (Tab V-12.1). Descriptions of where to route lines are non-existent. It is possible to route the SCAT hose next to the FPS feed line or away from that line. The temporary fix in theater is to use a zip tie to hold the SCAT hose away from the FPS feed line (Tab CC-7).

b. Procedures. For the postflight/preflight inspection, the upper cowl is removed and the engine bay area is inspected. Usually, the engine area is still very hot in many areas, especially around the turbocharger area. Also, due to the very confined space of the engine bay, the lower and side portions of the engine are difficult to inspect as depicted in the photos at Tab Z. These areas must be inspected with a mirror and flashlight. The ability to inspect fuel and oil lines is limited due to the outer heat shield tubing on many of the lines and the fact that some lines are not visible (Tab V-13.1). If some lines are routed in such a manner that causes them to lie against other lines, they must be moved away to see signs of chafing on fuel lines. The current procedure says to check for coolant, oil, and fuel lines for chafing, leaking and security (Tab BB-10). It does not state which areas are likely to chafe. Furthermore, depending on what side of the aircraft you are looking in from determines what you can see. One witness stated a person has to know what to look for and the tech data does not provide that knowledge (Tab V-13.1).

**b. Individual**

1. Psychological Factors – Attention Management

a. Boredom is a factor when the individual demonstrates a state of reduced conscious attention due to a sense of security, self-confidence, or a perceived absence of threat. Thus it may often be a result of highly repetitive tasks. Distraction is a factor when the individual has an interruption and redirection of the focus of attention by an environmental cue or mental process that degrades crew performance. Both of these factors may have played a part in the improper installation of the valve cover O-ring. With many engine changes during a deployment and the number of valve covers that need to be changed with them, it is possible to be easily distracted, become overly confident, or bored during this simple, yet critical procedure.

Although not considered a substantially contributing factor to the mishap, another environmental factor, Institutional or Management Factors – Training Issues, was considered relevant. The aircrew training program has a low fidelity training device for emergency procedures training. There is no training device that would have exposed the crew to the characteristics of a catastrophic engine fire. There is no training that would have allowed them to practice/develop procedures that could lead to either successful recovery of the aircraft or actions that could have minimized the damage. In this mishap, the crew could not have successfully recovered the aircraft unless they had landed the aircraft before the oscillation and failure of the left tail plane. Since the tail plane departed the aircraft in less than 8.5 minutes after confirmation of an engine fire (Tab CC-2), the MC would have to been less than 9 miles from the field based on the normal approach speed of the MQ-1 Predator. The only other option would have been to transfer control of the MRPA back to the Mission Control Element (MCE) for a Ku-band controlled attempt at a forced landing, which has never been attempted. The Launch and Recovery Element (LRE) loses control of the RPA when line of sight (LOS) control is lost. In this mishap, the LRE lost LOS control of the MRPA at 482 feet. Next, it is not common knowledge, even in the Predator pilot community, that a Predator engine fire fed by fuel and oil will most likely result in total loss

of control. The MP had no knowledge of previous Predator engine fie mishaps that resulted in total loss of control in less than 9 minutes (Tab V-9.6). The aircrew training program has one course that discusses previous mishaps as part of the Operational Risk Management class. It discusses a landing mishap and a weather-related mishap but no engine fire mishaps (Tab CC-3). The course is contractor developed and updated annually. There is no Predator Lessons Learned course that includes lessons learned from previous mishaps to include details extracted from SIB/AIB reports.

## 12. GOVERNING DIRECTIVES AND PUBLICATIONS

### a. Primary Operations Directives and Publications.

1. Air Force Instruction (AFI) 11-2RQ-1, Volume 1, RQ-1 Crew Training, 23 January 2002.
2. AFI 11-2MQ-1, Volume 2, MQ/RQ-1 Crew Evaluation Criteria, 18 July 2003.
3. AFI 11-2RQ-1, Volume 3, RQ-1 Operations Procedures, 28 February 2002.
4. AFI 11-202, Volume 1, Aircrew Training, 24 January 2005.
5. AFI 11-202, Volume 2, Aircrew Standardization/Evaluation Program, as supplemented, 17 June 2002.
6. AFI 11-202, Volume 3, General Flight Rules, 16 February 2005.
7. HOLDOVER – AFI 11-202, Volume 3, Air Combat Command (ACC) Supplement 1, 10 May 2004.
8. AFI 11-401, Flight Management, 15 December 2004.
9. AFI 11-418, Operations Supervision, 1 March 2002.
10. TO 1Q-1(R)B-1, 1 November 2003, USAF Series MQ-1B and RQ-1B Systems, Flight Checklist, with Change 3, 22 December 2004.
11. TO 1Q-1(R)B-1CL-1, 1 November 2003, USAF Series MQ-1B and RQ-1B Systems, Flight Checklist, with Change 3, 22 December 2004.

### b. Maintenance Directives and Publications.

1. AFI 21-101 1 JUNE 2004, Aerospace Equipment Maintenance Management
2. T.O. 00-20-1, Aerospace Equipment Maintenance Inspection, Documentation
3. T.O. 00-20-5, Aerospace Vehicle/Equipment Inspection & Documentation, 1 May 2000.
4. T.O. 1Q-1(M)B-6WC-1, Inspection Workcards for Pre-flight, Thru-flight, Basic Postflight and Combined basic Post/Preflight, Change 0, 31 March 2004.
5. T.O. 1Q-1(M)B-6WC-2, Inspection Workcards for 150hr Airframe, 25hr Engine, 60hr Engine, 360hr Engine, and 720hr Engine, Change 0, 31 March 2004.
6. T.O. 1Q-1(M)B-2-72JG-00-1, Job Guide for Engine General, Operational checks, Aft Engine Support, Aft Engine Mount, Upper Engine Cowl, and Lower Engine Cowl, Change 0, 31 Mar 2004.
7. T.O. 1Q-1(M)B-2-72JG-10-1, Job Guide for Carburetors, Carburetor Adjustment, Throttle Servo, Throttle Cables, Intake Manifold, and Plenum Chamber, Change 0, 31 Mar 2004.

8. T.O. 1Q-1(M)B-2-72JG-20-1, Job Guide for Ignition Module, Engine Kill and Ignition Relay Assembly, Spark Plugs, Spark Plug Wiring, Engine Sensors, and Starter/Alternator, Change 0, 31 Mar 2004.

9. T.O. 1Q-1(M)B-2-72JG-30-1, Job Guide for Cylinder Head, Cylinder Head Bolts, Lifters, Pushrods, Propeller Gearbox Backlash, and Magnetic Plug, Change 0, 31 Mar 2004.

10. T.O. 1Q-1(M)B-2-72JG-40-1, Job Guide for Exhaust Manifold/Pipes, Turbocharger, Wastegate Servo and Cable, Change 0, 12 Oct 2004.

11. T.O. 1Q-1(M)B-2-72JG-50-1, Job Guide for Cooling System, Engine Cooling Fan, Engine Bay Cooling System Check, Radiator/ Oil Cooler, Water Pump Housing Assembly, Engine Lubrication, Oil Filter, Oil Pump, and Turbocharger In-line Oil Filter, Change 0, 31 Mar 2004.

12. T.O. 1Q-1(M)B-2-61JG-00-1, Job Guide for Variable Pitch Propeller(VPP) Assembly, VPP Blade, VPP Servo, Shaft Bearing and Seal, Quill Shaft, and Rack Bridge Assembly, Change 0, 15 Nov 2004.

13. T.O. 1Q-1(M)B-2-24JG-50-1, Job Guide for Power Supply, Payload Power Distribution Module, and Battery Charger/Monitor Junction Board, Change 0, 15 Nov 2004.

14. T.O. 1-1-300, Acceptance/Functional Check Flight and Maintenance Operational Checks.

15. 57 WGI 21-250, Procedures for the Functional/Operational Check Flight Program and High Speed Taxi Check, 28 February 2004.

16. 57 WGI 21-250, Reference for Checklist used by QA.


**c. Known or Suspected Deviations from Directives or Publications.**

**(1) Crew.**

    (a) The MP did not set an angle of attack of a positive 2° as recommended by the flight manual to maximize glide-back range and set glide-back speed. However, this was not a significant factor in the outcome of the mishap.

    (b) Although the MP commanded the GCS Ignition to "Cold" to turn off the fuel pumps that were feeding the fire, the MP incorrectly actuated the ignition switch again which resulted in turning the fuel pumps back on during the engine fire. The MP did so based upon the erroneous data he observed. Since the only indication that the GCS Ignition was switched back to "Hot" is located on the HDD embedded with a host of other aircraft data, he was unaware of the current setting. As a result of this, fuel under pressure continued to be routed to the engine bay.

**(2) Maintenance.**

    (a) During installation of the #3 cylinder valve cover, the O-ring seal was pinched or cut which may have lead to an oil leak that provided combustible materials to increase the intensity of the engine fire. The improper installation likely occurred due to a distraction or inattention to detail during the valve cover installation.

(b) Inadequate technical data procedures allowed maintenance personnel to improperly route the SCAT hose that caused the FPS feed line to chafe.

(c) Current postflight inspections are not being completed properly in order to detect chafed fuel lines. One engine went 360 hours before any fuel chafing was detected (Tab CC-12). This also means numerous postflight/preflight inspections and 60-hr engine inspections were completed without detecting fuel line chafing. The fact that a one-time inspection of the Predator fleet at the FOL found 4 of 13 aircraft with undetected chafed fuel lines indicates a deficiency in the procedure resulting in the inability to properly conduct postflight inspections as currently written and a deficiency in the training of personnel required to perform such inspections.

## 13. NEWS MEDIA INVOLVEMENT

There was minimal media interest regarding this accident.

27 May 2005

HARRY J. BENDER, Lt Col, USAF
President, Accident Investigation Board

**STATEMENT OF OPINION**
**MQ-1L "PREDATOR" ACCIDENT**
**27 March 2005**

Under 10 U.S.C. 2254(d), any opinion of the accident investigators as to the cause of, or the factors contributing to, the accident set forth in the accident investigation report may not be considered as evidence in any civil or criminal proceeding arising from an aircraft accident, nor may such information be considered an admission of liability by the United States or by any person referred to in those conclusions or statements.

## 1. OPINION SUMMARY

There is clear and convincing evidence that this mishap was caused by fire in the engine compartment. There is substantial evidence the fire was caused by a fuel leak in the left forward part of the engine at the fuel priming solenoid (FPS) feed line caused by chafing against the Variable Pitch Propeller (VPP) servo cooling air hose (SCAT hose).

Although the FPS feed line and most other fuel and oil lines were destroyed by the fire (pre and post-impact), a one time inspection (OTI) of all Predator FPS feed lines was conducted on 30 March 2005 at the deployed location. The OTI revealed 4 of 13 chafed FPS feed lines, all chafed in the same location. The fuel backflow line and the turbo oil sump vent line, both lines being rubber hoses, run into the bulkhead near the SCAT hose. Also located near the FPS feed line is the main fuel supply line that runs into the fuel pressure regulator and the backflow line that takes unused fuel from the fuel pressure regulator.



Tab CC-9                          Tab Z-4

Once the FPS feed line failed from chafing, it sprayed fuel or fuel mist under pressure into the engine bay, onto the engine ignition module and left tail servomotor directly below it, ignited on a hot surface such as the cylinder, alternator or turbocharger, and began to consume the rubber fuel (main fuel supply and fuel backflow lines) and oil lines (turbo oil sump line, main oil supply line, turbo oil feed line). Within one minute of the fire, the engine oil pressure dropped from 60 psi to less than 20 psi, the turbo oil temperature and cylinder head temperatures spiked, fuel and oil were no longer being routed to the engine, and the fire disabled the ignition module on the left forward bulkhead, thereby causing engine failure. The fire grew to encompass the entire engine bay, the left tail plane servo unit, the propeller spinner area, the upper engine cowl and

lower engine cowl. As the left tail plane servo unit burned and weakened, it caused the left tail plane to oscillate inducing uncommanded pitch and roll changes. One minute after these uncommanded pitch/roll changes began, the left tail plane servo unit failed entirely and the left tail plane separated from the aircraft followed by departure from controlled flight. The total time from visual detection of the fire to departure from controlled flight was eight and a half minutes.

## 2. DISCUSSION OF OPINION

There is clear and convincing evidence that this accident was caused by an engine fire. There is substantial evidence that the primary cause of the engine fire was a fuel leak near the left forward part of the engine. At 22 hours and 20 minutes into the mission, a fire developed that catastrophically spread throughout the engine bay. Due to the intense heat and ferocity with which the fire spread, a fuel leak is the most likely cause of this fire.

Fuel is inherently more volatile than oil and the MQ-1 uses 100LL fuel (AVGAS). Furthermore, the MQ-1 uses synthetic engine oil which has a very high flashpoint. Although the aircraft and engine were heavily destroyed in the post-impact fire, video footage of the in-flight fire, post-impact analysis of the engine components, and the fact that the left tail plane servo unit burned causing the left tail plane to separate from the aircraft confirm the fire was most intense in the forward left area of the engine. The OTI of FPS feed lines confirmed four aircraft had FPS feed line chafing, all in the same place. This FPS feed line is on the forward left part of the engine on top of the plenum and it receives fuel from the fuel pressure regulator. The SCAT hose can be routed using several different routes to include one route that places the SCAT hose next to the FPS feed line and another route away from the line. There is little guidance on how best to properly route the hose when installing the engine. At one time, the SCAT hose was routed over the metal fuel line to the left carburetor but that practice was stopped once carburetor fuel lines began to chafe. Chafing of the FPS feed line caused the line to fail or leak fuel. Located directly next to this line is the fuel backflow line that takes unused fuel from the fuel pressure regulator and routes it back to the fuel tanks. Next to the backflow line and FPS line is the main fuel supply line into the fuel pressure regulator. In this area, the fuel or fuel mist found an ignition source from several possible sources (alternator, cylinder, and turbocharger). The failure of any of these lines would leak fuel to the engine bay compartment. In this mishap, the fuel pumps remained on and pumped fuel under pressure to the fuel pressure regulator and then to the engine compartment, thus feeding the fire. In fact, roughly seven pounds of fuel (a little more than a gallon) were consumed in one minute when the average fuel consumption for one hour is 20 pounds. Once this fire started, it consumed other combustible materials and was fanned by the ram air ports on the bottom of the lower cowl drawing flames and fuel throughout the engine bay. It likely burned through the turbo oil feed line or main oil supply line. Fuel continued to feed the fire since the fuel pumps were on.

The MP completed emergency procedures and pressed the Ground Control Station (GCS) ignition button to "Cold," turning off the fuel pumps. However, since the MP believed the engine had restarted, he commanded the GCS Ignition switch to "Cold" again as he attempted to bring the aircraft in for a recovery. In fact, this second activation of the GCS Ignition button turned the GCS Ignition to "Hot," and the fuel pumps were turned back on, feeding the fire. Since there is no dedicated on-board fire-detection system or fire-suppression system, pilots must

pull signs of engine problems from the Heads Down Displays (HDD), analyze the situation, and act quickly to set a course of action. The emergency procedures for engine fire in the Predator give little guidance, and they are not critical action, boldface procedures. Three previous engine fire incidents resulted in departure from controlled flight within eight minutes of an engine fire. Unless the aircraft is within roughly 5-7 minutes of landing, aircraft control will be lost before recovery.

There is substantial evidence that additional factors substantially contributed to this mishap: (1) An O-ring seal on the #3 cylinder valve cover was pinched or cut during installation. After holding a seal for three previous flights, it may have failed and leaked oil that collected in the lower engine bay cowl and provided combustible material to feed the fire. While it is possible this could have been the ignition source, it is unlikely due to the high flashpoint of the oil. The cause for the improperly installed O-ring was most likely distraction during the procedure or inattention due to the repetitive and simple nature of the procedure. (2) Engine Design. The rubber fuel and oil lines are exposed to extreme temperatures and likely to fail and be consumed quickly by fire. (3) The lack of a dedicated fire-detection system or fire-suppression system. Pilots have to extract information from sensor data displayed on the HDDs to determine if an engine fire is in progress. It does not display fire indications; only data from the engine sensors such as turbo oil temp, cylinder head temp, oil pressure, etc. A fire-suppression system may have put the fire, but since flammable liquids were still present, as well as ignition sources, it most likely the fire would have reignited. (4) The cockpit design for the GCS ignition button. The only means to verify activation of this button is displayed momentarily on the Head Up Display (HUD) and then is relegated to the HDD. It should be a two-position switch or similar item that shows GCS Ignition – Hot or GCS Ignition – Cold and displayed on the HUD as well. (5) Inadequate guidance in the T.O. for engine fires. There are no cautions discussing how quickly fuel and oil lines will fail during a fire in the engine bay, how the MTS has been used in previous mishaps to confirm fire, the amount of time remaining before flight controls may be lost, and reference to avoiding populated areas or actions to take in hostile territory. Had the MP known that loss of aircraft control was imminent, he may have attempted a forced landing in an attempt to minimize damage to the aircraft instead of trying to make it to the runway (6) inadequate technical data on the proper routing of fuel, oil, and cooling lines. All the maintainers interviewed stated there is little guidance for the proper routing of fuel, oil, and cooling air lines. The investigation showed there is no standardized routing procedure for the SCAT hose which led to chafing of the FPS feed line and subsequent fuel leak in flight, and (7). Current Postflight inspections are not being completed properly in order to detect chafed fuel lines. The fact that a one-time inspection found 4 of 13 aircraft at the FOL with undetected chafed fuel lines indicates a deficiency in the procedure, inability to properly conduct Postflight inspections as currently written, and a deficiency in the training of personnel required to perform such inspections.

Though not considered a substantially contributing factor to the mishap, the aircrew training program has a low fidelity mission task trainer for emergency procedures training. An improved training device would have exposed the crew to the characteristics of a catastrophic engine fire. This would have allowed them to practice/develop procedures that could lead to either successful recovery of the aircraft of actions that could have minimized the damage. In this mishap, the crew could not have successfully recovered the aircraft. The only option would have been to transfer control of the MRPA back to the Mission Control Element (MCE) for a Ku-band

controlled attempt at a forced landing, which has never been attempted. The Launch and Recovery Element (LRE) loses control of the RPA when line of sight (LOS) control is lost. In this mishap, the LRE lost LOS control of the MRPA at 482 feet. Next, it is not common knowledge, even in the Predator pilot community, that a Predator engine fire fed by fuel and oil will most likely result in total loss of control. The MP had no knowledge of three previous Predator engine fire mishaps that resulted in total loss of control in less than 8 minutes. The aircrew training program has one course that discusses previous mishaps as part of the Operational Risk Management class. It discusses a landing mishap and a weather-related mishap but no engine fire mishaps. The course is contractor developed and updated annually. There is no course related to Emergency Procedures training that includes lessons learned from previous mishaps to include details extracted from SIB/AIB reports.

27 May 2005

HARRY J. BENDER, Lt Col, USAF
President, Accident Investigation Board

Exhibit 3

Proposed Protective Order – Attached to Order Setting Jury Trial and Directing Pre-Trial Procedure

## IN T[ ] CIRCUIT COURT, SEVENTH JU[ ]IAL CIRCUIT,

## IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE NO.: 2001-30640-CICI

Judge Richard S. Graham

MARK GODFREY

and NICHOLAS GRACE,

    Plaintiffs,


PRECISION AIRMOTIVE

CORPORATION, et al.

    Defendants.

## PROPOSED PROTECTIVE ORDER

During discovery in this action, the undersigned parties may be required to produce documents, answer interrogatories and requests for admission, and provide testimony that might reveal confidential and proprietary business information and trade secrets that should not be disclosed except in a highly restricted manner. The parties desire to accomplish and facilitate discovery in this action without jeopardizing business and commercial interests in the confidentiality of this information. The undersigned parties therefore agree that:

1. The parties shall have the right to designate as "CONFIDENTIAL" any document, interrogatory answer, response to request for admission, deposition testimony, or other testimony given or produced in this litigation, provided that it concerns bona fide trade secrets, nonpublic financial information, research and development information, commercial information relating to future development plans or to competitive considerations, information relating to negotiations or transactions currently in progress or in prospect, or any other nonpublic, proprietary or confidential business information. Any document or information designated as "CONFIDENTIAL" (hereinafter "Confidential Material") shall have the legend "CONFIDENTIAL" placed on it and thereafter shall be treated in accordance with the provisions of this PROPOSED Protective Order.

Proposed Protective Order – Attached to Order Setting Jury Trial and Directing Pre-Trial Procedure

2. Confidential Material shall be used by the parties and their counsel solely for the purpose of conducting the above-captioned litigation, and shall not be communicated at any time, in any manner, directly or indirectly, to anyone other than a person qualified under the terms of this PROPOSED Protective Order as set forth in paragraph 3, below. The attorneys of record for the parties are responsible for employing adequate and reasonable measures to ensure compliance with this PROPOSED Protective Order.

3. Prior to trial, access to Confidential Material and to the information contained therein (including extracts and summaries derived from such material) shall be restricted to the following Qualified Persons:

a) the parties and their employees, officers and agents who are working on this litigation and whose assistance is required in the preparation of this matter for trial;

b) the attorneys working on this litigation on behalf of the parties, and their employees or agents working on this action;

c) experts and consultants who are employed or retained by any of the parties or their counsel to the extent necessary to investigate, prosecute, or defend this litigation, provided that such experts or consultants may not retain the Confidential Material after that use has ended, and further provided that such experts and consultants are advised of the existence of this PROPOSED Protective Order and given an opportunity to read it, and further provided that a party may disclose Confidential Material to its expert witnesses and consultants only after obtaining the person's express written acknowledgement to be bound by this Protective Order on the form prescribed in Appendix A;

d) deposition witnesses, provided that they are advised of the existence of this PROPOSED Protective Order and given an opportunity to read it;

e) private court reporting and document reproduction services;

f) the Court, jurors, court personnel and court reporters;

g) any person designated by mutual agreement of the parties, or by the Court in the interest of justice, upon such terms as the court may deem proper.

Proposed Protective Order – Attached to Order Setting Jury Trial and Directing Pre-Trial Procedure

4. The Qualified Persons described in paragraph 3 shall not include any competitor of any party, and every recipient of Confidential Material is hereby enjoined from disclosing such Confidential Material to any such competitor. Any such disclosure shall be deemed a material breach of this PROPOSED Protective Order, which may result in irreparable harm to the producing party.

5. The inadvertent failure of a party to designate discovery material as Confidential Material at the time of production shall not constitute a waiver of the party's claim to confidentiality as long as the party, upon discovery of such failure to designate, promptly designates such material as Confidential Material under the protection of this PROPOSED Protective Order. The recipient of such documents agrees to cooperate with the producing party to remedy the inadvertent failure to designate material as Confidential Material.

6. A party shall not be obligated to challenge the propriety of a confidentiality designation at the time made, and its failure to do so shall not preclude a subsequent challenge to such a designation. In the event that a party disagrees at any stage of these proceedings with another party's designation of any material as Confidential Material, the parties shall attempt to resolve such dispute in good faith on an informal basis. If the disagreement cannot be resolved in this fashion, a party may, by sealed motion setting forth with specificity the material challenged, seek an order freeing that material from the designation as Confidential Material. Any material as to which such a motion is made shall be treated as Confidential Material under the provisions of this PROPOSED Protective Order until further order of the Court.

7. This Protective Order shall not prevent Confidential Material from being offered or received as evidence at trial, subject to such confidentiality measures as the Court may then prescribe, if any. But for such use at trial, Confidential Material shall continue to be treated in accordance with this PROPOSED Protective Order. The use or admission of Confidential Material at trial shall not affect the right of the parties to designate the same or similar materials as Confidential Material in any other or subsequent litigation, civil action, or proceeding.

Proposed Protective Order – Attached to Order Setting Jury Trial and Directing Pre-Trial Procedure

8. In the event the any recipient of Confidential Material served with a subpoena, document request, or other request for the production of Confidential Material in other litigation, such recipient shall assert the existence of this Protective Order and refuse to produce such documents. The recipient of the request shall immediately notify counsel for the producing party and cooperate with such counsel to quash or prevent such disclosure.

9. Within thirty (30) days of the termination of this litigation, including settlement or the final determination of any appeal, all Confidential Materials and all copies, summaries, or excerpts thereof, shall be destroyed or returned to counsel for the producing party. Counsel for each party shall certify that he or she has recovered all Confidential Material from Qualified Persons to whom such materials may have been distributed during the litigation, including all copies that may have been made, and has destroyed or returned such documents to counsel for the producing party.

10. This PROPOSED Protective Order shall the termination of this litigation and the Court shall retain jurisdiction over the parties, their attorneys, agents and employees, to enforce the provisions hereof.

11. Nothing contained in this PROPOSED Protective Order and no action taken pursuant to it shall prejudice the right of any party to contest the alleged relevancy, admissibility or discoverability of the Confidential Material nor shall it prevent any party from using or disclosing its own Confidential Material for any purpose.


AGREED by the parties, by and through undersigned counsel, intending to be legally bound. [Signatures and identifying information to follow.]

Proposed Protective Order – Attached to Order Setting Jury Trial and Directing Pre-Trial Procedure

APPENDIX A

AGREEMENT OF CONFIDENTIALITY

I have read and am familiar with the Protective Order in the case entitled Mark Godfrey and Nicholas Grace v. Precision Airmotive Corporation, et al., Case No. 2001-30640-CICI, currently pending in the Seventh Judicial Circuit Court, in and for Volusia County, Florida. I hereby agree to abide and be bound by all of the terms of that Order and not to use or disclose any CONFIDENTIAL documents or information except in accordance with the terms of the Order.

I also agree to deliver to the counsel of record who has consulted or engaged me for this action, not later than fourteen days after the termination of this litigation, all documents in my possession or under my control designated CONFIDENTIAL, along with all copies thereof and all extracts and summaries of the matters contained therein.

[Signatures and identifying information to follow.]

KAMEELAH AL-AMIN, Administratrix of : COURT OF COMMON PLEAS the Estate
of Cylenna Terry, Deceased, and In : OF PHILADELPHIA COUNTY Her Own Right,
NAJWAA TERRY, and
LEWARGREA TERRY
        V.                  : JURY TRIAL DEMANDED
TEXTRON LYCOMING
RECIPROCATING ENGINE DIVISION, A
Division of AVCO CORPORATION,
TEXTRON, INC., AVCO CORPORATION,    DECEMBER TERM, 2002
BENDIX CORPORATION d/b/a BENDIX    ~~NO.~~ 003534
ENGINE PRODUCTS DIVISION, UNISON
INDUSTRIES, INC., ALLIEDSIGNAL, INC.,
HONEYWELL INTERNATIONAL INC.,
TELEDYNE CONTINENTAL MOTORS, INC., 'l
ELEDYNE TECHNOLOGIES, INC., 'l ELEDYNE
INDUSTRIES, INC., TELEDYNE, INC., and
ALLEGHENY TELEDYNE, INC.



AND NOW, this THIRD day of NOVEMBER,

2003, upon stipulation and agreement of plaintiffs and movants, the following is hereby

ORDERED and DECREED with regard to the production and protection of confidential

and proprietary information of defendants Teledyne Continental Motors, Inc., Teledyne

Technologies, Inc, Teledyne, Inc., Teledyne Industries, Inc. and Allegheny Teledyne, Inc.

(collectively "TCM" )[1], Bendix Corporation d/b/a Bendix Engine Products Division,

Allied-Signal, Inc., Honeywell International Inc.[2] that is disclosed by these defendants

throughout discovery proceedings in this case:

    (a) At the discretion of counsel, documents or information or parts thereof

designated as "confidential" will be stamped with the word "confidential" on each

page, or on the first of a collection or packet of pages produced as one document. In the

case where the first page of a multi-page document is stamped, each and every page

contained within such document shall be deemed confidential. All claims of

confidentiality shall be made in good faith by the party asserting the claim. Confidential

documents shall include trade secrets, formulae, patterns, devices or compilations of

information which are used in one's business that gives one an opportunity to obtain

an advantage over competitors who do not know or use it and information that is not known outside the owner's business or generally made available to the public.

(b) Documents or information designated "confidential shall be used only for purposes of the prosecution or defense of this lawsuit and shall be shown only to the parties' attorneys, the attorneys' staff including associates, clerks, paraprofessionals, secretarial personnel and clerical personnel; qualified persons taking testimony involving such information including necessary stenographic and videotape personnel; the parties; the parties' experts, consultants and investigators; and actual or proposed witnesses who have a need to review the documents or information for the prosecution or defense of this lawsuit.

---

[1] This Order will not be affected by the outcome of the Motion for Partial Summary Judgment filed by Defendants Teledyne Technologies, Inc, Teledyne, Inc., Teledyne Industries, Inc. and Allegheny Teledyne, Inc. [2] Allied-Signal, Inc. (which was renamed in 1993 as AlliedSignal Inc.) and Honeywell, Inc. merged in 1999. As a result of such merger, the former Honeywell became a wholly-owned subsidiary of AlliedSignal. At the effective time of the merger, AlliedSignal was renamed Honeywell International Inc.

2

103576.00840/21209763v1

(c) If a party believes that a document or information designated or sought to be designated confidential by the producing party does not warrant such designation, it shall first make a good faith effort to resolve such dispute with opposing counsel. In the event that such dispute cannot be resolved by the parties, either party may apply to the Court for a determination as to whether the designation is appropriate. The document or information shall be treated as confidential until the Court resolves the matter.

(d) At the time of deposition or within 30 days after receipt of the deposition transcript, a party may designate as confidential specific portions of the transcript which contain confidential matters. This designation shall be in writing and served upon all counsel. Transcripts will be treated as confidential for this 30-day period. Any portions of a transcript designated confidential shall thereafter be treated as confidential in accordance with this Order. In filing materials with the Court in pretrial proceedings, counsel shall file under seal only those specific portions of briefs, applications, and other filings which contain verbatim confidential data. Documents or information unintentionally produced without a designation of confidentiality may also be retroactively designated as such and shall be so treated from the date written notice of such designation is provided to the receiving party.

(e) All confidential documents and information produced in this lawsuit, and all copies thereof, shall be returned to the producing party within one hundred twenty (120) days after judgment becomes final in this lawsuit or payment, whichever is later, including any and all appeals, absent Court order to the contrary or if used as evidence at trial. In addition, the provisions of this Order restricting the use and communication

of confidential documents or information marked pursuant to this Order shall continue to be binding after the conclusion of this litigation.

(f) Nothing in this Protective Order, and no action taken pursuant to it, shall be deemed to preclude any party from seeking and obtaining, on an appropriate showing, any additional protection with respect to the discoverability or confidentiality of documents or other information, or prejudice the right of any party to contest the alleged relevance, admissibility or discoverability of documents or information that may be subject to this Order.

(g) This Protective Order is made for the purpose of discovery and pre-trial purposes only. The parties expressly agree that, in the event documents designated during discovery as "confidential" are to be used at trial and therein made part of a "public record," the confidential nature of such documents will be lost, and the burden will rest with the party seeking confidentiality to place such information under seal or otherwise protect the same from public disclosure.

(h) This Order shall not be used in any proceeding as evidence that the parties agree to its justification or necessity. This Order is merely a vehicle to facilitate on-going discovery.

Signed this 3rd day of November, 2003:

J.

*[signature]*

| | | |
|---|---|---|
| STEPHANIE RUEL ZAHORA, Co-Executrix of the Estates of Ronald Ruel and Denise Ruel, Deceased, et al. | : : : | PHILADELPHIA COUNTY COURT OF COMMON PLEAS |
| | : | JUNE TERM 2006 |
| Plaintiffs | : : | |
| v. | : | |
| | : | No. 003858 |
| PRECISION AIRMOTIVE CORPORATION, et al. | : : : | |
| Defendants | : | |

## ORDER APPROVING STIPULATED CONFIDENTIALITY AGREEMENT

AND NOW, this _____ day of _____, 2007, upon stipulation and agreement of the parties the following stipulation concerning the treatment of documents containing trade secrets or other confidential information is approved.

By the Court:

_____

J.

## STIPULATED CONFIDENTIALITY AGREEMENT

1.    This agreement to maintain confidentiality of certain documents is made for the purpose of discovery and pre-trial purposes only.

2.    The term "Protected Documents" or "Confidential Documents" shall include, but not be limited to, drawings, test reports, test proposals, and Type Inspection Reports or other

documents containing trade secrets. The designating party shall make all designations in good faith.

      3.     Access to materials designated "Confidential" or "Protected" and to the information contained therein shall be restricted to:

          (a)     The attorneys in the law firms appearing for the parties and personnel who are engaged by those firms who are assisting the attorneys working on this action;

          (b)     Those officers, directors, and employees of the parties, including the parties, whose assistance is required in the preparation of this litigation for trial and who must have access to the materials to render such assistance;

          (c)     Experts or consultants retained in connection with this action;

          (d)     The court and court personnel, including stenographic reporters engaged in such proceedings as are necessarily incident to the preparation or trial of this litigation;

          (e)     Such other persons as the parties to this litigation shall agree to in writing, or the court shall determine.

      5.     Each qualified person described in subparagraphs (b), (c) or (e) of the preceding paragraph to whom confidential, proprietary or protected materials are to be furnished, shown, or disclosed shall be provided with a copy of this Confidentiality Agreement. All such persons shall be bound by the terms of this Confidentiality Agreement, and shall not permit disclosure of the documents or the information contained therein other than pursuant to the terms of this Confidentiality Agreement.

      6.     Nothing in this Confidentiality Agreement shall be deemed to restrict in any way any party or its attorneys with respect to that party's own documents.

      7.     The party claiming confidential or protected status shall have the burden of establishing the same with respect to any document produced or created, but all parties agree to be bound by this agreement pending resolution of the document status, if such document status is challenged. It shall be the burden of the party claiming "confidential" or "protected" status within ten (10) days of a written demand challenging the "confidential" or "protected" status of a

document to make a motion to establish that such documents are deserving of confidential protection under the applicable law.

8.     This stipulation does not address the use of documents marked confidential at trial and it is the responsibility of the designating party to seek relief from the Court if necessary. This agreement in no way restricts a party's ability to use documents designated as confidential at trial. In the event documents designated during discovery as "confidential" are to be used as an exhibit to a motion, the document shall be filed under seal. However, if a court does not approve filing under seal the document may be filed of record and it will be the burden of the designating party to petition the court for appropriate relief.

9.     This Order shall not be used in any proceeding as evidence that the parties agree to its justification or necessity. This Order is merely a vehicle to facilitate ongoing discovery.

10.     The below listed parties may apply to the court for a modification of this Order at any time, and nothing in the order shall be deemed to prejudice their rights to seek modification. The Court shall retain jurisdiction to modify or strike this stipulation and order at any time during and after the litigation.

Bradley J. Stoll, Esquire
The Wolk Law Firm
1710-12 Locust Street
Philadelphia, PA 19103

*Attorney for Plaintiffs*

Jerrold P. Anders, Esquire
White & Williams LLP
1800 One Liberty Place
Philadelphia, PA  19103-7395

and

Clark Reed Nichols, Esquire
Mary Gaston, Esquire
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099

*Attorneys for Precision Defendants*

Scott Griffith, Esquire
Billet & Conner, P.C.
2000 Market Street, Suite 2803
Philadelphia, PA  19103-3201

and

Peter T. Kirchen, Esquire
Kern and Wooley, LLP
11100 Santa Monica Blvd., 7th Fl.
Los Angeles, CA  90025

*Attorneys for Kelly Aerospace, Inc. and Kelly
Aerospace Turbine Rotables*

Howard Klein, Esquire
Conrad O'Brien Gellman & Rohn
1515 Market Street
16th Floor
Philadelphia, PA 19102

and

Walter P. DeForest, Esquire
David J. Berardinelli, Esquire
DeForest Koscelnik Yokitis & Kaplan
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA 15219

and

Jeffrey W. Morof, Esquire
Bryan Cave, LLP
161 North Clark Avenue, Suite 4800
Chicago, IL 60601-3206

*Attorneys for Teledyne Defendants*

J. Denny Shupe, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Philadelphia, PA 19103

and

Michael H. Hull, Esquire
Maloney Bean Horn & Hull, P.C.
511 E. John Carpenter Freeway
Suite 440
Irving, TX 75062

*Attorneys for Aero Aviation Co. and A.E.R.O.,
Inc.*

John E. Salmon, Esquire
Salmon, Ricchezza, Singer & Turchi LLP
1700 Market Street, Suite 3110
Philadelphia, PA  19103

*Attorney for State Line Aviation*

Catherine B. Slavin, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

*Attorney for Textron Defendants*

BLANK ROME LLP
BY: DAVID N. ZEEHANDELAAR
Attorney I.D. No. 31923 LAURIE L.
ALBERTS Attorney I.D. No. 87884
One Logan Square Philadelphia, PA
19103-6998 (215) 569-5500

*#104*

*Attorneys for:• Defendants Bendix Corporation
dl b/a Bendix Engine Products Division,
Unison Industries; Inc., Allied-Signal, Inc.,
Honeywell International Inc., Teledyne
Continental Motors, Inc.; Teledyne
Technologies, Inca, Teledyne Industries, Inc.,
Teledyne, Inc., and _Allegheny Teledyne, Inc.*

j 0

**ORDER**

| | | |
|---|---|---|
| M. KATHLEEN WILSEY, as Executrix of the | : | |
| Estate of Alfred S. Wilsey, Jr., Deceased and | : | COURT OF COMMON PLEAS |
| M. KATHLEEN WILSEY, In Her Own Right, | : | PHILADELPHIA COUNTY |
| et. al. | : | |
| | : | SEPTEMBER TERM, 2007 |
| | : | |
| v. | : | NO.: 000586 |
| | : | |
| THE CESSNA AIRCRAFT COMPANY, | : | |
| et. al. | : | |

## CONFIDENTIALITY AGREEMENT AND STIPULATED PROTECTIVE ORDER

To preserve and maintain the confidentiality of certain documents, answers to interrogatories, and testimony to be produced by the parties to this litigation, it is hereby agreed by the undersigned parties and ORDERED as follows:

1.        Documents to be produced by a party to any other party or parties in this litigation, which contain protected, trade secret, proprietary, or competition-sensitive information shall hereinafter be referred to as "Protected Documents." When used in this Order, the word "documents" means material, whether produced as hard copy, computer diskette, CD-ROM, or otherwise. Except as otherwise indicated below, documents designated by a party as "Subject to Protective Order," "Confidential," "Proprietary," or a similar designation, which are produced or delivered by a party to any other party or parties and/or each party's respective attorneys, consultants, agents, or experts in this litigation shall be Protected Documents and given confidential treatment as described below. The attorney producing documents so designated shall provide at the time of production a certification from an attorney of record for the

producing party that they have reviewed and approved the "confidential" or "proprietary" designations and confirmed that such designations were made in good faith. When the first page of a multi-page Protected Document is so marked, each and every page contained within such document shall be deemed subject to this Protective Order. Any designation of a document as a Protected Document under this Order must be made in good faith.

      2.     Protected Documents shall be used only for purposes of the prosecution or defense of this litigation and shall be shown and/or communicated only to:

          a.     the parties' attorneys, the attorneys' staff, including associates, clerks, paraprofessionals, secretarial personnel, and clerical personnel;

          b.     qualified persons taking testimony involving Protected Documents, including necessary stenographic and videotape personnel;

          c.     the parties and their insurers, the parties' experts, consultants, and investigators;

          d.     those officers, directors, and employees of Cessna and other parties whose assistance is required in the preparation of this litigation for trial and who must have access to the materials to render such assistance;

          e.     such other persons as the parties shall agree to in writing, or the Court shall determine; and

          f.     the Court.

      3.     Each person (other than Court officials, the attorneys, clerical and support personnel employed by the attorneys in this litigation, and employees of third-party contractors involved in one or more aspects of copying, organizing, filing, coding, imagining, converting,

2

storing, or retrieving data or designating programs for handling data connected with this action) who is permitted to see the Protected Documents shall first be shown a copy of this Order. Such person shall agree in writing to be bound by the terms of this Order by signing a copy of the Confidentiality Agreement attached as Exhibit A hereto. Counsel for the party obtaining the person's signature on the Confidentiality Agreement shall retain the original signed agreement. In the event the parties hereto or their counsel are aware or become aware of any person (other than those exempted above) to whom Protected Documents have been shown or disclosed prior to such designation in this litigation or prior to the execution of this Order, counsel shall identify and inform those persons of the existence and terms of this Order and that unauthorized disclosure of the Protected Documents may constitute contempt of Court, and shall make a reasonable, good-faith effort to obtain a signed Confidentiality Agreement from such persons, in the form attached as Exhibit A hereto. Any Exhibit A executed by a non-testifying consulting expert need not be disclosed in this action via discovery or otherwise.

4.     All parties shall seek to have all parties to this litigation, whether presently a party or hereafter added, agree to be bound by the terms of this Protective Order. Those other parties shall become bound by the terms of this Protective Order by signing a joinder agreement substantially in the form of Exhibit B, which is attached hereto and is incorporated by reference herein. Upon signing that joinder agreement, a party shall be bound by the terms of this Protective Order to the same extent, as are all other parties. No confidential or protected document or material produced by parties in this litigation shall be produced to any other party in this litigation unless that party also agrees to be bound by this Protective Order or by other Order of Court.

5.       If a party believes that a Protected Document does not warrant such designation, the parties shall first make a good-faith effort to resolve such a dispute.  In the event that the dispute cannot be resolved, the objecting party may, by sealed motion setting forth with specificity the material challenged, seek an order freeing that document from the designation as a Protected Document.  Any document as to which such a motion is made shall be treated as a Protected Document under the provisions of this Order until further order of the Court.  In the event a motion is filed, the designating party bears the burden of establishing that the material should be treated as protected, as defined in this order, and that the protected document status should be maintained.

6.       At the time of deposition or within thirty (30) days after receipt of the deposition transcript, a party may designate as Protected Documents specific portions of the transcript which contain confidential matters.  This designation shall be in writing and served upon all counsel.  Transcripts will be treated as Protected Documents for this 30-day period.  Any portions of a transcript designated as Protected Documents shall thereafter be treated as such in accordance with this Order.  In filing material with the Court in pretrial proceedings, counsel shall file under seal only those specific portions of briefs, applications, and other filings which contain or summarize Protected Documents, or information therefrom.  Protected Documents unintentionally produced without the designation "Subject to Protective Order," or a similar designation, may be retroactively designated as such and shall be so treated from the date written notice of such designation is provided.

7.       Protected Documents and all copies thereof shall be returned to the producing party within ten (120) days after judgment becomes final in this litigation or payment, whichever is later, including any and all appeals, unless provided otherwise by Court Order.  In addition, the

4

provisions of this Order restricting the use and communication of Protected Documents, or the

information therein, shall continue to be binding after the conclusion of this litigation. Counsel

for any party receiving Protected Documents shall make a good-faith effort to recover Protected

Documents from those persons identified in paragraphs two and three of this Order to whom

such materials have been distributed during the litigation and to return such documents to

counsel for the party producing the Protected Documents. All copies containing notes or other

attorney's work product that may have been placed thereon by counsel shall be destroyed within

120 days of the final resolution of this litigation, at which time counsel for the respective parties

shall convey in writing to counsel for Cessna that such destruction has occurred.

8.    Nothing in this Stipulated Protective Order shall prejudice the right of any party

to contest the alleged authenticity, relevance, or admissibility of the Protected Documents, or to

seek relief from the Court from the provisions of paragraph seven of this Order. This Order shall

not prevent Protected Documents from being offered or received as evidence at trial, subject to

such confidentiality measures as the Court may then prescribe, if any. In the event Protected

Documents are used at trial and entered into evidence, they are no longer subject to this Order

and the burden shall rest with the producing party to seek Court assistance to place such

documents or information under seal or otherwise protect the same from public disclosure,

including requesting an order requiring return of any such documents. The use or admission of

Protected Documents at trial shall not affect the right of the producing party to designate the

same or similar material as confidential materials in any other or subsequent litigation, civil

action, or proceeding or the right of any party receiving Protected Documents to challenge the

designation if used and admitted into evidence at trial in this action. The parties agree that this

Order will not be used as precedent for the imposition of a stipulated protective order or the incorporation of provisions of this agreement in any other case, proceeding, or litigation.

9.      In the event that any recipient of Confidential Material is served with a subpoena, document request, or other request for the production of Confidential Material, such recipient shall assert the existence of this Protective Order and refuse to produce such documents.  The recipient of this request shall immediately notify counsel for the party who produced the Confidential Material and cooperate with such counsel to quash or prevent such disclosure.

10.      Nothing herein shall prevent a party from applying to the Court for modification of this Stipulated Protective Order, in any manner, upon good cause shown.

SO ORDERED this ____ day of _____, 2008.

BY THE COURT:

_____, J.

| | |
|---|---|
| _____<br>For Plaintiffs the Estate of Alfred S. Wilsey, Jr., M. Kathleen Wilsey, Patrick R. Wilsey, Shannon K. Wilsey, Nicholas G. Wilsey, the Estate of Richard J. Ongaro, Diane Ongaro, and Shannon Ongaro | _____<br>For Defendant Cessna Aircraft Company |
| _____<br>For Defendant McFarlane Aviation Products, Inc. | _____<br>For Defendant O&N Aircraft Modifications, Inc. |

6

## EXHIBIT A

**DECLARATION OF** _____

I, _____, being duly sworn, state that:

1.    My address is_____.

2.    My present employer is _____

      and the address of my present employment _____

      _____

3.    I have received a copy of the Protective Order Regarding Protected and
      Proprietary Information ("Order") in this case.

4.    I have carefully read and understand the provisions of the Order.

5.    I will comply with all of the provisions of the Order.

6.    I will hold in confidence and not disclose to anyone other than my support staff
      all documents designated "Subject to Protective Order," "Confidential," or
      similarly designated, that are disclosed to me under the Order.

7.    I will return all documents and information designated "Subject to Protective
      Order," "Confidential," or similarly designated and all copies thereof, which
      come into my possession, to the attorneys for the party by whom I am employed
      or retained, or to the attorney from which I received the documents and
      information.

8.    I understand that if I violate the provisions of this Order, I may be subject to
      sanctions by the Court, and that the parties, or any one of them, may assert other
      remedies against me.


Date: _____          _____
                                        DECLARANT

EXHIBIT "B"


JOINDER AGREEMENT


_____, by its counsel, hereby joins in and agrees to be bound by the

terms of the Confidentiality Stipulation and Protective Order by and between Cessna Aircraft

Company and the other parties in the matter of *Wilsey et al. v. Cessna Aircraft Co. et al.,* in the

Court of Common Pleas of Philadelphia County, Pennsylvania, September Term, No. 000586.


_____